**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

**Civil No.: 4:09-CV-40106-FDS**

_____
                                                        )
**CHRISTINE ZEOLLA, Individually and as**               )
**Administratrix of the Estate of Mario Zeolla,**       )
                                                        )
        **Plaintiff,**                                  )
                                                        )
**v.**                                                  )
                                                        )
**FORD MOTOR COMPANY,**                                 )
                                                        )
        **Defendant.**                                  )
                                                        )
_____)

**MEMORANDUM OF THE PLAINTIFF IN SUPPORT OF HER MOTION**
**TO EXCLUDE AS UNRELIABLE THE EXPERT TESTIMONY OF DEFENSE**
**EXPERT ELIZABETH H. RAPHAEL AND PORTIONS OF THE EXPERT**
**OPINIONS OF MICHAEL CARHART**

## I.      PRELIMINARY STATEMENT

Mario Zeolla, seated in the third row driver's side of a 2004 Ford Expedition, was killed

during a rollover accident.  Ford's biomechanical engineer, Elizabeth Raphael, opines that at the

point of the vehicle's initial contact with a Jersey barrier and before the rollover, Mario Zeolla

moved past the passenger side third row occupant, was fully ejected through the vehicle's third

row passenger side window, travelled through the air approximately 20 feet, struck a Jersey

barrier, bounced off the barrier, travelled approximately 17 feet to his final resting place, and was

killed when the vehicle rolled over him.  This opinion should be excluded because it is

unreliable, defies physics, and is based on pure speculation unsupported by the facts.

## II.     FACTUAL BACKGROUND

On June 2, 2007, the decedent, Mario Zeolla, and five of his friends were returning to

Albany, New York after attending a Red Sox/Yankees game at Fenway Park.  They all rode in a

2004 Ford Expedition owned and driven by Brendon O'Hara.  The Expedition was travelling

1

westbound on Route 90, the Massachusetts Turnpike, at approximately 9:10 a.m.   The Ford Expedition had no electronic stability control (ESC). The vehicle's side windows were made of tempered glass. The third row windows were not fixed to the vehicle's frame, but rather, were designed as hinged, "flip out" windows opened or closed by a driver controlled switch.   The Expedition was equipped with rollover canopy airbags only in the first and second rows, not the third row where Zeolla was seated.

The plaintiff alleges that Ford negligently and in breach of the implied warranty of merchantability failed to protect occupants of the third row to the same degree as occupants of the second row from the known propensity of the vehicle to rollover resulting in the full or partial ejection of an occupant.

The 2004 Expedition has three rows.   The occupants' seating positions and seat belt use were as follows:

| | |
|---|---|
| Brenden O'Hara (belted) | Jason Southworth (belted) |
| Larry Frederick (unbelted) | Joe Harrigan (unbelted) |
| Mario Zeolla (unbelted) | Noah Sorenson (unbelted) |

While Mr. O'Hara was driving in the left lane travelling at or below the speed limit, he saw a deer out of the corner of his left eye, coming quickly from the Eastbound lanes towards his Westbound lane.   He veered to the right to avoid the deer, steered the vehicle all the way to the right side of the highway, then corrected and veered all the way back to the left side of the highway, rotating (or "yawing") counter-clockwise.   Facing back towards the East, the right front corner of the Expedition struck the Jersey barrier that divides the Mass Pike from east and westbound travel.   The vehicle continued to yaw, and then the right rear of the Expedition struck

the barrier.  The vehicle then began to lift up and roll over.  It rolled only ¾ of a turn (first onto its driver's side, then the roof, then the passenger side) before coming to rest on its passenger door side.

The driver and front seat passenger were retained inside the vehicle, due to their seatbelts and the airbag deployment, with no injuries.  The middle passengers, again both unbelted, were retained inside the vehicle due to the airbag deployment and the strength of the windows, with no injuries.  Zeolla and Sorenson, who were unprotected from ejection, both died.

### III.    THE COMPETING EXPERT OPINIONS AND THE FRAMING OF THE *DAUBERT* ISSUE RAISED BY THE PLAINTIFF'S MOTION

A.  <u>The Accident Sequence.</u>

For purposes of this motion, the parties agree as to the accident sequence in terms of the movement of the vehicle.  The right front portion of the vehicle struck the Jersey barrier, causing the vehicle to pivot counter-clockwise with the rear right portion of the vehicle striking the Jersey barrier.   The initial contact with the Jersey barrier is depicted below:



3

The vehicle then entered into a three-quarter roll with the vehicle coming to a rest on its right or passenger side. The crash sequence is graphically depicted below by vehicle position locations 1-11.



