F

# Delta V Biomechanics

930 Commercial Street  
Palo Alto, CA 94303

Telephone: (650) 320.8800  
FAX: (877) 819.1969

March 31, 2011

Dave Rogers  
Campbell, Campbell, Edwards & Conroy, PC  
One Constitution Center, Third Floor  
Boston, MA 02129

**RE:   Zeolla v Ford**

Dear Mr. Rogers:

This letter briefly summarizes results of the investigation carried out to date in the above-referenced litigation. The following sections provide descriptions of the accident, review the injuries to the plaintiff, and present the analysis of the accident. My opinions are stated to a reasonable degree of engineering and medical certainty. My education, experience and training relative to the opinions set forth in this report are outlined in my curriculum vitae, which is attached to this report. My testimony list and rate sheet are also attached.

## Materials Received and Reviewed

The list contained in Appendix A describes materials that were received from your office and subsequently reviewed. It does not include technical literature reviewed in conjunction with this matter.

## Accident Description

The following accident description is a synopsis based on the accident report, which recorded a one-vehicle rollover around 9:10 a.m. on Saturday, June 2, 2007. The vehicle, a 2004 Ford Expedition (North Carolina license plate number: TND4817), was reported on Route 90 westbound, near mile marker 108, in Southboro, Massachusetts.

According to the police report, the driver stated that he was in the middle travel lane, traveling approximately 65 mph, when a deer jumped over the median and entered the westbound lanes. Attempting to avoid the deer, the driver swerved right; the vehicle then veered left, continuing through the middle and left lanes and leaving yaw marks on the roadway. The vehicle impacted the cement median barrier with its front end, overturning onto its passenger side in the median and left lanes. All air bags deployed, including the side air bags in the second row. Two occupants seated in the third row were ejected from the vehicle and came to rest in the left travel lane. The scene diagram is shown in Figure 1.

The vehicle was totaled and towed from the scene.



Figure 1: Scene diagram from the accident report.

According to police documents, six occupants were in the Expedition:

**Brenden P. O'Hara**, DOB 6/12/73, was the driver, listed as injury code "3" (non-incapacitating) and safety equipment code "1" (shoulder and lap belt). Mr. O'Hara was neither trapped nor ejected.

**Jason S. Southworth**, DOB 9/18/73, was the right front passenger (position "3"), listed as injury code "3" (non-incapacitating) and safety equipment code "1" (shoulder and lap belt). Mr. Southworth was neither trapped nor ejected.

**Larry A. Frederick Jr.**, DOB 8/9/74, was the left-side, middle-row passenger (position "4"), listed as injury code "4" (possible) and safety equipment code "0" (none used). Mr. Frederick was neither trapped nor ejected.

**Joseph T. Harrigan**, DOB 10/29/72, was the right-side, middle-row passenger (position "6"), listed as injury code "4" (possible) and safety equipment code "0" (none used). Mr. Harrigan was neither trapped nor ejected.

**Mario Zeolla**, DOB 12/8/73, was the left-side, third-row passenger (position "7"), listed as injury code "1" (fatal injury) and safety equipment code "0" (none used). Mr. Zeolla was listed as ejection status "1" ("totally ejected") and trapped status "0" ("not trapped").

**Noah Sorensen**, DOB 6/4/74, was the right-side, third-row passenger (position "9"), listed as injury code "1" (fatal injury) and safety equipment code "0" (none used). Mr. Sorenson was listed as ejection status "2" ("partially ejected") and trapped status "1" ("freed by mechanical means").

At the time of the accident, it was daylight; the weather was cloudy and the roadway dry. The accident report described the roadway as two-way, divided, with a positive median barrier.

Police photos show the Expedition at its point of rest on its right side. Blood deposits are evident in the roadway. There is a blood spatter pattern visible on the concrete median barrier.