B. <u>The Plaintiff's Experts' Opinion That Mr. Zeolla Was Partially Ejected And Killed During The Rolling Of The Vehicle.</u>

The plaintiff's experts opine that the left-side hinged tempered glass rear window of the vehicle (the window immediately to Mr. Zeolla's left) shattered during the three-quarter roll when Zeolla's body was pressed against the window. (Exhibit A: Batzer report at 5; Exhibit B: Bidez Report at 12). The plaintiff's biomechanical expert, Martha W. Bidez, further opines that during the three-quarter roll, Zeolla's head and shoulders were partially ejected through the right window portal, causing his head to be crushed between the road surface and the window frame. (Exhibit B: Bidez Report at 12). Ms. Bidez's opinion is based on testing in which a Ford Expedition with its third row windows removed was placed on a rotating "spit". She placed in Zeolla's third row driver side position someone of approximately the same height and weight, belted him, and then started to rotate the vehicle, to recreate the degree of roll in the crash. As can be seen from the below photo, the surrogate moved to the window, up and out, <u>even with a seat belt</u>, enough for his head to reach the roofline. Thus, the plaintiff claims that even if Zeolla was wearing his seat belt, he still would have been killed.



The image below shows the indentation in the metal roof line frame caused by the crushing of Zeolla's head against the pavement.[1]



---

[1] Ford's experts agree that the indentation was caused by the crushing of Zeolla's head between the metal frame and the roadway, but they opine that the crushing occurred when the vehicle rolled over Zeolla after he was ejected from the vehicle when the vehicle made initial impact with the Jersey barrier at position point 7.

C.  The Canopy Airbags.

The subject Expedition was equipped with first and second row canopy airbags.  These airbags deploy when a sensor triggers that the vehicle is about to roll over.  The canopy airbags drop down like a curtain covering the windows in the second and third row and are intended to prevent a person from being completely or partially ejected in the event that the tempered glass windows shatter.  The experts for both parties agree that the canopy airbags would have deployed during the rollover event in this case.

The plaintiff contends that Mr. Zeolla's head would not have exited the open portal and been crushed between the frame and the pavement if Ford included third row canopy airbags in the design of the vehicle or if the window was designed with fixed tempered glass as opposed to the hinged window design.  (Exhibit B: Bidez Report at 12-13; Exhibit A: Baltzer report at 5-7).  This is best demonstrated by the fact that the tempered glass and canopy airbags installed in the second row prevented the two occupants from being ejected or partially ejected from the vehicle during the rollover sequence.  Thus, under the plaintiff's theory of liability, the installation of third row canopy airbags and fixed tempered glass windows would have prevented Zeolla's death and Ford's failure to include those devices in the design of its vehicle was a proximate cause of his death.

D.  Ford's Unreliable Expert Opinion That Mr. Zeolla Was Fully Ejected From The Vehicle On Its Initial Impact With The Jersey Barrier.

According to Ford's expert, the third row passenger side window shattered at impact with the Jersey barrier at position No. 7.  (Exhibit D: Carhart Report at 17).  Ford's expert, Elizabeth Raphael, theorizes that Mr. Zeolla was fully ejected from the vehicle instantaneously with the vehicle's initial conduct with the Jersey barrier at position No. 7.  That is, upon initial impact with the barrier, Zeolla moved across the rear seat from left to right, went past Mr. Sorenson, who remained in the right rear seat of the vehicle at impact, flew through the right window at a speed of 48 miles per hour, flew at least 20 feet into the Jersey barrier leaving a blood stain, bounced off the Jersey barrier, and travelled at least 17 feet before coming to a rest.  The vehicle

then rolled over Mr. Zeolla and crushed his head.   (Exhibit F: Raphael Report at 5-6; Exhibit D: Carhart Report at 22).

By asserting this theory, Ford seeks to render the absence of the canopy airbags and the hinged window irrelevant.   According to Ford, because canopy airbags are not designed to deploy upon impact with the Jersey barrier and Mr. Zeolla was fully ejected from the vehicle at the moment of impact with the barrier, including the airbags in the third row of the vehicle would not have prevented Mr. Zeolla's death.   (Exhibit F: Raphael Report at 7; Exhibit D: Carhart Report at p. 22; Exhibit E: Croteau Report at 13-14).   Further, Ford maintains that even a fixed window would not have prevented Zeolla's ejection through the passenger-side window.