### Fact Witness Deposition(s)/Statement(s)

*Events of the Accident*

Driver **Brenden O'Hara** recalled that he was traveling westbound on the Mass Pike at 63-67 mph, probably in the middle lane, when he saw a deer jump over the median into his lane in his peripheral vision 50-100 yards away. Traffic was light at the time. Mr. O'Hara swerved right to avoid the deer; the Expedition fishtailed and traveled to the left, yawing counterclockwise. The Expedition's front struck the barrier; the back end of the vehicle came around and also impacted. He recounted, "And then the car – the airbags had deployed. And the car rolled." (Deposition of Brenden O'Hara, 05-25-10, pg. 38-42, 127, 132).

Left front passenger **Jason Southworth** testified that when he first observed the deer it was 500 to 1000 feet away on the other side of the road. He noticed it turn its head and move their way and he pointed and said "deer." He saw the deer start to leap over the median barrier then lost sight of it because Mr. O'Hara swerved the car. The vehicle was traveling in the left lane closest to the median when it swerved across the middle and right lanes to avoid the deer. The back end of the vehicle began to slide out sideways; the vehicle went back across the lanes, and some part of the passenger side struck the barrier and bounced off. Afterwards, the vehicle rolled towards the driver's side (Deposition of Jason Southworth, pg. 44-49).

*After the Accident*

**Jason Southworth** and **Brendan O'Hara** kicked out the front windshield to exit the vehicle (Deposition of Brendan O'Hara, pg. 45, Deposition of Jason Southworth p 52). Passenger **Larry A. Frederick, Jr.**, who testified that he was seated unbelted in the middle seat behind the driver, decided to rest his eyes for a little while. He heard some commotion and looked up and the next thing he knew, he was in the third row. He exited via the third row rear window that was facing up [right side of vehicle]; there was not much glass left in that window (Deposition of Larry Frederick, pg. 11, 13, 15-18, 38).

*Mr. Zeolla's Position of Rest*

**Brenden O'Hara**, the driver, testified that the vehicle was lying on its passenger side after the accident, with "Noah underneath and Mario laying on the ground near the vehicle with… blood coming out of his ears." (Deposition of Brenden O'Hara, 05-25-10, pg. 46). This statement is consistent with right front passenger **Jason Southworth's** testimony. Mr. Southworth stated that Mario was "lying on the ground with a pool of blood all under his head" and that Noah was "underneath the car." (Deposition of Jason Southworth, 05-25-10, pg. 34).

**Jason Southworth** recalled that only Noah Sorenson's legs, and possibly lower torso, were visible from underneath the Expedition's passenger side third row window. Mario Zeolla was on his back on the pavement, 10-15 feet away from the vehicle, with his head facing the Jersey barrier. (Deposition of Jason Southworth, 05-25-10, pg. 52-54) **Mr. O'Hara** agreed, saying Mr. Zeolla "was farther away than a person's distance... parallel to how the vehicle was." His feet were in the direction of the front of the vehicle (Deposition of Brenden O'Hara, 05-25-10, pg. 136).

**Mr. O'Hara** did not recall hearing any sounds from Mr. Sorenson or Mr. Zeolla (Deposition of Brenden O'Hara, 05-25-10, pg. 47-48).

## Summary of Medical Records

Southborough Fire Department, the first responder, found Mr. Zeolla on the ground next to the vehicle in critical condition. He appeared to have circumferential injuries of the head and chest. His pupils were fixed and dilated and he was bleeding from both ears. He had lacerations to both flanks and to the posterior head. Large amounts of blood and clots were suctioned from his mouth. After the paramedics intubated him, he had no change in his capnography readings, likely due to blood in the endotracheal tube. He was noted to have subcutaneous emphysema. Bilateral needle compression of his chest was performed with positive air release.

Life Flight air ambulance responded. Upon arrival, they found Mr. Zeolla intubated. He was unresponsive with a GCS of 3T. Life Flight transported Mr. Zeolla to the University of Massachusetts Trauma Center. Upon lift off Mr. Zeolla lost his thready pulse. The flight crew began CPR. He was given epinephrine times two. CPR was continued per protocol until he arrived at the trauma center. He never regained a pulse.