Thus, according to Ford, the presence of seatbelts rendered the vehicle reasonably safe in preventing occupant ejection and Zeolla's failure to wear his seatbelt was the sole cause of his death.[2]

## IV.   ELIZABETH RAPHAEL'S EXPERT OPINION AND DEPOSITION TESTIMONY

A.   Ms. Raphael's Expert Report.

Ms. Raphael opines as follows in her export report:

> As the vehicle next impacted its right front corner with the center barrier [the initial impact], a large impact force stopped the impending inbound motion of the vehicle toward the barrier.   The barrier showed evidence of scarring, but not moving as a consequence of this collision (cf., 10 and 11 of 76, from the Massachusetts Police on-scene photographs.) During this impact, Mr. Zeolla, unrestrained, moved violently toward the third row right side window, which was fractured from the inside-to-out direction, according to the glass fracture reconstruction of Dr. Michael Carhart.   After Mr. Zeolla's impact with and fracturing of the glass, Mr. Zeolla was ejected from the vehicle and thrown downstream of the vehicle's path, toward the center barrier.   Mr. Zeolla's body then collided with the center barrier, as evidenced by the presence of blood on the barrier itself (cf., 13 and 14 of 76, from the Massachusetts Police on-scene photographs).   The speed of this body-to-concrete impact

---

[2] Under Massachusetts law, "[t]he failure to wear a properly fastened safety belt shall not be considered as contributory negligence or used as evidence in any civil action."   St. 1993, c. 387, § 3.   Raphael opines that Zeolla would not have been ejected as she describes if he was wearing his seatbelt.   The plaintiff reserves the right to exclude via a motion *in limine* (due January 16, 2013) Raphael's opinion as inadmissible evidence that Zeolla was not wearing his seatbelt.

would exceed the speed of the vehicle at this point, since the vehicle has slowed down from the interaction with the barrier and subsequent yawing.

After its impact with the barrier, Mr. Zeolla's body then rebounded, tumbled, and slid to its point of rest.  As Mr. Zeolla's body came to rest, the Expedition, upstream of Mr. Zeolla's rest position, began to approach Mr. Zeolla, as the vehicle rotted through its yaw and began to roll, driver's side leading.

As the Expedition rolled, it encountered Mr. Zeolla's body in its path, and subsequently rolled over his body near the ¼ to ½ roll position.  The vehicle then continued its roll, coming to rest at the ¾ roll position, downstream from Mr. Zeolla's body.  (Exhibit F: Raphael Report at 6-7).

B.   Ms. Raphael's Deposition Testimony.

(i)      The Movement of the Occupants.

1.  The second row passenger side (right side), Joseph Harrington, remained in his seated position when the vehicle first impacted the Jersey barrier at location point No. 7 and throughout the entire crash sequence.  (Exhibit C: Raphael Dep. at 19-20, 23-24).  The centrifugal forces would have pulled his body back toward the third row and to the right.  (Id. at 24).

2.  The second row passenger, Larry Frederick, who was seated in front of Mr. Zeolla on the left/driver's side of the vehicle, ended up in the third row seat during the accident sequence. Raphael testified that beginning at position point 6 and through the crash sequence at position 7-8, the centrifugal forces would have pulled Frederick to the rear of the vehicle toward the third row.  (Id. at 20-22, 24-25).

3.  At position No. 7, the moment of impact with the Jersey barrier, the centrifugal forces would have further pulled Frederick back to the rear of the vehicle toward the third row.  This pulling back to the rear would have continued through vehicle positions Nos. 8 and 9.  (Id. at 22-23).  Mr. Frederick entered the third row at position point No. 9.  (Id. at 26).

4.   At position Nos. 7-8, Noah Sorenson, who seated in the third row right/passenger side, would have had "some forward motion" and moving rightward with a portion of his body up against and blocking a portion of the right-side rear window.  (Id. at 32, 34).  The force of

Mr. Sorenson's body would have caused the tempered glass right-side third row window to shatter at positions Nos. 7-8. (Id. at 36).

5. At position point 9, Sorenson's body would have been "pocketed" in the corner of the seat by his movement backwards into the corner between the seatback and the sidewall of the vehicle. (Id. at 34). Sorenson's body never became airborne until the end of the rollover sequence at points 10-11. (Id. at 39).