Upon arrival at U Mass. Trauma Center he had no cardiac rhythm. He had lost his vital signs for more than 8 minutes. A chest tube was inserted and he had both a right and left lung needle decompression. He had an arterial line inserted in left femoral artery. The trauma team noted facial swelling, a right periorbital ecchymosis and scrotal edema. A thoracotomy was performed and open chest CPR was instituted. His aorta was clamped. At 10:22 [a.m.] the code was called and he was pronounced dead.

On a body diagram, the Medical Examiner noted the following injuries: Probable depressed skull fracture, bruise right periorbital area, bruise on left and right side of head and blood in the right ear. He noted an open thoracotomy of the left chest. The Cause of Death was blunt head trauma.

Mr. Zeolla donated the following to the New England Organ Bank: Bone and associated tissues of the upper extremities and lower extremities; whole heart for valves and pericardium; aortio-iliac artery; corneas; and skin.

At the time of the accident, Mr. Zeolla was 33 years old (DOB 12-08-1973), weighed about 165 pounds and was 5' 8 ¾" tall.

## Discussion

### Subject Vehicle Inspection

Delta V Biomechanics inspected the subject 2004 Ford Expedition on July 8, 2010, in Auburn, MA. Notes and digital photographs were taken. Findings included:

1. There was right front, right rear and rollover damage.
2. Glass was found in both intact and fractured states:
    a. Intact: Rear lift gate window, left side glass in the left front door and left rear door, right side moveable glass in the right rear door,
    b. Fractured: Windshield (broken at attached in frame at the bottom), left side third-row glass, right side glass in the moveable section of the right front door and the non-moveable section of the right rear door, and the right side third-row glass.
3. There were spots, drips, dents, stains, scrapes and impressions on both sides of the second row bench seat.
4. There were spots and debris on the third row bench seat. Tempered glass pieces were on the seat bottom.
5. There were numerous spots and drips on the roof liner, as well as on the interior of the right and left side door frames.
6. A dent was visible on the top of the left side door frame, as viewed from the outside.
7. There were scratches, crazing, dark marks and cracks around the left-side third-row window.
8. There were rubs, cuts, swipes, dirt and impressions around the right-side third-row window.
9. The front airbags deployed, as well as the side canopy airbags.
10. There was no evidence of loading on the #4, 6, 7 or 9 belts.
11. The #9 belt retractor was locked in the stowed position.
12. There were marks consistent with use during the collision on the #1 and 3 belts.

### Occupant Kinematics and Injury Mechanism

Occupant kinematics describes how a person moves within vehicle, is ejected from a vehicle, and moves after the ejection. To understand the occupant's motion, one must first understand the vehicle's motion. According to the accident reconstruction of Mr. Jeffrey Croteau, the subject vehicle moved through a counter-clockwise yaw (when viewed from above), collided with the center barrier, spun around, then rolled over, as shown in Figure 2.



Figure 2: Plan view of the accident sequence from the reconstruction of Mr. Jeffrey Croteau.

As the vehicle yawed, the occupants in the third row seat of the Expedition---Mr. Zeolla seated in the third row left position (3L) and Mr. Sorenson seated in the third row right position (3R)--- would experience forces caused by the rotation and the drag of the Expedition. The rotation of the vehicle would cause the 3L and 3R occupants to experience a centrifugal force out away from the vehicle's center of rotation. This force would tend to move the occupants back into their seat backs, and to a minor degree, toward their adjacent portals. Superimposed with this centrifugal effect would be the drag effect. As the vehicle yawed, it slowed in speed as it traveled down the roadway. Since the 3L and 3R occupants were unrestrained, they tended to continue to travel in the direction down the roadway by virtue of their inertial force, causing the occupants to move to the right side of the vehicle as the vehicle dragged and slowed down.