6. Between position Nos. 6 and 7, but before impact with the Jersey barrier, Mr. Zeolla would have slid over to the middle of the third row seat. (Id. at 43-44). At position 7 and upon impact with the Jersey barrier, Mr. Zeolla's body became airborne and flew directly to the right—with no backwards motion—across Mr. Sorenson's body which is pressed against the right window and the corner of the seat. After passing Sorenson, Zeolla flew directly out the right window where he travelled in the air until he struck the Jersey barrier leaving a blood stain. (Id. at 44, 46-47, 70, 74-75, 78). Zeolla was out of the vehicle within "milliseconds" after the initial impact at location point 7. (Id. at 92). Mr. Zeolla's body was travelling at "enormous velocity" down the road at a speed of 48 miles per hour when ejected from the vehicle. (Id. at 51, 98-99).

7. Although Ms. Raphael did no calculation, she concluded that Mr. Zeolla had "plenty of room to get him out the window despite the fact Mr. Sorenson was to his right." (Id. at 45).

   (ii)    The Blood Stain

8. By looking at a State Police photograph (attached as Exhibit G), Raphael concludes that certain dark spots on the road are a trail of "passively dripped" blood from Mr. Zeola left behind as he travelled to his final resting spot on the roadway. (Id. at 48-49).

9. No DNA testing was done to determine whether the blood stain on the Jersey barrier and on the road was that of Mr. Zeolla or Mr. Sorenson. (Id. at 54).

   (iii)    Zeolla's Rebound Off the Jersey Barrier

10. Mr. Zeolla's final resting place is the location of the white towels depicted in the photograph attached as Exhibit H. (Id. at 50). Based on Mr. Carhart's own animation, Mr. Zeolla would

have rebounded off the Jersey barrier and travelled at approximately 17 feet to his final resting point. Ms. Raphael admitted that she did not analyze "what happened to [Mr. Zeolla] after he hits the barrier" or how he ended up at his final resting point. (Id. at 75).

11. During the three-quarter roll event, Ms. Raphael concludes that the vehicle rolled over Mr. Zeolla crushing his head and injuring his chest. (Id. at 52). The indentation in the metal frame above the left/driver's side window was caused by the crushing of Mr. Zeolla's head between the upper window frame and the pavement during the roll of the vehicle. (Id. at 52-53, 88-89).

12. The medical records and autopsy did not indicate that Mr. Zeolla sustained fractures of the ribs, sternum, or tears in the lungs or diaphragm. (Id. at 64).

13. The cause of death was blunt head trauma. (Id. at 69).

C. Ford's Calculation Of The Number Of Feet Zeolla's Body Travelled After Striking The Jersey Barrier.

Ford's expert, Mr. Carhart, testified in his deposition that he did not calculate the distance Mr. Zeolla travelled from his seated position at the point of the vehicle's initial impact with the Jersey barrier and his collision with the barrier. Raphael's report is silent on this issue. However, Mr. Carhart's animated reconstruction of the crash sequence depicts Zeolla striking the barrier at the location of a blood stain on the Jersey barrier depicted in the photograph attached as Exhibit H. The animation shows Zeolla's body (depicted as a green ball) striking the Jersey barrier at the blood stain depicted in Exhibit G and bouncing off the barrier and travelling 17 feet before coming to a rest. (Exhibit Q). This distance is determined by reference to Exhibit R which shows that the distance from the blood stain on top of the Jersey barrier is equal to the length of the vehicle itself, approximately 17 feet.[3]

_____

[3] Mr. Carhart's determination of the location of Zeolla's resting point is consistent with measurements taken by the State police at the scene indicating that Mr. Zeolla's body came to rest approximately 7-8 feet from the Jersey barrier. The distance from the Jersey barrier to the rear of the vehicle at its final resting point is 3.5 feet. (Exhibit J: two measurements by the State Police). A State Police photograph visually indicates that the final resting place of Zeolla's body, depicted by the towels on the ground, was at least twice as far from the Jersey barrier than

## V.    ARGUMENT

## A.  STANDARD OF REVIEW

In performing its gate-keeping role to rid a trial of "junk" science, "the trial judge must insure that the expert's opinion is based upon 'more than subjective belief or unsupported speculation. Proposed testimony must be supported by appropriate validation- i.e., good grounds, based on what is known." *Poland v. Bayer Corp.,* 122 F.Supp.2d 63, 66 (D.Mass. 2000), quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 590 (1993). "Where 'scientific knolwedge' is at issue ... '[k]nowledge connotes more than a subjective belief or unsupported speculation, but refers to a body of known facts or a body of ideas accepted as truths on good grounds." *Daubert, supra.*