As the vehicle next impacted its right front corner with the center barrier, a large impact force stopped the impending inbound motion of the vehicle toward the barrier. The barrier showed evidence of scarring, but not moving as a consequence of this collision (cf., 10 and 11 of 76, from the Massachusetts Police on-scene photographs). During this impact, Mr. Zeolla, unrestrained, moved violently toward the third row right-side window, which was fractured from the inside-to-out direction, according to the glass fracture reconstruction of Dr. Michael Carhart. After Mr. Zeolla's impact with and fracturing of the glass, Mr. Zeolla was ejected from the vehicle and thrown downstream of the vehicle's path, toward the center barrier. Mr. Zeolla's body then collided with the center barrier, as evidenced by the presence of blood on the barrier itself (cf., 13 and 14 of 76, from the Massachusetts Police on-scene photographs). The speed of this body-to-concrete impact would exceed the speed of the vehicle at this point, since the vehicle has slowed down from the interaction with the barrier and subsequent yawing.

After its impact with the barrier, Mr. Zeolla's body then rebounded, tumbled, and slid to its point of rest. As Mr. Zeolla's body came to rest, the Expedition, upstream of Mr. Zeolla's rest position, began to approach Mr. Zeolla, as the vehicle rotated through its yaw and began to roll, driver's side leading.

As the Expedition rolled, it encountered Mr. Zeolla's body in its path, and subsequently rolled over his body near the ¼ to ½ roll position. The vehicle then continued its roll, coming to rest at the ¾ roll position, downstream from Mr. Zeolla's body.

Injury mechanism analysis describes how forces, present within a crash, give rise to injuries sustained by an occupant. In this case, the main injury-causing force potentials arose from the occupant's ejection, the occupant colliding with the barrier, the occupant tumbling and sliding to rest, and the occupant interacting with the overrunning vehicle.

There are a number of opportunities for the observed injuries to occur. While all opportunities are likely, it is not possible to rule one out for the other.
- Mr. Zeolla's right-side head injuries (periorbital ecchymosis and bruise) were likely caused by one of the following events: his interaction with the glass upon his ejection, his interaction with the barrier, his tumble and slide to rest, or the overrun of his body by the vehicle.

- The balance of Mr. Zeolla's external head and neck injuries (see medical summary section above) were likely caused by one of the following events: his interaction with the barrier, his tumble and slide to rest, or the overrun of his body by the vehicle.

- The probable depressed skull fracture was likely caused by one of the following events: his head interacting with the barrier, the roadway upon ground impact, or the overrunning vehicle.

- Mr. Zeolla's flank lacerations, bruising and scratching are very consistent with tumbling and interacting with the roadway, though a vehicle overrun of the body cannot be ruled out as the mechanism.

Mr. Zeolla's massive subcutaneous emphysema is evidence of air from his lungs getting forced into the tissues under the skin, likely due from the vehicle's pressure over his body during the overrun.

### *Critique of Plaintiff's Expert Opinions*

Conspicuously ignored in the report of the Plaintiff's biomechanic expert is the issue of timing. Dr. Bidez either is unaware of or purposefully ignores the data present in the Restraint Control Module (RCM) Analysis. According to this analysis, the RCM issued a command to deploy the driver and passenger curtain air bags when the vehicle was approximately 16 to 17 degrees into its roll event. At this point in time, Mr. Zeolla was already fully ejected from the vehicle. Even if the curtain air bag had extended to the third row seating position in the subject vehicle, the air bag would have been irrelevant to the protection of Mr. Zeolla since he was no longer in the vehicle when the air bag deployed.