A trial judge must not admit expert opinion evidence "where there is simply too great an analytical gap between the data and the opinion proffered." *General Elect. Co. v. Joinder,* 522 U.S. 136, 146 (1997). Thus, the court's gate-keeping function is not limited to assessing the expert's methodology; but rather, the court must considers the expert's conclusions. *Ruiz-Troche v. Pepsi Cola Bottling Co.,* 161 F.3d 77, 81 (1st Cir. 1998). "[T]rial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Id.* See *Samaan v. St Joseph Hosp.,* 670 F.3d 21, 32 (1st Cir. 2012)("the scope of the *Daubert* hearing is not limited to an appraisal of the expert's credentials and techniques but also entails an examination of his conclusions to determine whether they flow rationally from the methodology employed").

## B.  MS. RAPHAEL'S EXPERT OPINION ON THE MOVEMENT OF MR. ZEOLLA'S BODY IS SPECULATIVE AND UNRELIABLE

There are simply too many analytical gaps and speculative assumptions contained in Ms. Raphael's opinion, adopted by Carhart, to permit its submission to the jury. Raphael's theory

---

the rear of the vehicle at its final resting place. (Exhibit H: Photograph). The State Police Reconstruction Report states that the paved breakdown lane is approximately 9.83 feet. (Exhibit K: page 5 of State Police Report). It appears from the State Police photograph (Exhibit H) that Zeolla's resting place was approximately 2 feet within the breakdown lane.

depends upon reliable, scientific proof that several distinct kinetic events occurred in an unbroken chain.   First, that the kinematic movements of Zeolla's and Sorenson's body in the vehicle upon the vehicle's initial impact with the Jersey barrier at position point No. 7 allowed Zeolla's body to slide past Sorenson's body and out the window.   Second, that Zeolla's body flew through the air an undetermined number of feet and struck the Jersey barrier.   Third, that Zeolla's body, travelling at a speed of 48 miles per hour, bounced off the barrier and travelled approximately 17 feet to its final resting point.   Because Raphael cannot reliably and scientifically explain that each one of these links in Ford's chain of events occurred, her entire opinion that Zeolla was ejected from the vehicle on initial impact with the Jersey barrier is likewise unreliable.   In short, under Raphael's own testimony, the laws of physics, and the facts, Raphael's opinion cannot be validated and is based on nothing more than unsupported speculation and subjective belief.

1.  <u>Raphael and Carhart Have Not and Cannot Scientifically Explain How Mr. Zeolla Travelled At Least 17 Feet After Striking The Jersey Barrier.</u>

Raphael admits in her deposition that she did not even attempt to conduct an analysis of how Mr. Zeolla travelled to his resting point after impacting the Jersey barrier.  (Exhibit C: Raphael Dep. at 75).   Specifically, she testified that "[w]e know his point of rest is (*sic*), but I'm not going to depict what happens to him precisely after he hits the barrier because I don't know what that is."  (Id. at 75).

Thus, Raphael has failed in her report or in her deposition to explain the kinetics and forces that would warrant a reliable conclusion that Zeolla's body would have travelled approximately 17 feet to its resting place after striking the Jersey barrier at a speed of 48 mph.   This is a perfect example of an expert vouching for the reliability of her opinion based only upon "the *ipse dixit* of the expert" and not upon scientific analysis.  *General Elect. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct.512, 519 (1997).

This failure is fatal to the reliability of her opinion that Mr. Zeolla's body was ejected on the vehicle's initial impact with the Jersey barrier and struck the barrier.   Ford's theory is that Zeolla

was killed when the vehicle rolled over his body and crushed his head after Zeolla was ejected from the vehicle, struck the Jersey barrier, and his body travelled to it final resting place.  Ford's failure to proffer any opinion or evidence explaining how Zeolla travelled 17 feet after striking the barrier and coming to his final resting place renders Ms. Raphael's opinion that Zeolla was ejected at the initial impact and collided with the barrier unreliable and speculative.

The plaintiff's biomechanical expert, Martha W. Bidez, Ph.d., opines that a human body of Mr. Zeolla's size hitting a Jersey barrier at 48 mph would come to rest against the barrier itself. Specifically, she states in her report that:

> Dr. Raphael testified that Mario Zeolla likely exited the vehicle through the right, rear passenger window at a speed of 48 mph (21.5m/s) and then he subsequently bounced off the median and tumbled into the roll path of the vehicle.  A human-to-median impact speed of 48 mph is essentially the same as a <u>human jumping out of a 6-story building and landing on a concrete parking lot</u>.  Under such conditions, the impact would be an almost plastic collision, akin to throwing clay against **a wall.  Under Dr. Raphael's scenario, Mario Zeolla would have sustained massive**, visible skeletal fractures throughout his torso and extremities and he would have been found at final rest lying against the median [barrier].  (Exhibit L: Bidez Supplemental Rebuttal report at 7)(emphasis in original).