Dr. Bidez is wrong about Mr. Zeolla's ejection. Dr. Bidez opines that Mr. Zeolla was ejected via the left third-row portal near the beginning of the roll sequence. This opinion is refuted not only by the glass fracture vector analysis, but also the occupant kinematics analysis. The former analysis establishes that the third-row left-side glass, adjacent to Mr. Zeolla's pre-accident seating position, was fractured from the outside-to-in direction (as a consequence of ground

contact), not from the inside-to-out direction (as a consequence of occupant interaction). This glass fracture vector as been clearly explicated by Dr. Michael Carhart. The latter analysis, which further solidifies Dr. Carhart's fracture vector analysis, is the simple fact that Mr. Zeolla's body motions never moved him toward the left-side third-row window of the vehicle. Indeed, the initial vehicle collision brought Mr. Zeolla's unrestrained body to the right side of the vehicle. Mr. Zeolla's motion during the entire accident sequence would never drive him into the vehicle's third-row left-side window.

Finally, the physical evidence confounds Dr. Bidez's opinion. There is blood splatter on the median barrier, located upstream from the location Dr. Bidez says Mr. Zeolla is ejected. The blood would have to have been spattered onto the median prior to the roll initiation.

Although Dr. Bidez equated the kinematics of the third row occupants to that of the second row, she was incorrect in this comparison. The second row occupants were substantially closer to the center of gravity of the vehicle and therefore had substantially lower forces on them as a result of the rotation of the vehicle. The second row occupants were also lower relative to the belt line of the vehicle. These two facts concerning the position of the second row occupants---not the deployment of the safety canopy---make a significant contribution to containing the second row occupants.

### Rollover and Ejection

Ejection increases the risk of being seriously injured in a rollover accident. Restraints markedly reduce the frequency of more severe injuries and fatality by preventing occupant ejection in rollover crashes. Ejected occupants are 9.8 to 11.5 times more likely to experience fatal injuries, and 5.1 to 8.3 times more likely to sustain AIS 3+ (serious) injuries, than occupants who are restrained and contained within their vehicle (Huelke 1973, 1977, 1983; Malliaris 1991; Partyka 1991). The unrestrained occupant accepts an increase in the AIS 3+ injury rate of 2.1 to 7.6 times that of the restrained occupant, as well as a fatality risk increase of 2.8 to 4 times that of the restrained occupant (Huelke 1973, 1977; James 1997; Mackay 1991; Moffatt 1995; Terhune 1991). In addition, Huelke, *et al.*, found that lap/shoulder belts reduced the risk of fatalities by 91% and the risk of serious to critical injuries (AIS 3-5) by 51%. They also found that 70% of contained, lap-belted occupants received minor or no injuries (AIS 0-1).

For those passengers who are not ejected from the vehicle, seat belts can reduce the risk of fatalities and more serious injuries. Studies of single-vehicle rollover accidents have shown that unrestrained and contained occupants are up to 3.4 times more likely to receive serious or worse (AIS 3+) injuries than belted passengers (Digges 2003, 2005; Moffatt 1995). Although seat belt usage does not eliminate the risk of injury, Malliaris and Digges determined that 98.6% of restrained occupants in sport-utility vehicles are not seriously or fatally injured in rollover accidents. In addition, less than 0.4% of these belted passengers sustain fatal injuries. These occupants, who are using seat belts in sport-utility vehicles that overturn, are also exposed to similar risk of serious or fatal injury when compared to those who are restrained in passenger cars involved in planar (non-rollover) accidents (Malliaris 1999).

## Opinions

1. Mario Zeolla sustained his fatal injuries as a result of his ejection from the vehicle.

2. Mario Zeolla was ejected through the right rear window opening just after the initial right frontal impact with the barrier.

3. Mario Zeolla would not have been ejected, and therefore would not have sustained the fatal injuries, had he been wearing his available 3-point lap-shoulder belt.

4. The safety canopy did not deploy until after the initiation of the rollover event and could not have prevented Mario Zeolla's ejection from the vehicle.

Please note that this report is based upon information available to me at the time of its preparation. Should substantial additional information that affects the contents of this report become available, an amended or supplementary report may be prepared.

If you have any questions, do not hesitate to contact me.

Sincerely,

Elizabeth H. Raphael, M.D., F.A.C.E.P.