2. <u>The Medical Evidence Disproves Raphael's Theory That Zeolla Was Ejected On The Vehicle's Initial Impact With The Jersey Barrier And That His Body Struck The Barrier.</u>

As explained by Dr. Bidez, a 48 mph impact with a Jersey barrier would cause multiple visual bone fractures.   The two primary injuries suffered by Mr. Zeolla were a head decompression—which was the cause of death—and subcutaneous emphysema.   Raphael testified that subcutaneous emphysema is defined as the presence of air below the skin in the chest cavity that escaped from the lungs caused by a serious chest injury.  (Exhibit C: Raphael Dep. at 58, 65-66).  The hospital medical records and the autopsy report do not mention the presence of any bone fractures or a deformity suggestive of a fracture.  (Exhibit M: Medical Records; Exhibit N: Autopsy Report).   The only fracture noted in the autopsy report is a "probable depressed" head fracture.  (Exhibit N: Autopsy Report).  This single fracture does not warrant a reliable opinion that Zeolla struck the barrier at a speed of 48 mph.  Dr. Bidez further explains in her rebuttal report that the absence of fractures disproves Raphael's theory:

Mr. Zeolla's torso injuries, including the subcutaneous emphysema, are consistent with an ejected person impacting a roadway and sustaining a basilar skull fracture. Only his head was trapped between the roadway and the Expedition. The Medical Examiner recorded only one part of Mr. Zeolla's body which exhibited obvious deformity, a "probable depressed" fracture on the right side of his skull (see Medical Examiner's diagram below). Notably, there is no further reference to an obvious deformity (i.e. fracture) to any other bone in Mr. Zeolla's entire body in any medical record. Also no organ injuries consistent with being crushed by an SUV were recorded. (Exhibit O: Bidez Rebuttal Report at 3).

3. Raphael's Failure To Scientifically Explain How Mr. Zeolla Flew In The Air An Undetermined Distance From The Vehicle To The Jersey Barrier Renders Her Opinion Unreliable And Speculative.

Ford's experts have not calculated or disclosed the number of feet between Zeolla's point of ejection from the vehicle and point of impact with the Jersey barrier. Carhart's graphic animation, using the length of the vehicle as a guide, indicates that the distance is approximately 20 feet. (Exhibits R and Q). Regardless of the exact distance, Raphael's report and her deposition testimony fails to provide any calculation or scientific kinetic analysis explaining how Zeolla could have flown the distance between the vehicle and the blood stain on the Jersey barrier. Her expert report fails to even acknowledge that, under her theory, Zeolla flew through the air for a substantial distance. Without a calculation that Zeolla's body, on the laws of Physics, could have travelled from the vehicle to the barrier, Raphael's theory that Zeolla was ejected from the vehicle at position 7 and struck the barrier is nothing more than speculation.

4. Raphael's Opinion That Sorenson Did Not Block Zeolla's Ejection Through The Right Side Window Is Unreliable, Speculative, And Contradicted By Her Own Deposition Testimony.

It is obvious that Mr. Zeolla could not have been ejected from the vehicle at the moment the vehicle first impacted the Jersey barrier if Mr. Sorenson—who all experts agreed remained in the vehicle at positions 7-9—blocked the window opening or slowed Zeolla's moment such that he could not have travelled approximately 20 feet before striking the barrier. Raphael opines that at the moment of impact at location point 7-8, Mr. Zeolla was able to completely move past Mr. Sorenson because Sorenson was "pocketed in the corner" of the right seat and the interior wall of

the vehicle.  (Exhibit C: Raphael Dep. at 44-45).  Raphael's opinion is disproved by her own expert testimony.

Raphael testified that Sorenson did not become "pocketed" in the corner—thereby permitting Zeolla to freely pass by him—until the vehicle was at position point 9 (Id. at 34).  Thus, the "pocketing" did not occur until *after* Zeolla—according to Raphael—had already been ejected. (Id. at 34-44, 46-47, 70, 74-75, 78).  Raphael testified that at the moment of impact at point No. 7-8 and at the moment of Mr. Zeolla ejection, Sorenson would have had "some forward motion" with his body moving rightward against the window.  (Exhibit C: Raphael Dep. at 32, 34).  She fails to offer any opinion whether Sorenson—in his slightly forward position leaning against the window—would have permitted Zeolla to physically pass by him and out the window at the moment of impact at position 7.  This failure renders her opinion that Zeolla had "plenty of room" to pass by Sorenson unreliable and speculative.[4]

Further adding to the speculative nature of her opinion is Raphael's admission that she did not conduct any analysis or make any calculations to determine Mr. Sorenson's movements. (Exhibit C: Raphael Dep. at 34-35).  She further testified that she did nothing to calculate how much of the window Mr. Sorenson was blocking and simply concluded that there was "plenty" of room for Zeolla to pass in front of Sorenson and out the window.  (Id. at 45).  Once again, Ford requests that this Court admit Raphael's opinion that Sorenson was not blocking the window simply because its expert says so and without any reliable scientific analysis supporting her opinion.  This is precisely the type of unsubstantiated opinion evidence that must be excluded as unreliable. *General Elect. Co. v. Joiner, supra.*

---

[4] Even assuming that, at the moment of impact and Zeolla's ejection, Sorenson was pocketed in the corner of the third-row seat, it is inconceivable that Zeolla would not have been blocked by Sorenson.  According to Raphael, Zeolla had moved in the center of the seat immediately next to Sorenson at position 6 before impact with the Jersey barrier.  (Exhibit C: Raphael Dep. at 43-44). Thus, in that close position to Sorenson, logic dictates that he would have been subjected to the same forces being applied to Sorenson.  Thus, Zeolla's body would have been moving back and toward the right, pocketing himself against Sorenson.  This is entirely inconsistent with Zeolla passing in front of Sorenson and exiting through the window.

The plaintiff's expert has offered the opinion that Sorenson would have blocked Zeolla's body.  She opines that:

> Mr. Sorenson's original seated position would have blocked the right side window.  The photograph [which is reproduced below] illustrates how the side window is blocked by a person the size of Mario Zeolla.  (Exhibit O: Bidez Rebuttal Report at 1).



5.  <u>Raphael's Opinion That Zeolla Moved Violently To His Right And Through The Right Side Window Is Contradicted By Her Opinion On The Movement Of All Other Occupants Of The Second And Third Row.</u>

Raphael's theory as to the movement of Zeolla at position points 7-8 is entirely inconsistent and different than the movement of Frederick and Harrigan, the two second row passengers, and Mr. Sorenson, the right side third row passenger.  Raphael opines that the second row right side passenger, Joseph Harrington, remained in his seated position when the vehicle first impacted the Jersey barrier at location point No. 7 and throughout the entire crash sequence.  (Exhibit C: Raphael Dep. at 19-20, 23-24).  The centrifugal forces would have pulled his body back toward the third row and to the right.  (Id. at 23-24).

The second row passenger, Larry Frederick, who was seated in front of Mr. Zeolla on the left/driver's side of the vehicle, ended up in the third row seat during the accident sequence.  Raphael testified that beginning at position point 6 and through the crash sequence at position 7-9, the centrifugal forces would have pulled Frederick backwards to the rear of the vehicle toward the third row.  (Id. at 20-22, 24-25).

As for Sorenson, Raphael opines, as discussed above, that from points 7-9, he would have moved somewhat forward and to his right and then backwards and to the right into the corner of his seat and against the rear window.  As to Zeolla, however, Raphael opines that during the impact at point 7, Zeolla, unlike all other second and third row occupants, had no backward motion.  Instead, she concludes that Zeolla's body moved directly and sharply to the right, past Sorenson's body, and through the window.  Raphael provides no explanation why, at the moment of impact with the Jersey barrier, Zeolla did not move backwards and to the right, like all other occupants.  If he had moved backwards, like Sorenson, he would have struck Sorenson's body, blocking his ejection out the window.

6.  Raphael Fails To Reliability Explain Why Sorenson Was Not Ejected.

If Raphael's theory that Zeolla moved violently to his right and through the window at point 7 was correct, Sorenson would have done the same.  Raphael admits that at position point 6, immediately prior to the impact with the barrier, Zeolla had moved to the center of the seat and was hip to hip with Sorenson at impact.  (Exhibit C: Raphael Dep. at 43-44).  If Zeolla moved violently to his right and through the window, Sorenson would have been ejected through the window before Zeolla.  As explained by the plaintiff's expert, Ms. Bidez, "if Ford was correct that Mr. Zeolla was ejected out the right side window, the laws of Physics would have necessarily caused Mr. Sorenson to be ejected before Mr. Zeolla."  (Exhibit L: Bidez Supplemental Report at 1).  Instead, Raphael conveniently concludes that Sorenson's body was pressed backwards and to the rear, presumably keeping him in the vehicle at impact at position points 7-8, while Zeolla's body inexplicably had no backward motion at all, causing him, not to press against Sorenson, but rather, to move immediately rightward and past Sorenson and through the window.

According to the plaintiff's expert, Ms. Bidez, Zeolla's violent rightward motion with no forward or backward movement directing his body away from the window could not have physically occurred unless the passenger side of the vehicle impacted the Jersey barrier flush at 90°, and not the 46° degrees calculated by defense expert, Mr. Croteau.  (Exhibit O: Bidez

Rebuttal Report at 2).    Using the same free particle simulation used by Raphael, Ms. Bidez further concludes in her supplemental rebuttal report that Sorenson would have been ejected before Zeolla.  (Exhibit L: Bidez Supplemental Rebuttal Report at 2-3).

7.  The Presence Of Blood On The Jersey Barrier Does Not Support Raphael's Opinion That Zeolla Was Ejected Through The Right Side Window.

Raphael admits that the presence of blood on the Jersey barrier is the only physical evidence that Zeolla struck the barrier after being ejected from the right window on initial impact with the barrier.  (Exhibit F: Raphael Report at 6).   However, Raphael admits in her deposition that no tests were ever conducted to determine that the red substance on the barrier was blood and, if so, whether it was the blood of Zeolla, Sorenson, or some other person or animal.   (Exhibit C: Raphael Dep. at 54).   Therefore, it is speculative to conclude that it was Zeolla's blood on the barrier.  As stated by the plaintiff's expert:

> The blood noted on the Jersey barrier is more likely than not a result of head impact by Noah Sorenson during partial ejection at position 10 according to Croteau's vehicle trajectory. Given the vehicle's rotation, centrifugal force would have been pulling Mr. Sorenson rearward as well as outward through the open ejection portal.  (Exhibit O: Bidez Rebuttal Report at 3).

8.  Raphael's Opinion Is Inconsistent With The Factual Statement Of An Eyewitness To The Accident.

John Kaminski, an eyewitness to the accident, was travelling behind the O'Hara vehicle when it made contact with the Jersey barrier.  He stated the following in his police statement:

> At approximately 9:10 a.m., my girlfriend and I were driving west on I-90 in the slow lane. A black SUV passed in the fast lane travelling at least 70 mph.  This car was 100 ft ahead when it quickly moved into the middle lane and hit the breaks.  The car then swerved right, narrowly avoiding a deer.  The driver seemed to overcompensate and the SUV veered left across the highway hitting the jersey barrier at a sharp angle.  The car rolled and I was able to see one passenger thrown from the car landing behind the overturned vehicle.  No other cars were involved in the accident.  At this point we pulled over to the side of the road and called 911.  (Exhibit T) (emphasis added).

Mr. Kaminski observed Zeolla's body being ejected from the vehicle when the "car rolled."

If Zeolla was fully ejected from the vehicle at initial impact with the Jersey barrier at position

No. 7 as claimed by Ford's experts, the vehicle would have blocked Mr. Kaminski's view of the ejected body.  (See Exhibit I).  This is so because Kaminski's vehicle was travelling behind the accident vehicle and he was looking at the driver's side of the vehicle from his position.  Because Kaminski saw Zeolla's body being ejected and he could not have seen the body if ejected through the passenger side window on initial impact with the barrier, his eyewitness observations disprove Ford's theory that Zeolla was ejected through the passenger side window at position point No. 7.

## VI.    CONCLUSION

For all the above reasons, this Court should exclude as unreliable Ms. Raphael's opinion, adopted by Mr. Carhart, that Mr. Zeolla was ejected through the passenger side window on initial impact with the Jersey barrier.


Respectfully submitted,

**CHRISTINE ZEOLLA, ET AL.**
By her attorneys

KREINDLER & KREINDLER LLP

/s/ Anthony Tarricone
Anthony Tarricone (BBO No. 492480)
Joseph P. Musacchio (BBO No. 365270)
Kreindler & Kreindler LLP
277 Dartmouth Street
Boston, MA 02116-2805
(617) 424-9100


## Certificate of Service

I hereby certify that on November 13, 2012 I served a copy of the foregoing on all counsel of record via the Court's ECF system.

  /s/ Anthony Tarricone