1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3


4                                    )
    CHRISTINE ZEOLLA, Individually   )
5   and as Administratrix of the     )
    Estate of Mario Zeolla,          )
6                                    )  No. 09-40106-FDS
                    Plaintiff,       )
7                                    )
                                     )
8   vs.                              )
                                     )
9   FORD MOTOR COMPANY,              )
                    Defendant.       )
10


11

    BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
12


13
                   JURY TRIAL DAY 10
14

15         EXCERPT OF MICHAEL REED CARHART ONLY

16

17     John Joseph Moakley United States Courthouse
                   Courtroom No. 2
18                 One Courthouse Way
                   Boston, MA 02210
19

20                 March 20, 2013
                     9:00 a.m.
21

22

23         Valerie A. O'Hara, FCRR, RPR
                Official Court Reporter
24     John Joseph Moakley United States Courthouse
              One Courthouse Way, Room 3204
25                 Boston, MA 02210
              E-mail: vaohara@gmail.com

1     APPEARANCES:

2     For The Plaintiff:

3        Kreindler & Kreindler LLP, by MARC S. MOLLER, ESQ.,
JUSTIN T. GREEN, ESQ. and JOSEPH MUSACCHIO, ESQ., 750 Third
4    Avenue, New York, New York  10017-2703;

5     For the Defendant:

6        Campbell, Campbell, Edwards & Conroy, P.C., by JAMES M.
CAMPBELL, ESQ., DAVID M. ROGERS, ESQ. and MICHELLE M. BYERS,
7    ATTORNEY, One Constitution Center, Boston, Massachusetts
02129;

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2    Testimony of:              Direct  Cross  Redirect  Recross

3

     MICHAEL REED CARHART
4    by Mr. Campbell           10-4            10-121
     by Mr. Green                     10-130
5

6                            E X H I B I T S

7

8          (See transcript designations)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. CAMPBELL:  Your Honor, at this time we call

2     Dr. Michael Carhart.

3          MICHAEL REED CARHART, having been duly sworn by the

4     Clerk, testified as follows:

5          THE CLERK:  Please state your name spelling your last.

6          THE WITNESS:  It's Michael Reed Carhart,

7     C-a-r-h-a-r-t.

8                         DIRECT EXAMINATION

9     BY MR. CAMPBELL:

09:39AM 10    Q.   Good morning, Dr. Carhart, good morning, ladies and

11    gentlemen.  Would you tell us where you live and by whom you

12    are employed?

13    A.   Sure.  I live in Phoenix, Arizona.  I'm employed by

14    Exponent, Incorporated.  I work in our Phoenix office.

15    Q.   You were present for Mr. Croteau's testimony, you work for

16    the same company?

17    A.   We do.

18    Q.   Now, you were retained in this case to address issues

19    related to the third row windows including hardware and glass

09:40AM 20    used in those windows; is that right?

21    A.   That's right.

22    Q.   To that end, Dr. Carhart, I want to ask you about your

23    education, background and experience that allows in part to

24    form the basis of your opinions.  Please tell the ladies and

25    gentlemen of the jury what your education is.

1    A.    I have been a Bachelor of Science degree in biomedical

2    engineering.  I received that from the Milwaukee School of

3    Engineering in 1991.  After that I pursued graduate studies

4    focusing on human motion, kinematics, dynamics, how things

5    move, some of which you just heard some about, and I pursued a

6    Ph.D. at Arizona State University in Arizona, Tempe, Arizona.

7    I received my Ph.D. in 2000 in the area of bioengineering

8    specializing in biomechanics.

9    Q.    Have you taken any courses following that regarding

09:41AM 10   automobile glazing or glass?

11   A.    Sure, I've taken a couple of courses from the Society of

12   Automotive Engineers.  Automotive glazing is one of them;

13   designing with glass is another.  I also took a course from

14   Alfred University focusing on fractography, which is studying

15   broken ceramics and glass to try and figure out how they broke

16   using the cues that we get from the broken pieces to determine

17   where the fractures originated, how it may have originated,

18   things of that nature.

19   Q.    With regard to your employment at Exponent, how long have

09:41AM 20   you been employed there?

21   A.    Nine and a half years I worked at Exponent in Phoenix.

22   Q.    What is your hourly rate, please?

23   A.    Exponent bills my time in this case at $340 per hour.

24   Q.    You've worked with my law firm in the past and you've been

25   retained by Ford in the past; is that right?

1    A.    I have.

2    Q.    Approximately how much have you billed on this case?

3    A.    My billings at the time of my deposition were

4    approximately $60,000.  We've done some work since.

5    Q.    Now, do you have in connection with your background and

6    your training, do you have any experience in testing

7    automobiles?

8    A.    Yeah, I have experience.

9    Q.    Would you relate that experience to the jury?

09:42AM 10    A.    Sure, I do have extensive experience in automotive

11    testing.  A lot of that deals with rollover, full scale

12    rollover tests, working with vehicles and dummies, both

13    statically, dynamically, in a spin environment, fixture

14    environment.  I've also done a lot of component level testing,

15    looking specifically at glass and its retentive capacities.

16    I've done a good amount of research, both computational

17    research, computer modeling, looking at the rollover

18    environment, how occupants move, how they load, how they load

19    into restraint systems or perimeter structures, things like

09:42AM 20    that.

21            I've also done a good amount of testing with dummies

22    to look at things that things aren't related to the automotive

23    environment like helmets and fall events and things like that.

24    Q.    Do you have publications?

25    A.    I do, I have a number of publications, yes.

1    Q.    Would you explain those publications to the extent they're

2    relevant to issues in this case?

3    A.    Sure.  I've got ten publications focusing in the area of

4    rollover peer review publications where we did some research,

5    submitted it for publication.  A lot of them deal with how

6    occupants move in a rollover environment, how they interact

7    with restraint systems again, how they interact with perimeter.

8         I published two articles specifically focusing on side

9    window glazing and how occupants load, what the retentive

09:43AM 10  capacity is, things like that.

11   Q.    To the extent you haven't already discussed it, have you

12   conducted research or engaged in research regarding automotive

13   glazing or glass issues?

14   A.    Yes.

15   Q.    Explain that, please.

16   A.    Sure.  I published two articles specifically focusing on

17   retentive capacity of laminated glass.  One article we used

18   guided impactor testing to look at what glass could withstand

19   in the way of assimilated occupant load, and the other research

09:44AM 20  activity involved a couple of full scale rollover tests where

21   we analyzed what occurred in the way of occupant motion, how

22   occupants loaded to the perimeter of the vehicle and ultimately

23   what happened in terms of their ejections.

24   Q.    Have you received any awards in connection with your

25   biomechanical work or your rollover work?

1    A.    Yes, a couple.

2    Q.    Please explain that.

3    A.    Okay, I received an award from the Society of Automotive

4    Engineers called the Caldwell Award.  That was for work that we

5    did related to restraints in the rollover environment, and that

6    was for outstanding research in I think the 2006 or 2007 time

7    frame.

8    Q.    What, if any, teaching experience do you have?

9    A.    Okay.  After I completed my degree and actually while I

09:44AM 10   was a graduate student, I began doing some teaching in the

11   areas of physiology and instrumentation, but after I completed

12   my degree at Arizona State University, I was hired on as a

13   research scientist and then later as an adjunct professor.  I

14   taught a number of courses, instrumentation, biomechanics,

15   computer modeling, computer applications in engineering,

16   bioengineering.

17   Q.    I want to turn your attention to your retention in this

18   case and your work that you did to develop opinions.

19   A.    Okay.

09:45AM 20   Q.    What were you asked to do in the case?

21   A.    Well, to specifically look at the third row window

22   configuration, the selection of materials, the configuration on

23   the vehicle, to analyze this crash and figure out what happened

24   in the way of the glass breakage, to use the physical evidence

25   that's in the roadway and is present on the vehicle, to

1    understand when the glass broke in the sequence, how it broke,

2    how it broke and how that relates overall to the crash timing.

3    Q.    Okay.  What did you do to carry out that assignment?

4    A.    My first step was to review the materials that were

5    provided, and we've got a lot of scene photographs in this

6    case, we've got a police report, we've got a lot of witnesses,

7    so looking at the testimony, looking at the available

8    information, looking at documents produced in the case and

9    trying to figure out essentially what documentation we have

09:46AM 10   regarding the crash event either through testimony or

11   photographs and sketches and things like that.

12         Following getting that material, I inspected the

13   vehicle, made my observations about what was on the vehicle in

14   terms of damage, what's happening around the window openings,

15   which windows broke and to the extent that we could determine

16   how they broke and then ultimately incorporated accident

17   reconstruction information, Dr. Raphael's analysis of the

18   biomechanics and the occupant motions to understand how the

19   glass broke, how that relates to the crash sequence from the

09:46AM 20   vehicle standpoint, from the occupant standpoint.

21   Q.    In your report, you make reference to something called

22   photogrammetry; is that correct?

23   A.    I do.

24   Q.    Please explain what photogrammetry is and how you utilize

25   that technique in connection with your development of your work

1    in this case?

2    A.    Photogrammetry tends to be important in reconstructing

3    accidents.  Very often there's information that's visible in

4    photographs that someone took, but they didn't record it, they

5    didn't go out and measure it.  Photogrammetry is the process

6    where we can actually extract quantitative information, real

7    measurements from photographs, photographs of the scene in this

8    case, and so that was one of the techniques that I employed

9    extensively to identify where glass fields were, where deposits

09:47AM 10    of fluid were and how that relates to Mr. Croteau's analysis of

11    the vehicle motion, where the tire marks are, what the spatial

12    relationship between these items were.

13    Q.    Why is it that you needed an understanding of the accident

14    reconstruction as developed by Mr. Croteau?

15    A.    I need to know how the vehicle's moving, and I certainly

16    had some impressions from looking at the evidence myself, but

17    he conducted a detailed analysis, and so that tells us

18    spatially where the vehicle is moving, how fast it's moving, it

19    will tell us something what inertially is going to happen to

09:48AM 20    occupants inside the vehicle.  It's going to give us some ideas

21    about how people might load during various parts of the

22    sequence to the perimeter, to the windows.

23    Q.    What, if any, of the accident reconstruction that we just

24    heard about is key or important to your analysis and opinions

25    in the case?

1    A.   I think ultimately understanding the crash sequence

2    beginning as the vehicle approaches the barrier, including the

3    vehicle's interaction with the barrier, how severe is it,

4    what's the vehicle orientation, we've got a right front hit

5    that's severe, produces a large delta-v, as you just heard

6    about, it induces the vehicle to rotate so that it's going back

7    end leading, it again hits, ultimately yaws around so that it

8    goes driver's side leading and completes a short sequence,

9    about 18 feet.  I think all of that information and how the

09:48AM 10  vehicle position's lay out relative to the physical evidence

11   becomes important in my analysis.

12   Q.   The next witness will be Dr. Elizabeth Raphael, and your

13   understanding is she did a biomechanical or occupant kinematic

14   analysis in this case; is that right?

15   A.   That's correct.

16   Q.   And you talked about reviewing that in connection with

17   your work in this case; is that right?

18   A.   I did discuss her analysis with her and then review it,

19   yes.

09:49AM 20  Q.   What is your understanding about the biomechanical

21   occupant kinematic analysis that is relevant to your work in

22   the case?

23   A.   Well, I think one important aspect is that Dr. Raphael has

24   determined that Mr. Zeolla, who was initially seated in the

25   left rear, was projected across the vehicle when it struck the

1    barrier.  That right front hit, that was pretty severe and

2    generated an 18 mile an hour delta-v and some vehicle rotation,

3    induced Mr. Zeolla to move across the vehicle, ultimately

4    strike the right side of the vehicle, get ejected through that

5    side, strike the barrier and then go into the roll path where

6    he was overrun.  In a nutshell that's an important aspect.

7         I think the other thing that's important about her

8    analysis is how fast Mr. Zeolla and Mr. Sorensen are moving as

9    a result of that impact, and I understood that to be quantified

09:50AM 10    about 10 miles an hour.

11         MR. GREEN:  Objection, your Honor.

12         THE COURT:  Basis?

13         MR. GREEN:  It's beyond the scope of Dr. Raphael's

14    report, and it's not in Dr. Carhart's report.

15         THE COURT:  The speed, the 10 miles an hour piece?

16         MR. GREEN:  It's not in there, Judge.

17         THE COURT:  All right.  It will be struck.  Go ahead.

18    Q.    What is your understanding, if any, about the seat belt

19    use by the occupants of the vehicle?

09:50AM 20    A.    That the two front passengers, the driver and the front

21    passenger, were belted, the rest of the individuals in the

22    vehicle were not wearing their seat belts.

23    Q.    Did the Expedition provide protection regarding ejection?

24    A.    It did.

25    Q.    What is that, please.

1    A.    It provided a seat belt for all of the seating positions

2    that were occupied, and the seat belt is highly effective in

3    reducing injuries and fatalities in planar crashes and in

4    rollovers.

5    Q.    Before we discuss the basis of your opinions in each of

6    them, would you please relate to the jury a summary of your

7    opinions in the case?

8    A.    Sure.  My first opinion is that based on the analysis, the

9    glazing and the context, the reconstruction, the biomechanical

09:51AM 10   opinions, Mr. Zeolla was ejected out the right side of the

11   vehicle.  The glass on the right side in the third row was

12   broken out as a result of inside to out loading that was loaded

13   from the occupants, Mr. Zeolla and Mr. Sorensen, while the

14   vehicle was still upright and as a result of the vehicle

15   hitting the barrier, as has been discussed in some detail.

16   Q.    And by right side, correct me if I'm wrong, you mean the

17   passenger's side window?

18   A.    The passenger's side.

19   Q.    Please continue with your summary and overview of your

09:51AM 20   opinions.

21   A.    My second opinion is that the ejection of Mr. Zeolla would

22   not have been prevented if that glass in the third row on the

23   right side were fixed instead of movable.

24   Q.    And following that, please.

25   A.    My next opinion is that the appropriate means of

1    mitigating ejection and serious and fatal injury in rollovers

2    is the seat belt.

3    Q.    Continue, please.

4    A.    Next, that glass is not a substitute for a seat belt.

5    Q.    And a further summary of your opinions, please.

6    A.    That the glass configuration in the third row of the

7    Expedition at issue here was consistent with the state of the

8    art and industry practice at the time the vehicle was designed

9    and manufactured, the configuration and selection of tempered

09:52AM 10    glass for that location is appropriate and consistent with

11    industry standards.

12         My next opinion is that occupants in vehicles with

13    this type of window configuration are adequately protected in

14    rollover crashes and in planar crashes, and then I think lastly

15    my area of opinion is that I disagree, and I believe that the

16    opinions expressed by Dr. Bidez and Dr. Batzer with respect to

17    glass breakage timing and ejection portals are incorrect.

18         MR. CAMPBELL:  And I just wanted to express to the

19    Court and the jury, I referred to Dr. Baxter as Mr. Baxter

09:53AM 20    during my examination, it's because I forget he had a Ph.D.  I

21    know he's Dr. Batzer.  I told him that afterwards.

22    Q.    Do you hold those opinions that you just expressed in

23    summary form to a reasonable degree of scientific certainty and

24    probability?

25    A.    I do.

1    Q.    And to the extent that you express opinions through the

2    course of your testimony, I ask that you only do that if you

3    hold them to that degree of certainty and probability.

4    A.    I will do that.

5    Q.    I would like to turn our attention, please, to your scene

6    or your site and inspection findings, okay.  What did you do

7    to -- what, if anything, did you do to analyze the available

8    evidence in the roll path of the Expedition?

9    A.    I think the first step was identification of what is

09:54AM 10    evident in the scene photographs, so step Number 1 was looking

11    through the scene photographs, identifying areas of glass

12    deposit and of fluid deposit on the scene and then placing

13    those relative to Mr. Croteau's accident reconstruction.

14    Q.    Okay.  You have some exhibits that you've made with

15    reference to the police photographs that are in evidence; is

16    that right?

17    A.    That's right.

18    Q.    Will they assist you in talking to the Court and jury

19    about your observations?

09:54AM 20    A.    I think they will.

21    Q.    And if you could, please, would you describe your review

22    of the scene photos and advise what is important to you in that

23    analysis, and I would start with Exhibit Number -- I want to

24    use Exhibit Numbers 882.15, .19, .17, .20, and I don't believe

25    there's an objection, but I would ask plaintiff's counsel.

1           THE COURT:  There's no objection.

2           MR. GREEN:  Can you show me what the -- I don't object

3    if these are chalks, but to the extent they have circles and

4    arrows and words on them, I don't think they should go into

5    evidence.

6           MR. CAMPBELL:  Your Honor, they're similar to what the

7    plaintiff offered in their materials.

8           THE COURT:  All right.  Let me see them.  Well, they

9    certainly look like chalks to the extent that they have

09:56AM 10   markings on them, so the underlying photographs are admissible,

11   and otherwise they'll be held as chalks.

12          MR. GREEN:  Thank you, your Honor.

13          THE COURT:  Ladies and gentlemen, let me explain this,

14   chalk is obviously an old fashion word.  We used to have

15   chalkboards.  They never lost power, and they worked very well,

16   but, anyway, there's a difference between what is evidence in

17   the case and what has been created after the fact to help

18   explain the evidence to you.  We call those demonstrative

19   evidence or chalks, you can see them, but they're not the

09:56AM 20   actual evidence in this case.  In this case, for instance, the

21   photograph is the evidence.  What someone says about the

22   photograph and how they mark up the photograph to help explain

23   it to you, those markings themselves don't come into evidence,

24   although you can see them to help understand the testimony.

25          MR. CAMPBELL:  In that event, Judge, I would like to

1    show Exhibit 882.15 for identification I should call it.

2    Q.   Dr. Carhart, could you explain what we're looking at and

3    why, if at all, it's important to your views of the case.

4    A.   It's a police scene photograph, and it's one that I think

5    I used to orient myself to parts of the crash sequence.  I've

6    circled here for reference as it relates to Mr. Croteau's

7    reconstruction in the green box the location where there's a

8    scuff on the barrier, there's a red transfer area and deposit

9    within the top of the barrier within that green box.

09:57AM 10        I've also circled that garbage can because I think

11   it's helpful in looking at some of the other photographs for

12   reference.  There's one thing that I do want to point out in

13   this photo in particular, and I think I can circle it here.

14   That's the left rear tire mark which means that the vehicle is

15   still upright in that location, and so I was going to use

16   those, the trash can and that left rear tire mark and gouge as

17   landmarks as we look through some additional information that's

18   present in these photos.

19   Q.   Are you done with 882.15?

09:58AM 20   A.   I think so.

21   Q.   If we could call up 882.19 for identification.  What do

22   you have here and why is it of consequence to your opinions?

23   A.   So, I've again circled that garbage can that's there

24   against the barrier just for reference, and if you look to the

25   right, again we can see that tire mark that I just highlighted,

1    it terminates there, and I've circled in red here a number of

2    fluid deposits that are present in the roadway and on the

3    barrier, the areas that are denoted.

4            MR. GREEN:  Your Honor, I have an objection to this

5    witness.  He's been presented as a glass expert, now going to

6    the area of glass, which I understand is Dr. Raphael's area.

7    It's cumulative and not part of his expert opinion in the case.

8            THE COURT:  You're saying glass is not part of his

9    expert opinion?

09:59AM 10       MR. GREEN:  Blood, I mean, your Honor, I meant the

11   blood.

12           THE COURT:  I'll let the evidence stand.  He is a

13   glass expert, as I understand it, but I'll let the answer

14   stand.

15   Q.    Just to clarify that point, Dr. Carhart, why if at all is

16   where the blood or the fluid is on the scene relevant to your

17   glass analysis?

18   A.    Well, if we have blood in the roadway before the vehicle

19   overturned, then we need to explain how somebody could have

09:59AM 20   escaped the vehicle, gotten into position where they were

21   bleeding before the vehicle overturned, and so it's important

22   for me to understand this from a glass perspective.

23           MR. GREEN:  Your Honor, I just renew my objection to

24   the discussion of blood from a glass expert.

25           THE COURT:  I'll allow it to this limited extent.

1    Let's move on.

2         MR. CAMPBELL:  That's the purpose of it.

3    Q.   Are you through with Exhibit 882.19 for identification?

4    A.   Yeah, just simply again emphasizing blood on the barrier

5    adjacent to the trash can, blood on the ground adjacent to the

6    tire mark.

7    Q.   If we could call up 882.17 for identification.  Explain

8    this, please.

9    A.   This is a separate view, again, trash can circled for

10:00AM 10   reference, so we're looking at an area that's upstream from

11   where the vehicle began to overturn, and on the barrier, there

12   are numerous fluid deposits consistent in color with blood.

13   That's what's circled here in the red dots.  There are a number

14   of them there.

15   Q.   I see we have a yellow circle.  What's that, please?

16   A.   There's yellow transfer on the top of the barrier in that

17   area.

18   Q.   Are you through with 882.17 for identification?

19   A.   I am.

10:00AM 20   Q.   Could we call up 882.20 for identification.

21        MR. GREEN:  Your Honor, I just renew my objection

22   about the extent that this glass expert is going into what he

23   considers blood evidence without a foundation, especially since

24   we have a Dr. Raphael who's coming right after this whose

25   report and her slides that they apparently are going to show

1    deal with blood.  I think they're basically trying to put two

2    blood experts on.

3         THE COURT:  All right, I'll let the witness explain

4    what he sees in this photograph and then let's move on.

5    Mr. Campbell.

6    Q.   Please explain what's in this photograph.

7    A.   Again, we're looking at that left rear tire mark which it

8    indicates that the vehicle is not yet rolled over and adjacent

9    before the vehicle has rolled are multiple areas of red fluid

10:01AM 10   deposit circled here in this chalk in the red circles or ovals.

11   Q.   Are you through with this?

12   A.   Yes.

13   Q.   If we could call up 882.19, please, for identification.

14   What is your understanding as to the rest positions of

15   Mr. Zeolla and Mr. Sorensen?

16   A.   That Mr. Sorensen comes to rest underneath the vehicle,

17   that he's partially under and that he's pinned to some extent

18   from the descriptions, so in this area, and that Mr. Zeolla is

19   away from the vehicle out in the roadway in this area.

10:02AM 20   Q.   Okay.  Did you use the scene photographs taken by the

21   police to assist in the analysis of the third row window

22   breaks?

23   A.   I did.

24   Q.   Would you explain how you did that, please?

25   A.   Sure, there's some additional evidence that I didn't

1    emphasize in those prior photographs, and that is some glass

2    deposits that are there in the roadway.

3    Q.   If we could call up Exhibit 882.22 for identification.

4    Would you explain this, please?

5    A.   Yes, in looking through the scene photographs, this one is

6    one example that demonstrates it.  There's two deposits of dark

7    glass that are here, that we can see, and there's what I'm

8    going to call a diffuse deposit -- which extends in the area

9    where I've drawn the arrow here.  I'll draw another one just to

10:03AM 10   emphasize that -- where the glass is somewhat spread out, and

11   it encompasses a very large area.  It's been spread, it's

12   diffuse, and then there's a second area where we see dark

13   glass, again, consistent with a third-row window that is very

14   concentrated.  That's the one that I've highlighted here with

15   the blue rectangle.

16   Q.   If we could call up Exhibit or 882.2 for identification,

17   please.  This is another photograph that you enlarged and

18   prepared; is that right?

19   A.   Yeah, I think we enlarged it, lightened it, zoomed in on

10:03AM 20   it, yes.

21   Q.   How did you use this in you analysis, please?

22   A.   Well, there's something interesting about the passenger's

23   side glass hardware, that is the mechanism that opens and

24   closes the window.  It's broken, it's broken in two places, and

25   this shows one of the components.  It's the motor housing and

1    the axle for that regulator that drives the window in the open

2    and closed position.  It's actually laying there out in the

3    scene in that area.

4    Q.   Did you use the scene photos to understand what happened

5    to the other glass or glazing in the Expedition?

6    A.   I did.

7    Q.   Explain that, please, and what happened to the other

8    glass?

9    A.   Just briefly, there are two other pieces of glasses on the

10:04AM 10   vehicle that were broken out, and they were broken out very

11   close to the vehicle rest position.  The right front window in

12   my analysis was engaged by the mirror as the vehicle went to

13   the three-quarter roll position.

14   Q.   If I could just stop you for a second, if we could call up

15   880.8, that might assist you in explaining.  Please continue

16   with your answer.

17   A.   Yes, so the right front window, there's a pile,

18   concentrated pile of green glass in the area that I just

19   circled, and when I looked at the vehicle and examined the

10:05AM 20   fracture fragments at the perimeter, it was indicative of the

21   glass being broken out low and forward of the window opening.

22   There was a mark there from the mirror coming in and basically

23   interacting with the belt line in the area of the lower front

24   glass, and so that's what I would attribute that breakage to.

25   The right front window broke out almost at rest.

1           There's a second area of deposit that corresponds to

2     the smaller window in the second row on the right side, so that

3     second row door has a large movable window that goes up and

4     down vertically, then a smaller window.  That smaller window

5     was broken out, and there's a deposit not shown in this

6     photograph but just on the other side of that block that I just

7     made a mark on where there's a clear deposit.

8           I believe that was related to the extrication efforts,

9     the blocking efforts.  When they blocked it, they created

10:05AM 10    contact to that fixed window and broke out essentially after

11    the crash was over.

12    Q.   How, if at all, was the information about these other

13    windows that were broken significant to your analysis in the

14    case?

15    A.   It's just very straightforward in terms of potentially

16    ejection port holes, we're looking at the third row windows and

17    the third row windows only to explain the physical evidence and

18    the occupant injuries.

19    Q.   The jury has heard a lot of evidence about third row

10:06AM 20    windows.  Do you have something in the Court that could assist

21    you in explaining, you know, the shape of it and how it works

22    and the like?

23    A.   Yeah, I had a quarter buck made from an exemplar vehicle

24    that was salvaged, which is over there across the room, and it

25    just demonstrates the configuration of the window and how it

1    operates.

2           MR. CAMPBELL:  Your Honor, if I may bring that in

3    front of the jury and have the witness step down?

4           THE COURT:  Yes.

5    Q.   Please position it in a way that would help you explain

6    and just explain to the jury what we're looking at and the

7    features what we're looking at?

8    A.   All right.  This is obviously a cut-down section from an

9    exemplar vehicle.  So I just wanted, first of all, to

10:07AM 10   demonstrate some of the hardware and how this works.  There's a

11   pair of pivots that are actually hidden up the trim up there to

12   allow the glass to lever open at the back, and I'm going to

13   demonstrate that in a second.

14          There's a motor behind the pillar that spins the rod,

15   an axle that connects to this toggle link which has an

16   irregular shape right here, and when we activate that motor,

17   it's going to swing that cam open to cause the window to swing

18   open.

19   Q.   In any event, I'm not sure what we're talking about there.

10:08AM 20   Just explain the device that is used to open and close the

21   window.

22   A.   There's a motor behind the trim panel here and an axle

23   that sticks out, connects to this triangular-shaped tab which

24   then attaches to some glass attachment hardware, and when I

25   turn this, I'm going to power it up, you see that motor rotate.

1    Okay.  So that is the venting function of the window.  I'm

2    going to do that the other way so you can see the calm operate

3    again.

4         This window is designed to vent and pop just as we've

5    shown.  I think we can turn around just so we can see how it

6    looks in the exterior so we can get it in the open position.

7         You see the venting configuration when it's in the

8    open position, and that's the full open position.  That's

9    achieved by adding some pivots which adhesively attaches to the

10:09AM 10  glass here and then this hardware at the back which involves a

11   circular tab that is again adhered to the glass which then

12   attaches to that regulator hardware mechanism that I think I

13   can show you separate from the vehicle.

14   Q.   Do you have the actual hardware pieces that are the

15   regulator, as you're calling it, the actuator, I think it's

16   been called, but the window opening device?

17   A.   I do have some of those, yes.

18   Q.   Could you use those to discuss?

19   A.   I do.

10:10AM 20  Q.   Where are they?

21   A.   I'm not sure.

22        THE COURT:  We're going to take a break in five

23   minutes.  We can try to sort it out then.  Let's move on.

24   Q.   Why does the window open?

25   A.   For ventilation in the third row.

1    Q.    Do other windows in the vehicle open for ventilation?

2    A.    They do.  The first and second row windows have movable

3    mechanisms that move up and down for ventilation.  Also, this

4    vehicle also had a moonroof.

5    Q.    Why doesn't this window go down?

6    A.    There's not space.

7    Q.    What's underneath the window?

8    A.    There's a wheel well for structure down there, so this

9    configuration allows the ventilation, but there's not space for

10:11AM 10   the full vertical like you might have a door window.

11   Q.    Okay.  Anything else on this before I move it out of the

12   way?

13   A.    No, I think that's it.

14   Q.    Did you consider evidence of the driver's side or the left

15   side area of the vehicle?

16   A.    I did.  I inspected.

17   Q.    Again, do you have a series of photographs that would help

18   explain that?

19   A.    I do.

10:11AM 20   Q.    Would you bring up 880.08 for identification, please.

21   Explain what we're looking at here and how it is of consequence

22   for your use.

23   A.    The scene photograph, again, and what you're going to

24   observe in this photograph is that there's some damage.  First

25   of all, the glass is absent, but, secondly, there's some damage

1    to the roof on the vehicle.

2    Q.   Would you blow that portion up, please.  Sorry to

3    interrupt.  Please continue.

4    A.   That is that there is an area of deformation which I think

5    has already been described on the roof rail over there, but if

6    you look a little closer, there's also a depression of this

7    roof rack line right in there, right at this roof rack base

8    where that is depressed downward, and then there's distortion

9    of the overall roof where I made that semicircular ark.

10:12AM 10   Q.   Are you done with this one?

11   A.   I am.

12   Q.   Can we call up 880.9, please.  This is for identification.

13   Again, why did you select this photograph?

14   A.   Again, a different view.  This one emphasizes again damage

15   here on the roof rail.  That is the area above the window

16   opening, but, again, if you look at that roof rack and its line

17   as you come front to back on the vehicle, you can see that the

18   overall roof rack rail and the support at the left rear is

19   depressed, it's been pushed downward.

10:13AM 20   Q.   You also did a vehicle inspection; is that right?

21   A.   I did.

22   Q.   Took some photographs of it?

23   A.   I did.

24   Q.   Would you call up 880.14, please.  If you could put up

25   886.2.30 for identification at the same time.  Would you

1    explain what you're depicting here, please?

2    A.   Yes, I'm trying to depict with the photograph and then

3    with my arrows as I'm looking at the vehicle.  It's not only

4    been distorted from left to right in this area, but it's also

5    the roof rail has been distorted and the roof panel has been

6    distorted in a top down manner, and you can see that again by

7    the depression of the roof rail rack support, pushed down,

8    compressed.

9    Q.   Are you through with this?

10:14AM 10    A.   I am.

11    Q.   If we could call up 886.2.28, please.  And explain to the

12    jury what we're looking at.

13    A.   Just another shot, this one from the scene emphasizing the

14    same thing, and I think what's interesting and important about

15    that is that this damage is not accompanied by ground contact

16    abrasions, it's absent contact abrasions.

17    Q.   What do you mean by ground contact abrasions in connection

18    with the rollover accident?

19    A.   Well, when a vehicle in a crash sequence such as this

10:15AM 20    that's rolling over the asphalt surface, the roadway surface,

21    when it makes contact, that leaves abrasions.  This particular

22    area on the vehicle doesn't have abrasions associated with

23    moving across, sliding across loading into the asphalt, so we

24    have deformation without striations or abrasions consistent

25    with being in contact with the ground.  It tells us that

1    something is in between the vehicle and the ground.

2    Q.   What are we looking at the forward edge windshield or that

3    portion of the vehicle that I just circled?

4    A.   In the area that you circled are some ground contact

5    abrasions.

6    Q.   Are you through with this exhibit?

7    A.   I believe so.

8    Q.   Did you consider or analyze the window hardware, that

9    actuator or the mechanism that opens the window?

10:15AM 10    A.   I did.

11    Q.   And did you do that in connection with your analysis of

12    the driver's side or the left side of the vehicle?

13    A.   I did.

14    Q.   Again, you prepared some exhibits or photographs to help

15    with your testimony; is that right?

16    A.   I did.

17    Q.   Could you call up 880.10.  Would you explain what we're

18    looking at, and if you need to focus on any given portion of

19    this exhibit, we can blow up one or the other.

10:16AM 20    A.   So maybe we could focus our attention here first on the

21    overall photo.

22    Q.   What are we looking at here, please?

23    A.   We're looking at the three points of attachment between

24    the glass and the hardware, so there's those two pivots that I

25    mentioned.  One is circled in a pink box here, one in an orange

1    box.  Those are at the front edge.  You couldn't see them on

2    the box because you can't see through the glass in that area,

3    and then at the back, there's this closure hardware.  There's a

4    circular area that adheres to the glass and then attaches to

5    this regulator hardware that we talked about.

6         On this side of the vehicle, on the driver's side, all

7    that hardware is intact, the glass is broken.

8    Q.   What is the term that you would use for the portion of the

9    actuator or the opening, the opening and closing device that's

10:17AM 10   glued to the glass?

11   A.   It's the attachment hardware.

12   Q.   Okay.  Is there a term called "toggle link"?

13   A.   Well, the toggle link goes between the attachment hardware

14   and the motor.

15        THE COURT:  Why don't we pause there and why don't we

16   take a quick break.

17        THE CLERK:  All rise.

18        (JURORS EXITED THE COURTROOM.)

19        (A recess was taken.)

10:26AM 20   THE CLERK:  All rise for the jury.

21        (JURORS ENTERED THE COURTROOM.)

22        THE CLERK:  Thank you.  Please be seated.

23        THE COURT:  Mr. Campbell.

24        MR. CAMPBELL:  Thank you, your Honor.

25   Q.   Dr. Carhart, if I could just ask you to keep your voice up

1    and perhaps speak slightly slower.  With reference to this

2    portion of 880.10 for identification, are you through with this

3    aspect of it?

4    A.    I am.

5    Q.    Would you back out, please.  What else are we looking at

6    here on this exhibit, on this I.D. photograph?

7    A.    So the remainder of the exhibit shows the configuration of

8    the glass attachments that are attached to the upper pivot here

9    that goes over here.  This is the lower pivot, front edge of

10:29AM 10   the window opening, which goes to that orange box, and then,

11   lastly, this is the glass attachment hardware at the back that

12   attaches to the toggle link and attaches to that motor that's

13   underneath the trim, and the significance here, Number 1, is

14   that that structure is intact, it's not broken.

15   Q.    Which structure?

16   A.    The glass attachment hardware, the toggle link and the

17   motor all intact on the driver's side of the vehicle.

18   Q.    You mentioned during your qualifications that you engage

19   in something called is it fractography?

10:30AM 20   A.    Fractography, yes.

21   Q.    And what is that again, please?

22   A.    It's understanding how glass broke by looking at the

23   pieces.

24   Q.    Did you use your experience in fractography in looking at

25   this evidence?

```
 1   A.   I did.
 2   Q.   Could we call up 880.11, please, for identification.  Just
 3   before we start, we can see that the boxes are color-coded to
 4   what we're looking at; is that right?
 5   A.   That's right.
 6   Q.   Would you explain this 880.11 for identification, please.
 7   A.   Sure.  Here I'm demonstrating the primary lines of
 8   fracture propagation, and if we identify those on the broken
 9   pieces, we can extend them back and identify where the tempered
10   glass fracture originated, and with tempered glass, there's a
11   process where the glass is quenched when it's made, it puts the
12   outside in compression and the inside in tension.  It makes it
13   really strong.
14        It's a thermal process that makes it stronger.  It
15   puts the glass in a high state of stress so when it breaks, it
16   relieves that stress, and we'll get rapid propagation in all
17   directions out from the location where it breaks, and so what
18   I'm doing here is using the feature lines that are evident on
19   the pivots to back project and figure out based on the physical
20   evidence where the glass broke.
21   Q.   And if we could call up 880.12.  Explain this, please.
22   A.   This is the primary fracture lines that are expressed on
23   the upper pivot and the lower pivot, and I'm showing the
24   directionality with those arrows, and roughly where those
25   intersect is our area of origin, where the glass began to
```

10:30AM (line 10)
10:31AM (line 20)

```
 1   break, where the fracture originated and propagated from.
 2   Q.   And why is that of significance to your evaluation of the
 3   case and the evidence?
 4   A.   Well, I'm collecting information at this point in my
 5   analysis, but I want to know where it originated, and, again,
 6   it's sort of central in the opening and how it began
 7   essentially, so that's the location where the glass began to
 8   break, and the hardware is now broken.  That's the key
 9   takeaways from this particular photograph.
10:32AM 10   Q.   Could we just blow that up, please.  We'll return to this
11   in a moment.  What are we looking in that blown-up portion of
12   the photograph?
13   A.   So this is the shaft that comes out of the motor in the
14   motor housing.  There's a motor down here behind the trim.
15   This is the toggle link, which is triangular shape that
16   connects the motor to the glass attachment hardware.  This
17   right here is the glass attachment hardware, which is a
18   circular segment that adhered to the glass.
19           You can see if you look closely in this shot that
10:32AM 20   we've got fragments of tempered safety glass attached to that,
21   so the whole series of structures, the motor, motor housing,
22   the axle, the toggle link and the glass attachment hardware are
23   present.  They're undamaged.
24   Q.   Thank you.  And did you analyze information from the right
25   side or the passenger's side third window?
```

1    A.    I did.

2    Q.    Again, did you create some exhibits from the photographs

3    and your inspection that would assist in your testimony?

4    A.    I did.

5    Q.    Can we call up 880.20 for identification.  Explain this

6    photograph, please.

7    A.    This is a scene photograph looking at the right side of

8    the vehicle, the passenger's side after it's been righted, and

9    we can see if you zoom in on this area, please, we can see

10:33AM 10    those two pivots on this side of the vehicle here and here, but

11    we're missing the third piece of attachment.  In fact, we're

12    missing the whole motor housing, at least the portion of the

13    motor and the axle that extend out from behind the trim.

14    They're fractured off, they're not present on scene.

15    Q.    Okay.  Could you back out, please.  Just show that.  I

16    believe you did a vehicle inspection, true?

17    A.    I did.

18    Q.    What, if any, observations did you make on the interior of

19    the vehicle around the window?

10:34AM 20    A.    Well, I found a part that corresponds to what I just

21    described as missing with respect to the regulator hardware and

22    the toggle link.

23    Q.    And if we could go back to Exhibit 882.2 for

24    identification, please.  You described this as what, please?

25    A.    It's part of the motor and motor housing and the axle and

1    the gears, and it's a portion of the toggle link that goes

2    between the actuator, the motor and the glass attachment

3    hardware, so there's two locations where this particular piece

4    is broken, one at the toggle link, one at the motor housing.

5    Q.    Okay.  Did you just mention that you found something with

6    respect to the window opening device, the regulator in your

7    vehicle inspection; is that right?  What did you find?

8    A.    I found this part.

9    Q.    When you looked at the inside of the vehicle, did you look

10:35AM 10    at -- I'm looking at the back of the markup of the window, and

11    there's trim and the like surrounding the window.  Did you look

12    at that portion of the vehicle?

13    A.    I did carefully examine the parameter for both the right

14    side and left side windows, inside and outside.

15    Q.    What did you observe or find relevant to your opinions on

16    the passenger's side of the vehicle?

17    A.    On the passenger's side, I found a deposit of short fibers

18    consistent with hair just above the D pillar trim, so at the

19    back edge of that window opening, on the top of the trim up on

10:36AM 20    the headliner.

21    Q.    Above the regulator that we've been talking about?

22    A.    Above that regulator and attachment hardware, that's

23    right.

24    Q.    Did you find anything else of consequence in looking at

25    that area that would be the inside of the unit?

1    A.    There was deposits, fluid deposits, but that's what comes

2    to mind.

3    Q.    If we could continue with your analysis of the passenger's

4    side right rear quarter window and the hardware, would you call

5    up 880.22, please.  What are we looking at here, please?

6    A.    On the left, I'm taking a photograph behind the trim

7    showing that the motor housing and gear housing is exposed,

8    it's been broken, and the mating piece I did find in the rear

9    seat area.  I'm holding it in my left hand when I take this

10:37AM 10    photograph that's shown here on the right.  I've got some

11    additional close-ups that focus in on that.

12    Q.    You mentioned something about trim.  What did I just line

13    up here?

14    A.    You just drew over the what I'll call the D pillar trim.

15    Q.    Okay.

16    A.    So it's trim material that goes to the interior of the

17    vehicle.

18    Q.    And is that the way that you found it when you looked at

19    the vehicle?

10:37AM 20    A.    Yeah, I might be using my finger on the bottom edge to

21    open it up a little bit so I can take this shot, I don't

22    recall.

23    Q.    When the trim is in place, are you able to see the motor?

24    A.    If it's properly in place, no.

25    Q.    So explain the relationship of the trim that appears beige

1    here and the motor for the window.

2    A.    So this piece that I'm circling on the right would

3    normally reside behind the trim and made up to the area that

4    you can see exposed in there.  It would be hidden.  All that

5    would come out is the shaft, the axle that drives that open and

6    closed.

7    Q.    And, again, you mentioned that the shaft is attached to

8    the toggle link which is attached to the pad that adheres to

9    the window?

10:38AM 10    A.    That's right.

11    Q.    Are you through with 880.22, which is what we're looking

12    at?

13    A.    I think so.

14    Q.    Would you call up 880.23 and explain that to the jury,

15    please.

16    A.    All right.  So when I looked at this toggle link, that's

17    this piece right here, normally it has a triangular shape, and

18    what you can see in the area that I'm focusing on in the

19    photograph is that it's fractured photograph.  That is a

10:38AM 20    fracture surface.  That piece is broken, and that's in the area

21    between our motor and the glass, so just out near where it

22    attaches to the glass hardware, it's been fractured off, and

23    it's been fractured off in a manner consistent with the glass

24    being forced outward and overloading that component.

25            If we look at this regulator hardware in general

1     though, it's broken a second way, and that is that the whole

2     motor housing was then fractured, and my analysis, my opinion

3     this happened when something directly loaded the shaft area

4     that does stick out of the trim and applied a torsional

5     movement, pushed it inside to out, torqued it outboard.  That

6     created this spiral fracture down here on the motor housing, so

7     two distinct events involving this particular piece of

8     hardware.

9     Q.    With reference to the toggle link, did you find that after

10:39AM 10    the accident, for instance, inside the vehicle?

11    A.    There was a portion of the toggle link attached to the

12    regulator hardware.

13    Q.    Okay.  What about the portion that glues to the window?

14    A.    No, I did not find that.  I did not find the section that

15    would attach what glues to the window to this fracture surface.

16    It wasn't present.

17    Q.    Are you done with 880.23?

18    A.    I believe I am.

19    Q.    Would you call up 880.21 for identification.  Again, it's

10:40AM 20    a series of four photographs; is that right?

21    A.    It is.

22    Q.    And the colors associate where the pictures come from; is

23    that right?

24    A.    That's right.

25    Q.    Would you explain what we're looking at, please.

1    A.   Well, similar to the other side, I'm looking at fracture

2    fragments that remain.  In this case, we don't have the

3    attachment point at the rear, so we've got the two front

4    pivots, and I'm looking for information that would allow me to

5    determine the origin on this particular window.  I did not find

6    one.

7    Q.   Do you have an opinion, Dr. Carhart, to a reasonable

8    degree of probability and certainty as to how that toggle link

9    and the housing for the motor fractured?

10:41AM 10   A.   Yeah, I do.

11   Q.   What is that opinion if you could explain the basis for

12   it?

13   A.    Yeah.  The opinion is that this window was broken as a

14   result of inside to outside loading, and that's consistent with

15   an occupant loading it from the inside to the outside

16   direction, an occupant moving rightward into the glass, loading

17   the glass, overloading the back edge of the glass where it

18   attaches to the toggle link, essentially breaking that, causing

19   the glass then to swing open because it's unconstrained at its

10:41AM 20   back edge once that link is broken and then breaking as it

21   basically swings into the open position.

22         My basis for that is my observations on the vehicle,

23   my observations on the regulator hardware and the scene

24   evidence as well.

25   Q.   What about testing evidence?

1    A.    Yeah, I did consult some crash testing which demonstrates

2    this particular phenomenon, yes.

3    Q.    Any other testing?

4    A.    Dr. Batzer has done some testing loading inside to out

5    looking at the behavior of the toggle link.

6    Q.    Okay.  Now, you already told us that the event that

7    fractured the toggle link and the housing occurred, there are

8    two breaks; is that right?

9    A.    There's two breaks.

10:42AM 10   Q.    Do you have an opinion as to whether or not those

11   fractures of the device occurred at the same time?

12   A.    I believe they did not occur at the same time.

13   Q.    Would you explain why that is the case and the basis for

14   it?

15   A.    Sure.  In order to break that triangular toggle link

16   that's right out near the glass attachment hardware, you have

17   to hold back both sides.  You have to put it in tension, tear

18   it apart, if you will, and that can't happen if the motor

19   housing is broken.  If the axle is free, there's not going to

10:42AM 20   be a mechanism to load it in tension, and so we have one event

21   that gives rise to the toggle link break and then a second

22   event, which I believe is associated with occupant movement in

23   the opening, that snags that axle that's sticking out of the

24   trim, torques the housing and rips it from behind the trim.

25   Q.    Now, you mentioned that is some testing supports these

1    opinions; is that right?

2    A.    I did.

3    Q.    Explain the crash testing that you're talking about.

4    A.    Well, I did consult two moving crash tests, which is one

5    vehicle impacting another.  It involved an Expedition of the

6    prior generation.  It was struck in the left rear, so there was

7    a direct contact glass breakage on the left side cargo window,

8    the vehicle yaws around and then hits a fixed object that was

9    put there, high severity, high speed, and by inertia, that

10:43AM 10    causes the glass to continue to want to move downstream while

11    the vehicle abruptly stops.

12           And in that particular test, it demonstrated both

13    features of the glass fracture that we have on this side,

14    direct contact on one side creating a fracture pattern

15    consistent with outside in loading intact hardware on the

16    opposite side creating a pattern of evidence that we have on

17    the passenger's side of this vehicle, inside to out loading

18    overloads the toggle link, the glass swings open and fractures.

19    Q.    What about Dr. Batzer's testing, you consulted that?

10:44AM 20    A.    I did.

21    Q.    You consulted his report; is that right?

22    A.    I read his report.

23    Q.    You read his report?

24    A.    I read his report in this case, and I also consulted some

25    prior testing that Dr. Batzer had conducted, both his

1    photographs and test documentation.

2    Q.   Did you read the testimony he gave in court before the

3    jury?

4    A.   I did.

5    Q.   What testing are you referring to when you refer to

6    Dr. Batzer's testimony testing, if we could call up 886.2.12,

7    please.

8    A.   Yeah, the first one that I would refer to is some testing

9    that Dr. Batzer did back in 2005 on an Expedition where he was

10:44AM 10   loading this movable or similar movable window configuration,

11   shares the same regulator hardware.  It's got a little

12   different attachment to the glass, but he loaded this in some

13   testing and observed the kind of toggle link fracture that we

14   see here.

15   Q.   If you could call up 886.2.13, is this the data that came

16   from his testing?

17   A.   It is.

18   Q.   Would you explain this to the jury.

19   A.   Yeah, he ran a number of drop tests using a 40-pound

10:45AM 20   impactor, so it's a guided impactor with a head form that

21   weighs in total 40 pounds.  He dropped it from four different

22   heights.  When he dropped it from a height of six inches

23   yielding an impact speed of 3.9 miles per hour, he overloaded

24   that toggle link, and the glass swung open.  It didn't break,

25   but it broke the hardware at the back edge of the window

1    opening.

2    Q.   Did you review the photos that he took of that testing?

3    A.   I did.

4    Q.   If you could call up 886.2.14, please.  What is this,

5    please?

6    A.   Well, this shows the glass after the impact so that link

7    that would normally be back here attaching the back edge of the

8    glass to the vehicle has been overloaded, fractured, and so

9    without that constraint, it can pivot outward, and I believe

10:46AM 10    that's what occurred on the passenger's side in our crash.

11    Q.   And did Dr. Batzer take pictures of what the toggle link

12    looks like after the fracture?

13    A.   He did.

14    Q.   Could we call up 886.2.16.  What are we looking at here,

15    please?

16    A.   So the regulator motor is behind the trim, so you don't

17    see it, you can see the shaft coming out here and then

18    connecting to the toggle link, and it's not the best

19    photograph, but the toggle link, which is right in there is

10:46AM 20    what fractured during this test.

21    Q.   Okay.  And how does that compare to the passenger's side

22    or the right side of the Expedition involved in the crash we're

23    here for?

24    A.   We see a similar breakage at the toggle link on the

25    passenger's side of our vehicle consistent with this kind of

                1    inside to outside loading mechanism.

                2    Q.   And how, if at all, does that support your views and

                3    opinions in the case?

                4    A.   It's supportive of my overall analysis that the right side

                5    glass, the passenger's side glass, was overloaded by the

                6    occupants following their movement on barrier contact.

                7    Q.   How, if at all, does this compare to the left side or the

                8    driver's side rear window?

                9    A.   So what is notably absent on the driver's side of the

    10:47AM  10    vehicle is this kind of damage.  The hardware's completely

               11    intact.  If it were loaded hard in the inside to out direction,

               12    we'd expect similar overload at the hardware.  We don't see it.

               13    We've got glass that was broken out in the middle of the pane,

               14    yet the attachment hardware is completely intact.  How can that

               15    occur?  It can occur on an outside to in load, just like we

               16    have roof panel deformation loaded outside to in, we have glass

               17    loading outside to in.  We can overload the glass and break it,

               18    push it into its weatherstrip but not overload the hardware,

               19    and I believe that's what occurred on the driver's side of the

    10:48AM  20    vehicle outside to in.

               21    Q.   Now, do you have an opinion to a reasonable degree of

               22    certainty and probability as to the distribution of glass that

               23    was broken from the inside out in this manner?

               24    A.   I do.

               25    Q.   What is that opinion and why?

1    A.    Yes, so my opinion is that the passenger's side glass was

2    broken out as a result of inside to out loading while the

3    vehicle was still upright.  The portion of the sequence where

4    that would occur is when the vehicle slams into the barrier.

5         The occupants have inertia, they continue to move

6    along their path.  Loading the glass inside to out overloads

7    the hardware, causes the glass to lever open, like we saw in

8    the photographs, it breaks, it disperses widely because the

9    vehicle is still upright.  That glass then goes downstream, but

10   it gets distributed widely because the vehicle is upright.  In

11   contrast, had it broken while the vehicle was against the

12   ground, it would be more concentrated.

13   Q.    Do you have an opinion to a reasonable degree of certainty

14   and probability as to how the glass field would appear when

15   broken from the outside in?

16   A.    Well, it depends on where.

17   Q.    Okay.  In the context of this case?

18   A.    In the context of this case, if it's broken outside in, I

19   think we're talking about an event where the vehicle is down

20   against the ground.  When the vehicle is down against the

21   ground, if it's broken outside in, it's not going to have a lot

22   of velocity, it's going to end up in a concentrated deposit.

23   Q.    Now, with reference this case, did you find a dispersed or

24   widely dispersed field of glass?

25   A.    I did.

1    Q.   And where was that located?

2    A.   It was extending toward the vehicle rest position and

3    beyond.  There's a big spill, if you will, or dispersed area

4    tempered safety glass that's gray in color that extends in that

5    area.   I think we showed it earlier.

6    Q.   If we could call up 887.6.16 for identification.  Does

7    this photograph help illustrate that testimony?

8    A.   It does.

9    Q.   Would you show the ladies and gentlemen of the jury the

10:50AM 10   dispersed field from the inside to out passenger or right side?

11   A.   I just circled kind of a D-shaped area there where there

12   is dispersed glass, and if you look around the vehicle and look

13   at some of the other views, you can see it's on the other side

14   of the vehicle as well, but in this photograph, in that general

15   area is the dispersed deposit.

16   Q.   If we were to look at the police photographs looking

17   eastward back towards the vehicle back towards Boston, what, if

18   anything, would we see with respect to this dispersed field of

19   glass?

10:50AM 20   A.   More dispersed gray tempered safety glass.

21   Q.   Does this photograph also depict the concentrated pile of

22   glass?

23   A.   It sure does.

24   Q.   Where is that?

25   A.   It's right here.

1    Q.    Where did that glass come from?

2    A.    It came from the driver's side window.

3    Q.    Now, with reference to the driver's side, you showed us

4    your pictures of the vehicle and the dent on the roof and the

5    dent above the driver's side third window.  Do you recall that?

6    A.    I do.

7    Q.    How, if at all, does that relate to the fracture from the

8    outside to the inside of the driver's side third window?

9    A.    Well, the damage pattern on the vehicle demonstrates

10:51AM 10    outside to in loading on the roof panel and on the roof rail,

11    and the findings at the window opening are the same, they're

12    consistent with outside to in loading, so that goes to my

13    opinion that the glass fracture of the vehicle damage happened

14    as a result of Mr. Zeolla being interposed between the vehicle

15    and the ground.

16    Q.    During your vehicle inspection, did you examine the seat

17    belts in the third row?

18    A.    I did.

19    Q.    What, if anything, did you see regarding the use of those

10:52AM 20    belts?

21    A.    I did not find any evidence of use during this crash.

22    Q.    Let me turn your attention, please, to some of the

23    opinions that you have in the case.  Do you have an opinion as

24    to where, when and why the glass in the passenger's side third

25    row windows broke during the accident sequence?

1    A.    Yes.

2    Q.    What is that opinion and what's the basis for it?

3    A.    That the passenger's side glass broke out following

4    contact to the barrier.  It broke out as a result of occupant

5    motion and occupant loading inside to out that overloaded the

6    toggle link, caused the glass to swing open, break and get

7    widely dispersed.

8    Q.    Do you have -- what about the evidence that you had

9    presented earlier regarding the fluid that you observed at the

10:52AM 10   scene?

11   A.    Yeah, of what significance is the fluid?

12   Q.    Yes.

13   A.    Well, again, we have fluid deposits.

14         MR. GREEN:  Objection, your Honor, for the same

15   reasons.

16         THE COURT:  Is this in his report?

17         MR. CAMPBELL:  Absolutely it's in his report.

18         THE COURT:  All right, I'll allow it.  Again, I

19   understand he's testifying that it's consistent with his

10:53AM 20   opinion.

21         MR. CAMPBELL:  That's correct, Judge.  I can rephrase

22   it if you'd like.

23   Q.    The evidence that you described on the accident scene

24   regarding the fluid deposits --

25   A.    Yes.

1    Q.    -- is that consistent with your view about where the

2    passenger's side window broke out?

3    A.    Yeah, in order to have a fluid deposit before the vehicle

4    overturns, we've got to have broken glass.  We have to have a

5    side window in the third row that's disrupted so that we can

6    get some contents from the vehicle interior to the exterior at

7    the first level, so in order to get a deposit in the roadway

8    before it's rolling over, glass has got to be broken.  An

9    occupant had to come outside the vehicle.

10:54AM 10    Q.    Do you have an opinion to a reasonable degree of certainty

11    and probability as to where, when and why the glass in the

12    driver's side third row window broke during the accident

13    sequence?

14    A.    I do.

15    Q.    What's that opinion and explain the basis for it?

16    A.    The opinion is that the glass on the driver's side of the

17    vehicle broke out as the vehicle rolled over Mr. Zeolla, the

18    one quarter, three-eighths position that there was outside to

19    inside loading present on the roof panel and into the glass

10:54AM 20    plane, he loaded centrally into the glass plane creating the

21    fracture that I described for you earlier.  The basis for that

22    is my observations at the time of my vehicle inspection, my

23    understanding of the accident reconstruction, the

24    photogrammetry analysis we did to place the evidence relative

25    to Mr. Croteau's reconstruction and the deposits.

1    Q.   Have you prepared an animation that illustrates and

2    demonstrates those opinions?

3    A.   I have.

4    Q.   Now, you mentioned early on that you did some work with

5    photogrammetry; is that right?

6    A.   I did.

7    Q.   If we could, and have you prepared some exhibits that

8    demonstrate how that process worked in your work on this case?

9    A.   I have.

10:55AM 10    Q.   And did you use that in connection with preparing the

11    animation?

12    A.   Yeah, I used that photogrammetry technique to place the

13    physical evidence that we can see into the animation.

14    Q.   If we can run through a few of the pictures that you did.

15    If we would call 887.6.16.  This is a police photograph; is

16    that right?

17    A.   It is.

18    Q.   If we could call 887.6.17.  Explain this to the jury,

19    please.

10:56AM 20    A.   This is an overlay of three-dimensional information, a

21    scan acquired from the scene area, and what we're doing is

22    showing how we're going to position a three-dimensional model,

23    a scan of this scene into the photograph.

24         The photogrammetry process when done on the computer,

25    as we've done it here, we create a three-dimensional model.  We

1    place the camera in the model in the same location where the

2    person was standing when they took this photograph.  When we

3    get that matched up, when we get the scene to match the

4    photograph in terms of permanent lines, like the lane lines,

5    like the barrier, like the gouge mark in the police barracks,

6    when we get that lined up, then we know we've got the camera in

7    the right location in the three-dimensional model, and then we

8    can then go trace the physical evidence in the photo into the

9    three-dimensional model and then extract its location.  We

10:56AM 10    basically determine where it is by analyzing quantitatively the

11    photograph.

12    Q.   If we we go to 887.6.18, please.  Explain what you've done

13    here.

14    A.   So now we've gone from the scan to a three-dimensional

15    surface representing the scene, we've got our barrier features,

16    there's some light gray lines in here, we've got the gouge mark

17    right in here, got the tire mark depicted, we've got lane lines

18    out there, so we're basically setting up those permanent

19    features and demonstrating them over the top of the photograph,

10:57AM 20    and at the same time we're going to trace out where we see

21    physical evidence in the scene ultimately allowing us to then

22    put this physical evidence, for example, this location of a

23    blood deposit back into a three-dimensional scene.

24    Q.   So when you're at the scene, the barrier's there, the

25    building is there, the lane lines are there, but things like

1    the fluid, what's been described as blood on the roadway,

2    they're gone; is that right?

3    A.   All those things are gone, this gouge is still there is my

4    understanding, or it recently was, but many of these features

5    are gone, and so we can use this photographic technique,

6    photogrammetry to replace them and identify where they were.

7    Q.   And go to 877.6.18A, please.  What do we have here?

8    A.   So now we've pulled back to the three-dimensional model,

9    and we've positioned that physical evidence into the same

10:58AM 10   location in the photograph, and I've got the camera set up here

11   in the three-dimensional model in the same location.  If you're

12   able to toggle back and forth, you'll see that it corresponds

13   to the photo.

14        Now we've got -- we've extracted that physical

15   evidence from the photographs.  We've extracted the location of

16   the tire mark, the gouge, the blood deposits on the ground, for

17   example, the blood deposits on the barrier over here, fluid

18   deposits in the roadway and then these fields of glass,

19   concentrated field denoted there and then the distributed field

10:58AM 20   denoted there.

21   Q.   And just another example if we could quickly go through

22   exhibits for I.D. 887.6.2.3 and .3A, please.  If you could

23   explain them as they come up on the screen.

24   A.   So the same process here, and I actually did this with six

25   distinct photographs, and the reason we might want to do that

1    is some things might not be visible in every photograph, and

2    then the other advantage of doing that is that if it fits in

3    one photo and it fits in the other photo, which it did, we've

4    got a very strong or good fit to the evidence.

5          If we had just one camera, one photograph, it may not

6    be as good.  Here we had six camera shots that actually

7    depicted these locations, and so if you toggle to the next,

8    you're going to see that same process.  There's the scene scan,

9    which includes the gouge in the roadway.  If you go to the

10:59AM 10   next, you're going to see tracing out that physical evidence in

11   the roadway and then ultimately the same view from the

12   three-dimensional model.

13   Q.   And then did you before you created the full animation,

14   did you prepare some slides that illustrate your opinions and

15   demonstrate your opinions?

16   A.   I did.

17   Q.   If we could call up 887.7.22, please.  These are slides

18   that go through 887.7.63.  Explain, please, how these slides

19   are set up and how we walk through them.

11:00AM 20        MR. GREEN:  Your Honor, I'd just renew my objection

21   that we had this morning about the use of these slides.

22        THE COURT:  All right.  Overruled.  Go ahead.

23   A.   So --

24   Q.   What is this series of slides?

25   A.   This is an overhead view from the three-dimensional model

1    where I'm depicting Mr. Croteau's accident reconstruction, I

2    think as you had it explained to you, and he directly provided

3    us with the information that went in here, and then I'm

4    incorporating the physical evidence that we extracted from the

5    photogrammetry and my opinions about the glass breakage timing

6    and sort of demonstrating all that in an overhead

7    three-dimensional model.

8    Q.   And that's depicted in these slides that we just

9    identified as 887.7.22 through .63 in that series?

11:01AM 10    A.   That's right.

11    Q.   And from that you created an animation, the next

12    iteration?

13    A.   I did, the next iteration was to actually put that in a

14    time sequence.

15    Q.   And at this time I'd like to -- and the animation has

16    several different views; is that right?

17    A.   It does, two different views.

18    Q.   Okay.  If we could call up Exhibit 887.1, please.  If we

19    could go back to the start of this line, if you could narrate

11:02AM 20    it, please.

21    A.   Sure.  Maybe if you can go toggle, this is one-tenth speed

22    in the way we've set up the animation, and so it's picking up

23    at the front interaction with the barrier which produces --

24         THE COURT:  Meaning in real life, it happened ten

25    times as fast?

           1              THE WITNESS:  Yes, if we play it, yes.

           2     A.   So here we're picking up the right front contact with the

           3     median barrier.  That's going to cause the vehicle to slow,

           4     induce that big delta-v that Mr. Croteau talked about.

           5     Occupants are going to continue to move rightward with respect

           6     to the vehicle.

           7     Q.   Can we stop, please.  We've heard about a green ball.

           8     What's this, please?

           9     A.   I'm demonstrating just in generic sense Mr. Zeolla's

11:02AM  10     motion.

          11     Q.   Okay.

          12     A.   If you back up just a second or a fraction of a second,

          13     what I'm demonstrating here is the toggle link overload and the

          14     glass swinging out intact.  It can only do that so far before

          15     the stress gets too great at the front pivots and it fractures,

          16     which is what's depicted in the next few frames if you toggle

          17     forward.  The toggle link's overloaded, the glass swings open,

          18     it fractures, the glass and Mr. Zeolla continue to move along

          19     their inertial path towards the barrier, Mr. Zeolla strikes the

11:03AM  20     barrier, glass strikes the barrier and gets projected

          21     downstream.  This glass breakage, because it's coming from an

          22     upright vehicle that's moving at a high speed, is going to

          23     create a very diffuse deposit because ultimately we're going to

          24     show it's a little bit difficult to pick up, if you pause for a

          25     second, you can see that we've got glass coming downstream

1   where it's going to get deposited into a diffuse area.

2          Go ahead and play.  There's actually two versions of

3   this.  This one doesn't show Mr. Zeolla's continued path off

4   the barrier and into the path of the vehicle, but I believe

5   that he was underneath the roof rail.  Can you back up?  He

6   bounced off the barrier and into the path of the vehicle.

7   Q.   We can show the other version.

8   A.   That would be helpful.

9   Q.   Why don't we go to 887.2, please.  If we could just let

11:04AM 10   this roll and then if you could narrate it, please.  Okay.  If

11   we could go back to the start, and if you could narrate this.

12   This is an overhead view of the animation?

13   A.   Yes.  Now we've switched views and now we're incorporating

14   more of the information about Mr. Zeolla.

15          MR. GREEN:  Judge, I just renew my objection.  This is

16   being gone over and over again the subject that I objected to

17   this morning.

18          THE COURT:  All right.  I'll give you a standing

19   objection.  You don't need to keep repeating it.

11:05AM 20          MR. GREEN:  Thank you, your Honor.

21          THE COURT:  Go ahead.

22   Q.   Please narrate what we're seeing.

23   A.   Back up, please.  I just want to emphasize again, so we

24   get outward loading on the inside of the passenger side glass,

25   inside to out loading, overload the toggle link, the glass

1     swings open, eventually swings far enough that the stress

2     rises, it breaks, it breaks into small fragments as tempered

3     glass does when it breaks, those fragments and Mr. Zeolla

4     continue towards the barrier, they are redirected downstream,

5     Mr. Zeolla into the path of the vehicle, and he gets rolled

6     over at about the quarter to three-eighths roll position by the

7     driver's side roof rail that creates outside to in loading on

8     the glass, it creates outside to inside loading on the roof

9     rail, creates deformation and the glass breakage.

11:06AM 10         The glass on the driver's side because it's down

11    against the ground ends up in a concentrated deposit basically

12    adjacent to the area where he was overrun.

13    Q.    We see here there's a blue object, a ball; is that right?

14    A.    Yes.

15    Q.    What is that, please?

16    A.    It's Mr. Sorensen.

17    Q.    Okay.  Now, you told the jury that you have an opinion

18    that the toggle link and the motor housing fractured at two

19    different times; is that right?

11:06AM 20    A.    I did.

21    Q.    And we've located the parts?

22    A.    Good.

23         MR. CAMPBELL:  Your Honor, may I hand these?

24         THE COURT:  Yes.  I'm sorry, are these samples, not

25    the actual link?

1          MR. CAMPBELL:  It's not the actual piece, your Honor,

2     it's a sample.

3          THE COURT:  All right.  Let's lay a foundation that's

4     what it is.

5     Q.   Dr. Carhart, would you explain to the ladies and gentlemen

6     of the jury and the Court what I've just handed to you?

7     A.   Yeah, these are exemplar parts.

8     Q.   What do you mean by exemplar?

9     A.   I mean these are replacement parts for the subject

11:07AM 10   vehicle, and we obtained them from the dealership and said,

11     okay, I'd like to get the motor, the motor housing, the axle

12     and the toggle link, and so we did obtain those from a dealer.

13     Q.   So it's an exact or it's a duplicate of what would be in

14     the car, an example of it, but it's not the actual part?

15     A.   This did not come from the subject vehicle, this is a

16     replacement for what was in there at the time of the crash.  It

17     would be a replacement on this make, model of the vehicle.

18          MR. CAMPBELL:  Your Honor, since it wasn't there when

19     he was in front of the jury, may I have him come down and just

11:08AM 20   show?

21          THE COURT:  Yes, we need him to identify this.

22          MR. CAMPBELL:  Is the next one up G for

23     identification?

24          MR. ROGERS:  I believe it's K.

25          MR. CAMPBELL:  If I could have the exemplar parts

1    marked as K for identification.

2             THE COURT:  Okay, go ahead.

3             (Exemplar parts were marked Exhibit K for

4    identification.)

5    Q.   Dr. Carhart, if you could come down and show the jury what

6    you have.  Do we need this rolled over or not?

7    A.   It wouldn't hurt.

8    Q.   I'm going to tilt this up.

9    A.   These are replacement parts for what's on here so it's

11:09AM 10   going to be the same as what's on the vehicle.  What I didn't

11   obtain was the link, that circular pad that attaches to the

12   glass, but this is the hardware that then attaches to that

13   location.

14            Now on the subject right side, on the subject vehicle,

15   we had two locations of breakage.  We've been talking about

16   this toggle link, which is this triangular piece right here.

17   It was fractured right here, but there was a secondary fracture

18   on the overall assembly down here on the motor housing, and

19   I've broken one by the mechanism.

11:09AM 20   Q.   Is this different than we've just been shown?

21   A.   It's the same part but I've broken it.

22            MR. CAMPBELL:  So if we could mark what's after K, L?

23            THE COURT:  Exhibit L will be the broken part, L for

24   identification.

25            ( Broken exemplar part was marked Exhibit L for

1    identification.)

2    A.    I talked about there being two breaks on the toggle link,

3    one here, excuse me, two breaks on the overall assembly, one on

4    the toggle link and a second one where after this is broken,

5    something loaded the axle and literally torqued it outward like

6    this and created a spiral fracture, and that's very similar to

7    what we found on the subject vehicle, so the two loading events

8    create two distinct events.  One, the toggle link, and

9    secondarily here, and the significance is that this piece is

11:10AM 10    generally going to be behind the trim, and if you had a loading

11    event here that broke the toggle link, you wouldn't necessarily

12    have this break and come outside the vehicle, but the way that

13    that can happen if it's sticking out after this is fractured,

14    after the glass is gone, something engages the axle and rips it

15    outward, takes it outside the vehicle.

16    Q.    Using the overhead view that we were looking at, I think

17    that was 887.2, could you as it rolls through identify where in

18    your opinion as you've expressed the toggle link fractures and

19    then the motor housing fractures?

11:11AM 20    A.    So the toggle link is about to fracture as we're rolling

21    here, and the timing is just preceding that glass swinging in

22    the open position and then breaking.  I don't believe that the

23    actual motor housing is broken until we're closer to rest where

24    we have some occupant moving through the opening, most likely

25    by Mr. Sorensen.

1   Q.   Continue on, please.  If you could, would you show us

2   where you believe the housing fractured.

3   A.   Yeah, I think the housing is getting fractured as

4   Mr. Sorensen is moving into the window opening getting

5   partially ejected, which is happening here at the half to

6   three-quarter roll position.

7   Q.   I just noticed that the green object, and that depicts

8   Mr. Zeolla; is that right?

9   A.   It's just meant to be a very simple depiction of the

11:12AM 10   physics of his movement, yes.

11   Q.   Why after the vehicle passes by does it go in that

12   direction?

13   A.   Why does it go back upstream a little bit, if you watch

14   the way the vehicle rolls, can you scribe back or scroll back

15   to the roll sequence?  The vehicle is rolling like a fan where

16   the front end is encompassing a pretty big space whereas the

17   back end is rolling very tightly, and if you look at that

18   spatially or you analyze it, the roof rail in the area where it

19   overruns Mr. Zeolla actually has a velocity that's back

11:12AM 20   upstream.  It's that particle analysis, the kinematic analysis.

21        MR. GREEN:  I object.  This is beyond the scope of his

22   report.

23        THE COURT:  All right.  That will be struck.  Let's

24   move on.

25   Q.   If we could play 887.3, please.  What are we looking at

1    here?

2    A.    It's the same thing without any occupant kinematics

3    depicted.

4    Q.    If you could play 887.4, please.  What is this one?

5    A.    It's going to be similar to a view that we looked at from

6    the downstream where we don't show Mr. Zeolla's motion past the

7    barrier interaction, so, again, focusing on the glass breakage.

8    Q.    887.5, please.  What is this view?

9    A.    This is the downstream view again without Mr. Zeolla's

11:14AM 10    motion depicted, just focusing on the glass deposits.  We were

11    about to get the driver's side breakage and the low side

12    concentrated deposit.

13    Q.    And then finally 887.9.  If you could, you mentioned where

14    the low side glass broke?

15    A.    Yeah, I think it's best depicted in this particular

16    downstream shot.  You can see that the depiction for

17    Mr. Zeolla, the green dot is in the vehicle roll path, he's

18    overrun, he's engaged by the roof rail, the roof panel, and I

19    believe the window on the driver's side of the vehicle that

11:15AM 20    fractures it creates that low side concentrated deposit.

21    Q.    Why does the glass from the driver's side that fractures

22    when the vehicle rolls over Mr. Zeolla continue westward away

23    from Boston?

24    A.    Because it had linear velocity downstream.

25    Q.    What do you mean linear velocity?

1    A.    You have to look at how different points on the vehicle

2    are moving at that point, and the vehicle is rolling down its

3    roll path.   There are points on the vehicle because of rotation

4    that will be moving upward and some that are moving downward

5    due to those rotation components, and Mr. Croteau talked to you

6    about that in terms of the yaw motion, here we're talking about

7    in terms of the rolling motion.   The glass on the vehicle at

8    this point in the sequence has a net velocity that's

9    downstream, and that's why it goes downstream a bit.

11:15AM 10   Q.    Thank you.   You mentioned that you considered and reviewed

11   Dr. Batzer's report and deposition materials?

12   A.    I did.

13   Q.    Have you analyzed and do you have an opinion to a

14   reasonable degree of certainty and probability as to

15   Dr. Batzer's opinion that Mr. Zeolla was ejected through the

16   driver's side window at Mr. Croteau's position Number 10 on the

17   accident reconstruction diagram?

18   A.    I've reviewed that opinion.   I disagreed with that

19   opinion.

11:16AM 20   Q.    Would you explain what your review and why you disagree

21   with it?

22   A.    Looking at the vehicle dynamics first and foremost,

23   there's no impetus to drive an occupant hard left at that point

24   in the sequence.   The vehicle is decelerating at seven-tenths s

25   of a g or thereabouts, and so there's no mechanism to have the

1    occupant moving hard in that direction.

2         MR. GREEN:  Objection, your Honor, beyond the scope of

3    his report.

4         THE COURT:  Let me see counsel.

5         (THE FOLLOWING OCCURRED AT SIDEBAR:)

6         THE COURT:  You said beyond the scope of his report?

7         MR. GREEN:  I don't believe it is.  He is specifically

8    analyzing several of the opinions that Dr. Batzer offered.  He

9    made a further submission in a written format in his

11:17AM 10    deposition, but this is the first report that he did.

11         THE COURT:  It seems his answer had technical

12    information that I don't see in the report.  Let's stick to the

13    report.  I have to say I have had more objections to things

14    beyond the scope in expert reports that an all other trials

15    I've participated in as a lawyer and a Judge.  Let's stick to

16    the reports.

17         MR. GREEN:  Thank you, your Honor.

18         (SIDEBAR CONFERENCE WAS CONCLUDED)

19         THE COURT:  The objection is sustained.

11:18AM 20    Q.   Do you have your report with you?

21    A.   I do.

22    Q.   I'd like for you to turn to page 18 and 33.  Do you have

23    that?

24    A.   I do.

25    Q.   And do you see there you have an analysis of the

1    plaintiff's expert's opinions?

2    A.   I do.

3    Q.   What I'd like you to do is to review to yourself your

4    analysis of opinion 4 and what you say about it.  Okay.

5    Dr. Carhart, do you have an opinion as to Mr. Batzer's opinion

6    that occupant interaction during the rollover, not yaw, barrier

7    impact or rollover ground interaction caused Mr. Zeolla's third

8    row window to fracture?

9             MR. GREEN:  Objection, your Honor.  Beyond the scope.

11:19AM 10        THE COURT:  Overruled.

11   Q.   What is that opinion?

12   A.   I have an opinion, I disagree with Dr. Batzer's opinion.

13   Q.   What is your analysis in that regard as set forth in this

14   report?

15   A.   That Mr. Zeolla wasn't there as a result of his prior

16   movements, he would have been projected to the right side of

17   the vehicle and already ejected.  He wouldn't be in a position

18   where he could load the left side glass at position 10.  That's

19   point Number 1.

11:20AM 20        Point Number 2 is that Dr. Batzer's analysis doesn't

21   account for the damage to the roof rail, to the roof panel and

22   the fractured pattern on the glass.  That is the absence -- in

23   addition to that, the absence of breakage to the hardware on

24   the driver's side.

25   Q.   Dr. Carhart, do you have an opinion as to a reasonable

1   degree of certainty and probability as to whether fixed

2   tempered glass would have prevented Mr. Zeolla's ejection?

3   A.   I do.

4   Q.   What is that opinion and why?

5   A.   My opinion is that fixed tempered glass would not have

6   prevented his ejection.  The energy levels that Mr. Sorensen

7   and Mr. Zeolla were exerting on the right side glass following

8   the barrier impact far exceed the capacity of fixed tempered

9   safety glass.  You've got two occupants moving at a speed above

11:21AM 10  which only portions of one of their body mass would break the

11   glass, so we've got two times that because we've got two

12   occupants, so there can be heavy loading, well above the

13   capacity.

14   Q.   The testing that you showed from Dr. Batzer was a 40-pound

15   head form; is that right?

16   A.   It was.

17   Q.   How, if at all, does this compare to two adult bodies in

18   this circumstance?

19   A.   Well, it's going to greatly underestimate what two

11:21AM 20  unrestrained adults are going to exert as they move rightward

21   in an unrestrained fashion.

22   Q.   Dr. Carhart, do you have an opinion as to a reasonable

23   degree of certainty and probability as to the design choice of

24   using a movable piece of tempered glass in the third row

25   seating position or next to the third row seating positions in

1    this 2004 Expedition?

2    A.    I do.

3    Q.    What is that opinion and why?

4    A.    I believe that it's consistent with industry, it's

5    consistent with the standards, it's consistent with federal

6    standards, industry standards, the need for ventilation in a

7    third row position, what consumers want in terms of the third

8    row position, the ability to ventilate, and I think it's in

9    accordance with the state of the art and industry practice.

11:22AM 10    Q.    And that includes the use of the movable glass mechanism;

11    is that right?

12    A.    Yes.

13    Q.    You mentioned Federal Motor Vehicle Safety Standards; is

14    that right?

15    A.    I did mention the Federal Motor Vehicle Safety Standards.

16    Q.    What is the standard that applies to window glass?

17    A.    It's FMVSS 205 which pertains to glass and glazing in

18    automobiles.

19    Q.    Have you reviewed the compliance documents for this

11:22AM 20    vehicle?

21    A.    I have.

22    Q.    Did the vehicle comply with the standard?

23    A.    It did.

24    Q.    Dr. Carhart, what is Exhibit 338.5.1, please?

25    A.    It's compliance documents from Ford Motor Company

1   pertaining to FMVSS 205 compliance certification.

2          MR. CAMPBELL:  Your Honor, I'd offer that at this

3   time.

4          MR. GREEN:  No objection at this time.

5          THE COURT:  It may be admitted, 338.1.

6          (Exhibit No. 338.1 was admitted into evidence.)

7   Q.   Dr. Carhart, do you have an opinion as to whether glass is

8   a reasonable substitute for seat belts in regard to rollover

9   ejection prevention?

11:23AM 10        MR. GREEN:  Objection, your Honor.  Leading.

11          THE COURT:  I'll allow it, overruled.

12   Q.   Do you have an opinion?

13   A.   I do have an opinion.

14   Q.   Would you state that opinion and the basis for it, please?

15   A.   Yeah, glass is not a substitute for a seat belt.  Glass at

16   the vehicle perimeter cannot control occupant kinematics.  It

17   can't do what a seat belt does.  A seat belt couples you to the

18   vehicle, gives you ridedown during crash events.  It applies

19   the loads to your body in locations where your body is tolerant

11:24AM 20   to them.  A seat belt is designed to apply load to your pelvis,

21   designed to load your thorax, bony areas on your skeleton which

22   can sustain high loads.

23          In contrast, if we look to other things, we can't

24   control where the forces are applied, we can't control your

25   body position with respect to the vehicle.  We can't do

1    anything to slow you down until you've now struck the

2    perimeter, so glass can't act as a substitute for seat belt.

3    Q.   Do you have an opinion, Dr. Carhart, as to whether or not

4    the design of the rear windows, third windows is defective or

5    not in this case?

6    A.   I do.

7    Q.   What is that opinion and why, please?

8    A.   I don't believe that the design is defective.  It's

9    consistent again with industry standards, industry practice,

11:25AM 10   federal standards and consumer desires to have ventilation.

11   Q.   Do you have an opinion as to whether or not that design of

12   these windows and their attaching hardware is unreasonably

13   dangerous?

14   A.   Do I have an opinion?

15   Q.   One way or the other.

16   A.   Yes.

17   Q.   What is that opinion and why?

18   A.   I don't think it's unreasonably dangerous.

19        MR. CAMPBELL:  Your Honor, just one moment.  Your

11:25AM 20   Honor, there's a question about whether some of the photographs

21   we used should be chalks or full exhibits.  Can we take that up

22   a later time?

23        THE COURT:  Yes.

24        MR. CAMPBELL:  With that, your Honor, I don't have any

25   further questions.

```
 1              THE COURT:  Cross-examination.

 2              MR. GREEN:  Thank you, your Honor.

 3                         CROSS-EXAMINATION

 4     BY MR. GREEN:

 5     Q.   Dr. Carhart, I'm Justin Green.  I'm going to be

 6     questioning you.  This isn't your first time testifying in

 7     court, is it?

 8     A.   It's not.

 9     Q.   I'm going to ask you a bunch of questions, most of them I

10     think are going to be relatively easy and call for yes or no

11     answers.  Can you do your best to give me a yes or no answer?

12              MR. CAMPBELL:  Your Honor, I object.

13              THE COURT:  This has to be question by question.

14     Let's just put a question to the witness.

15     Q.   One of the last things that Mr. Campbell asked you was

16     about FMVSS 205.  Do you remember those?

17     A.   Yes.

18     Q.   As I understand it, FMVSS 205 deals with the glass that is

19     installed in the Expedition and other vehicles, correct?

20     A.   It does.

21     Q.   And there's nothing in FMVSS 205 that talks about the

22     attachments for the glass; is that correct?

23     A.   That's correct.

24     Q.   So in this case, your testimony about this is compliant

25     with FMVSS 205 relates to the tempered glass that was in this
```

1    vehicle?

2    A.    That's correct.

3    Q.    Thank you.  Do you have a copy of your report and your

4    deposition in front of you?

5    A.    I have my report.  I don't have my deposition in front of

6    me.

7    Q.    You agree that only two people were ejected in this

8    accident?

9    A.    I do.

11:27AM 10    Q.    And both people were seated in the third row, correct?

11    A.    I do.

12    Q.    And both were seated adjacent to the flip-out windows that

13    you have a chalk here today?

14    A.    Yes.

15    Q.    But they weren't the only people not wearing seat belts in

16    the vehicle, correct?

17    A.    That's true.  There were two second row occupants that

18    were unbelted.

19    Q.    And the second row windows didn't break, correct?

11:28AM 20    A.    They did not.  There was one window in the second row on

21    the right.

22    Q.    That's the sail window?

23    A.    You can call it, I'll call it the fixed window, but it's a

24    smaller window in the door at the rear.

25    Q.    That didn't break during the accident, correct?

|  | |  |
|---|---|---|
| 1 | A. | I think it broke as a result of the cribbing. |
| 2 | Q. | The cribbing, and that's after the accident? |
| 3 | A. | That's right. |
| 4 | Q. | And the second row had side curtain bags, right? |
| 5 | A. | It did. |
| 6 | Q. | And Mr. O'Hara and Mr. Frederick were the two people in |
| 7 | | the second row? |
| 8 | A. | They were. |
| 9 | Q. | And neither of them were injured? |

11:28AM 10   A.   Not seriously.

11   Q.   Okay.  Neither of them went to the hospital?

12   A.   Yeah, I think that's right, I think the two front

13   passengers were transported in the second row.  Actually I'm

14   not sure, I'm not sure.

15   Q.   I want to talk a little bit about your work history and

16   your education.

17   A.   Sure.

18   Q.   You graduated, I think you said this morning you graduated

19   college in 1999, correct?

11:28AM 20   A.   '91.

21   Q.   '91.  Actually I have it written down correctly, 1991, and

22   your major was bioengineering?

23   A.   Biomechanical engineering.

24   Q.   Okay.  Did you study any automobile glass as part of your

25   undergraduate education?

1    A.    No.

2    Q.    Do you have a master's degree?

3    A.    I do not.

4    Q.    You received your Ph.D. in the year 2000?

5    A.    I did.

6    Q.    Did you do any course work regarding automobile glazing as

7    part of your Ph.D. work?

8    A.    I did not.

9    Q.    Did you do any work regarding automobile glazing before

11:29AM 10   the year 2000?

11   A.    Yeah, I investigated a lot of crashes prior to 2000, yes.

12   Q.    Okay.  Have you testified before 2000 as an expert?

13   A.    I didn't testify before 2000, I think it's probably 2001,

14   2002 frame, maybe '03 even, so I hadn't prior to 2000.

15   Q.    You were never an employee of the automobile industry?

16   A.    No, not an employee.

17   Q.    So you have never worked for any automobile manufacturer?

18   A.    I have not.

19   Q.    And you never worked for a manufacturer of automobile

11:30AM 20   glass?

21   A.    That's true.

22   Q.    You're not a licensed engineer?

23   A.    I'm not.

24   Q.    Did you ever design any glass installed in any automobile?

25   A.    I have not.

1    Q.   Did you ever design the attachments, the hardware that

2    attaches glass in any automobile?

3    A.   No.

4    Q.   Do you have any patents related to automobile glass or the

5    attachments for automobile glass?

6    A.   No.

7    Q.   We talked about FMVSS 205.  Have you ever certified an

8    automobile as being compliant with FMVSS 205?

9    A.   I've not done certification testing for 205, sorry.

11:30AM 10    Q.   I'm sorry.

11    A.   For 205.

12    Q.   What's the National Highway Transportation Safety

13    Administration?

14    A.   Did you say Hutton?

15    Q.   I said National Highway?

16    A.   What is it?

17    Q.   Yes, what is it?

18    A.   It's a federal entity that looks at roadway crash safety

19    and roadway safety in general.

11:31AM 20    Q.   Have you ever worked for NHTSA?

21    A.   I have never worked for NHTSA, no.

22    Q.   And they call it NHTSA, right?

23    A.   Why not, it's a lot quicker.

24    Q.   Right.  Did you ever consult with NHTSA?

25    A.   I've written to NHTSA, but I haven't consulted with them.

```
 1   Q.   What is S.A. Glazing Committee?

 2   A.   It's a committee that historically has contributed to the

 3   ANSI standard, which is part of FMVSS 205.

 4   Q.   Have you ever served on it?

 5   A.   I have not.

 6   Q.   Now, let me talk about your testimony.  You've testified

 7   for Ford, correct?

 8   A.   I have.

 9   Q.   You testified for Yamaha?

10   A.   I have.

11   Q.   You testified for Nissan?

12   A.   I think so.

13   Q.   Daewoo?

14   A.   I believe so.

15   Q.   Toyota?

16   A.   Yes.

17   Q.   Mitsubishi?

18   A.   Yes.

19   Q.   Any other manufacturers?

20   A.   Probably.

21   Q.   Can you tell me?

22   A.   I don't know, I'd have to kind of check through my

23   testimony list.

24   Q.   Okay.  None come to mind right now?

25   A.   Yeah, it was kind of rapid fire, I'd have to look.
```

1    Q.    That's fine.  Did you ever testify against Ford?

2    A.    I don't believe so.

3    Q.    You don't believe so or you don't know?

4    A.    No, I haven't.  I don't think I have, no.

5    Q.    Have you testified for Ford more than you've testified for

6    any other automobile manufacturer?

7    A.    I think it's fair to say that if you counted up my

8    deposition and trial testimony there would be more occasions

9    where I testified in a case involving Ford or where Ford's

11:32AM 10   attorneys were my client than any other.

11   Q.    And when you testified, you're testifying on Ford's side

12   of those cases, right?

13   A.    In the cases that are on my testimony list, I would have

14   been retained by counsel for Ford, yes.

15   Q.    When you were deposed, you gave a list of your prior

16   testimony?

17   A.    I did.

18   Q.    And that list contained about 30 different times, 30

19   different cases where you testified for Ford?

11:33AM 20   A.    I don't remember.  I don't know.

21   Q.    Can you ballpark for the jury today how many times you've

22   appeared either at trial or at deposition testifying for Ford?

23   A.    Many.

24   Q.    Many?

25   A.    Many.  I think it's more than 30.

1    Q.    Is it more than 50?

2    A.    I don't know.

3    Q.    Do you consider Ford to be a major or a significant client

4    for you?

5    A.    They're a significant client for me, yes.

6    Q.    Have you ever testified against any automobile

7    manufacturer?

8    A.    I've testified in a case where it was my understanding

9    that some parties perceived it to be adverse testimony, but I

11:33AM 10    wasn't working on behalf of plaintiff.

11    Q.    Who were you working on behalf of?

12    A.    In one case, I was working on behalf of Yokohama Tire, in

13    another case, I was working on behalf of the State of Arizona.

14    Q.    Let's talk about Exponent.  You joined that in 2003?

15    A.    I did.

16    Q.    Before joining Exponent, had you ever testified as an

17    expert in cases involving automobile glazing?

18    A.    I'd have to go back and look at my testimony list.  I

19    think I just began testifying in that time frame, maybe I had a

11:34AM 20    little bit experience at the time that I joined Exponent in

21    terms of trial or deposition testimony or arbitration

22    testimony.  I don't specifically recall what the issues were in

23    those cases.  They weren't automobile glazing claims, but I've

24    been involved in a lot of crashes over time that involved

25    occupant interaction or ejections, which often includes the

1    analysis of what happened with glass.

2    Q.   You started out really as a biomechanical engineer expert,

3    correct?

4    A.   I started out working for a firm in Phoenix, Arizona,

5    Tempe, Arizona, doing accident reconstruction, injury

6    biomechanics, general crash investigation and analysis.

7    Q.   But you developed your expertise regarding automobile

8    glazing as part of your work in litigation?

9    A.   I developed it, I developed it over time, that's true.

11:35AM 10    Q.   So at some point on your resume', you did not include an

11    expertise in automobile glazing, and then about -- I think it's

12    about the year 2000, you added that to your resume', 2006, I

13    mean?

14    A.   That could be the timing, it could be.

15    Q.   Can you tell the jury what percent of your work today

16    involves testifying in cases on behalf of Ford?

17    A.   I don't know what the percentage is.  This week it's

18    probably 100 percent, but I don't know what the percentage is.

19    Q.   Is it 50 percent overall?

11:35AM 20    A.   I don't know.

21    Q.   We heard from Mr. Croteau this morning.  Other of your

22    colleagues at Exponent also testified for Ford?

23           MR. CAMPBELL:  Objection, your Honor.

24           THE COURT:  I'll allow it to the extent he knows.

25    A.   Yeah, I think I have colleagues at Exponent who have been

1   retained by Ford.

2   Q.   Do you know of any colleague at Exponent who has ever

3   testified against Ford?

4   A.   I don't know of that occasion.

5   Q.   You're a principal at Exponent?

6   A.   I am.

7   Q.   What does that mean?

8   A.   It's a job title and a series of job titles.  We have

9   associates, senior associates, managers, senior managers,

11:36AM 10   principals and then directors and corporate officers, so for me

11   it means that it comes with certain responsibilities in terms

12   of professional development, business, leadership and team

13   work.

14   Q.   Does Karen Balavich who testified in this case by

15   deposition, does she work at Exponent?

16   A.   Karen Balavich does work in the Detroit office.

17   Q.   Are you aware that Exponent is a publicly-traded company?

18   A.   I am aware of that.

19   Q.   And the way you're compensated is you get a salary and

11:37AM 20   you're eligible for bonuses?

21   A.   All Exponent employees are eligible for bonus, yes.

22   Q.   And whether you get a bonus or not depends on your

23   performance?

24   A.   Yeah, we do have a performance review process, sure.

25   Q.   And for you, your performance involves testifying in

1    cases?

2              MR. CAMPBELL:  Objection, your Honor.

3              THE COURT:  I'm not sure it's a fair question.

4    Sustained.  You can get at the subject matter, but I'm

5    sustaining it as to the wording.

6    Q.    Are you a stockholder in Exponent?

7    A.    I think I am.

8    Q.    Do you participate in the equity incentive plan that

9    Exponent has?

11:38AM 10    A.    I don't know.

11    Q.    You don't know.  Do you agree that Ford is a large client

12    of Exponent?

13    A.    I don't know how large a client Ford would be.  I know

14    that the company is large, we've got 90 some disciplines.  Ford

15    is a significant client for me.  I don't know overall for the

16    firm.

17    Q.    Okay.  Do you know how much -- well, I think you testified

18    on direct that you charged about $60,000 up to your deposition?

19    A.    That's right.

11:38AM 20    Q.    What have you done since your deposition in this case?

21    A.    Worked on the animation, the exhibits for trial and then

22    prepared to testify here today, secured a buck, identified

23    parts, things like that, corresponded with counsel.

24    Q.    Can you estimate how much you've charged, Exponent's

25    charged Ford for your work subsequent to your deposition?

1    A.   I don't know the figure.  We've done a substantial amount

2    of work.

3    Q.   You referred to the buck.  That's the red piece of the

4    vehicle with the glass that you talked about before?

5    A.   Partial vehicle section, yes.

6    Q.   Where did you get it?

7    A.   I got it from a junk yard.  It was in a frontal, so we

8    were able to salvage out the quarter area.

9    Q.   When you say we, is that Exponent?

11:39AM 10   A.   Yes.  We have a purchasing agent who has contacts with

11   part suppliers and junk yards and things like that.

12   Q.   Do you know how much Exponent has charged -- withdrawn.

13   Do you know how much Ford has paid Exponent for Exponent's work

14   in any given year?

15   A.   No.

16   Q.   Do you know generally about how much Exponent's paid Ford

17   in any 10-year period?

18        MR. CAMPBELL:  Objection, your Honor.

19        THE COURT:  It does seem awfully cumulative, but I'll

11:39AM 20   allow this.  Go ahead.

21   A.   I've been represented with some figures in the past, some

22   figures in the past.  I don't know them.

23   Q.   So the figures were approximately $77 million in a 10-year

24   period?

25        MR. CAMPBELL:  I object.  There's no foundation for

1    this with this witness.

2         THE COURT:  The witness can answer if he knows.  If he

3    doesn't know, it doesn't come into evidence.

4    A.   I don't know the exact figures and time frames.  I've been

5    presented with things at various times, but I don't know what

6    the numbers are.

7    Q.   Let's talk about your opinion in this case.  According to

8    your testimony, Mario Zeolla helped break the right side

9    window, correct?

11:40AM 10   A.   That's right.

11   Q.   And then he broke, a part of his body broke the other

12   window as well, he broke the right side and the left side

13   windows?

14   A.   Yes, he did participate in the loading that fractured the

15   driver's side glass as well but by an entirely different

16   mechanism.

17   Q.   And your expert opinion is that the glass evidence shows

18   that shortly after the vehicle hit the barrier, Mario Zeolla

19   was thrown out through the right side window, correct?

11:41AM 20   A.   That's right.

21   Q.   Do you believe that he and the glass left the vehicle at

22   that point, correct?

23   A.   I do.

24   Q.   How about the part of the regulator?

25   A.   Well, the glass attachment hardware did, so the circular

1    dot that attaches to the glass would have swung out and

2    separated as well.

3    Q.   Okay.

4    A.   And a portion of that toggle link, the portion that we

5    don't find.

6    Q.   Correct.

7    A.   Also at that time, yes.

8    Q.   So then Mario Zeolla goes through the air with the glass,

9    and they all hit the barrier essentially at the same point?

11:41AM 10   A.   It's more distributed with the glass --

11   Q.   Right.

12   A.   Because -- the glass is going to distribute more

13   than -- well, it's not constrained, and there is some energy

14   released when it breaks, so the glass goes into a greater

15   dispersion, but they're coming out at the same time, similar

16   velocities.

17   Q.   So then Mario Zeolla rebounds off the barrier?

18   A.   He does.

19   Q.   Okay.  And the glass all rebounds off the barrier?

11:42AM 20   A.   Probably not all of it.

21   Q.   Not all of it.  In your report, did you identify any glass

22   on the other side of the barrier?

23   A.   No, I looked, but I don't have good enough quality photos

24   to identify it.

25   Q.   I'm not asking you that, sir, I'm asking in your report

1    that you prepared and you gave the plaintiffs to tell us what

2    your opinions were in this case, did you identify any glass on

3    the other side of the barrier?

4    A.    I have not identified glass on the other side.

5    Q.    You prepared a PowerPoint, correct?

6    A.    I did before for my deposition to demonstrate my opinions.

7    Q.    What was the purpose of preparing that PowerPoint?

8    A.    So it was clear what my opinions were.

9    Q.    You don't have a copy of that PowerPoint in front of you,

11:43AM 10   do you?

11   A.    I may have.

12   Q.    I believe it's Exhibit 887.

13   A.    I believe it is, too.

14   Q.    Could you turn to this page.

15         MR. CAMPBELL:  887.7.22.

16         MR. GREEN:  Thank you.  887.7.22?

17         MR. CAMPBELL:  The start of it.

18   Q.    Do you have that in front of you?

19   A.    I do.

11:44AM 20   Q.    And you prepared this before your deposition, correct?

21   A.    I did.

22   Q.    The purpose that you prepared this document is to show us

23   where your opinions are -- withdrawn.  The purpose that you

24   prepared this was to show the plaintiffs your opinions about

25   where the glass went after breaking, and we're talking about

1    the right side glass, Noah Sorenson's glass where it went and

2    where it ended up in the glass sequence, right?

3    A.    It's to demonstrate, yes, that's true.

4    Q.    You don't show any glass in what you prepared and you gave

5    us before your deposition in this case showing any glass going

6    on the other side, correct?

7    A.    I didn't.

8    Q.    And you didn't identify any glass on the other side of the

9    barrier in any police photo, correct?

11:44AM 10    A.    I have not been able to, no.

11    Q.    And at your deposition, you didn't tell us that you

12    believe glass went across the barrier, correct?

13    A.    I don't think I was asked, no.

14    Q.    Well, we had your opinion where you show no glass going

15    over, why would we ask you if you believe glass went over?

16          MR. CAMPBELL:  Excuse me, I object.

17          THE COURT:  Sustained.  Put a question to the witness

18    that elicits a fact.

19          MR. GREEN:  Sure.

11:45AM 20    Q.    I think we looked at a series of animations that you

21    prepared, correct?

22    A.    Yes.

23    Q.    And were shown to the jury, correct?

24    A.    Yeah, and I worked with others clearly.

25    Q.    And you worked with others?

1    A.    Yes.

2    Q.    And in those animations, every single one of them you show

3    glass flying over to the other side of the barrier, correct?

4    A.    There is some glass that goes over the top of the barrier

5    in the animation, yes.

6    Q.    And you've been given copies of Officer DeJong's,

7    of Trooper DeJong's trial testimony?

8    A.    Not his trial testimony.

9    Q.    Have you been told what Trooper DeJong testified about

11:46AM 10    glass at his deposition, I mean, at his trial testimony?

11   A.    I don't specifically recall.

12   Q.    Have you been given a copy of Trooper Jakubowski's trial

13   testimony?

14   A.    I have not.

15   Q.    Have you been told what Trooper Jakubowski said about

16   where the glass, where he found the glass?

17   A.    I don't have specifics of his testimony, no.

18   Q.    Do you believe that either Trooper DeJong or

19   Trooper Jakubowski said glass flew over the barrier and ended

11:46AM 20   up on the other side of the highway?

21        MR. CAMPBELL:  Objection, your Honor.

22        THE COURT:   Sustained.

23   Q.    While the glass and Mr. Zeolla were I guess going through

24   the air, hitting the jersey barrier, rebounding off the barrier

25   and coming to rest as you've shown at least in your PowerPoint

1    that you gave us before trial, the vehicle was continuing to

2    move, correct?

3    A.    I'm sorry, the vehicle continues, yeah, it does.

4    Q.    And it was pivoting counterclockwise?

5    A.    I don't know which part of the sequence you're referring

6    to.

7    Q.    After -- well, let's use Mr. Croteau's, after point 8 to

8    point 9 to the tipover point, it's pivoting counterclockwise?

9    A.    It's rotating counterclockwise throughout.

11:47AM 10   Q.    The rear right side of the vehicle hits the barrier,

11   correct?

12   A.    It does.

13   Q.    It leaves a mark on the barrier?

14   A.    It does.

15   Q.    Can you give us Exhibit 59.  I'm sorry, could you give us

16   Exhibit 50.9.  Can you zoom in this area right here.  That's

17   the area where the right rear of the vehicle hit the barrier,

18   correct?

19   A.    That's right, that's my understanding.

11:48AM 20   Q.    That would also in your opinion be in the vicinity of

21   where Mr. Zeolla rebounded off the jersey barrier?

22   A.    Yes.

23   Q.    Okay.  That would also be in the vicinity according to

24   your opinion where the glass rebounded off the jersey barrier?

25   A.    Yes.

1    Q.   But there's no glass there, correct?

2    A.   I don't see any glass on the face of the barrier.

3    Q.   Thank you.  There's no marks left by the glass hitting the

4    barrier?

5    A.   Not that I can discern from what we have.

6    Q.   Now we have -- now let's go back to this.  I think you

7    testified before that this little green object represents

8    Mario Zeolla?

9    A.   That's right.

11:49AM 10    Q.   And at this point, you believe -- sorry about that.  At

11   this point, you believe Mario Zeolla was ejected from the

12   vehicle?

13   A.   That's right.

14   Q.   Then the vehicle continued rotating counterclockwise,

15   correct?

16   A.   It did.  In fact, it rotates faster in this interval

17   immediately after what's depicted here on the screen.

18   Q.   It's rotating, correct?

19   A.   Yes.

11:50AM 20    Q.   So Mario has gone out the right side now?

21   A.   Yes.

22   Q.   And it continues turning until it's almost turned

23   completely around, correct?

24   A.   I think I understand what you're saying.

25   Q.   Right?

1    A.    So the vehicle orientation at position 10 is nose away

2    from the barrier.

3    Q.    So its nose is in the barrier at 8?

4    A.    Nose away from the barrier.

5    Q.    At 8, nose in?

6    A.    I'm sorry, yes.

7    Q.    And it's nose away at 8, so the vehicle basically comes

8    around.

9    A.    Nose in at 8, nose away at 10.

11:51AM 10    Q.    Nose in at 8, nose away at 10?

11    A.    Yes.

12    Q.    So you have Mario going out the right side around at 8?

13    A.    I do.

14    Q.    And at 10, you have the left side facing him where you

15    believe he's now deposited in the road, correct?

16    A.    Yes, I have to look at the video to see how that timing

17    works out, but he's traversing to his rest position just before

18    the vehicle gets there.

19    Q.    And then the left side of the vehicle when it tips over

11:51AM 20    lands on him?

21    A.    That's right.

22    Q.    Do you believe his head made the dent in the upper rail

23    that we've been talking about?

24    A.    I defer to Dr. Raphael, but I understand that she's

25    described that there is a component there of damage related to

1    his head.

2    Q.   Were you able to identify which part of Mario Zeolla got

3    in between the glass, the left side glass now and the ground?

4    A.   I didn't identify a specific body part, I think I talked

5    about in my deposition his appendages, his body could be

6    turned, it could be C-shaped, things like that.

7    Q.   His appendages, meaning his legs?

8    A.   Arms and legs.

9    Q.   His arms and legs.  You're deferring to Dr. Raphael about

11:52AM 10   injuries to Mr. Zeolla?

11   A.   I am.

12   Q.   Have you reviewed her deposition in this case?

13   A.   I did.

14   Q.   Are you relying on what she said at her deposition?

15   A.   Yeah.

16   Q.   Dr. Raphael's deposition at page 52.  Actually staying on

17   photo 13, could we have 50.13, please.  Actually staying on

18   photo 13 of the police photos, you can see that there's an

19   indentation?  Can you show the indentation, please.

11:53AM 20   "Indentation above the driver's side rear window, and I

21   attribute that to the vehicle rolling over his head.  You can

22   see further damage on the roof around that transverse roof rack

23   member in the area of the driver's side of the aft the roof

24   rack member.  You can see it as dented there, and that's what's

25   rolled over at least the upper part of his chest.  Legs are

1    also underneath the roof area."

2         Could I have the Elmo, please.  Do you understand that

3    testimony?  Do you accept that testimony?

4    A.   Yes, I read it carefully, yeah.  I don't know if you read

5    it -- I read it carefully at the time I reviewed her

6    deposition, so if you read it correctly, it sounds like the

7    spirit of what I understood her to have said.

8    Q.   According to what I just read, Mario Zeolla's head makes

9    the dent, right?

11:54AM 10  A.   That's right.

11   Q.   His chest makes the damage on the roof area?

12   A.   That's right.

13   Q.   His legs are also on top of the roof, right?

14   A.   According to what you just read, yeah.

15   Q.   You don't challenge it?

16   A.   I don't specifically recall her placing the legs.  If she

17   did, she did.

18   Q.   So what does that leave?

19   A.   Appendages, the arms.

11:54AM 20  Q.   Can I have Exhibit 1, page 2, please.  Can you zoom in.

21        MR. CAMPBELL:  You know, your Honor, I asked questions

22   of the witness, and we were objected to regarding the scope and

23   biomechanical issues and wait to Dr. Raphael, and that seems

24   like what we're doing here.

25        THE COURT:  I don't understand.  Are you examining him

1    about Dr. Raphael's report?  That's what I'm --

2           MR. GREEN:  No, your Honor, what I'm trying to find

3    out from Dr. Carhart is what part of Mario Zeolla got between

4    the ground and the window, and he basically --

5           THE COURT:  All right, let's put a question to him.

6           MR. GREEN:  Okay.

7    Q.   You have this as one of the documents you reviewed in this

8    case before you gave your opinion in this case?

9    A.   I did review some fire department records.  It looks

10   familiar.

11   Q.   This is the EMT record?

12   A.   Yeah, I thought it was fire, but, okay.

13   Q.   And you see there that there's no indication of any damage

14   to Mr. Zeolla's arms?

15   A.   I don't see a note there pertaining to his arms in which

16   you've highlighted.

17   Q.   I'll just read what I see, "Negative signs of injury,

18   right, left legs and arms unremarkable."  You don't see that?

19   A.   No, I just said I didn't see a notation about injuries to

20   his arms from which you highlighted.

21   Q.   I'm sorry, I misunderstood what you said.  You also

22   reviewed as listed on your report all of the other medical

23   records associated with Mr. Zeolla's injuries, correct?

24   A.   I don't think I had all the medical records.

25   Q.   Why don't you just tell me, you have your report in front

1    of you.  What medical records did you review?

2    A.   The chart from the office of the medical examiner, the

3    Southborough Fire Department report and a document from

4    Bethlehem Family Practice.

5    Q.   Did you take any note of anything in those records that

6    would indicate that or support the idea that Mr. Zeolla's arms

7    got in between the glass and the ground?

8    A.   I don't specifically recall finding that I would attribute

9    to that.

11:58AM 10    Q.   You think that's something you would put in your report?

11              MR. CAMPBELL:  I object.

12              MR. GREEN:  Withdrawn. Your Honor, would now be a good

13    time to take the break.

14              THE COURT:  Sure.

15              THE CLERK:  All rise.

16              ( A recess was taken.)

17              (JURORS EXITED THE COURTROOM.)

18              THE COURT:  A question about Dr. Raphael, the exhibits

19    that were objected to, Exhibits page 36 through 47 are a free

11:59AM 20    particle analysis?

21              MR. CAMPBELL:  Given that the animation is now in use,

22    we wouldn't use the hard evidence.

23              THE COURT:  That piece of it is then easy.  The

24    exhibits and the numbering is somewhat off, but what appears to

25    be pages 32 to 34 has various measurements inside the vehicle.

1              MR. MOLLER:  Can I pull it out?

2              THE COURT:  Yes.

3              MR. MOLLER:  I'm a little bit behind, Judge.  I'm with

4      you now.

5              THE COURT:  All right.  Exhibit at page 31 is a

6      somewhat unremarkable chalk.

7              MR. MOLLER:  Yes.

8              THE COURT:  The next three exhibits talk about

9      occupant kinematics, and they had various measurements and the

12:00PM 10    weights of the passengers and so forth.  I didn't see that in

11     her report.

12             MR. CAMPBELL:  This one, your Honor?

13             THE COURT:  Yes.  Is it in her report?

14             MR. CAMPBELL:  The actual data that's in this, I don't

15     believe that's in the report.  It was presented ad nauseam in a

16     big stack at deposition.

17             THE COURT:  All right.  The one marked 35 again it

18     seems to me is a chalk, without any particular data.

19             MR. CAMPBELL:  Nominal position at the top.

12:00PM 20            THE COURT:  Pardon.

21             MR. CAMPBELL:  Nominal position at the top.

22             THE COURT:  The one I was looking at was called

23     occupant kinematics.  It's at page 35, then we skip ahead to

24     page 48, which is the document that we've seen ad nauseam, and

25     then page 49 has data concerning centrifugal forces.  Was that

1    in her report?

2            MR. CAMPBELL:  This was presented in a document at her

3    deposition that was in rebuttal to Dr. Bidez.  It's not

4    specifically in her report.

5            THE COURT:  All right.  So the exhibits at pages 32 to

6    34 and at page 49 were raised in the deposition but not the

7    report, correct?

8            MR. CAMPBELL:  Yes, your Honor.

9            THE COURT:  Mr. Moller.

12:01PM 10        MR. MOLLER:  I'm sorry, they're raised after the

11   deposition.

12           THE COURT:  Raised after the deposition?

13           MR. MOLLER:  As far as I know.

14           MR. CAMPBELL:  Here's the stack of stuff that was

15   provided at the deposition, and it just happens that the last

16   one that you identified is on top of the stack.  This was

17   presented at the deposition based upon Mr. Frederick's

18   testimony and was presented in rebuttal to Dr. Bidez's

19   testimony.  If you leaf through this, all of the material that

12:02PM 20   we are talking about I believe is in what was given at the

21   deposition precisely.

22           MR. MOLLER:  Our position is that it's not in the

23   report, it's at best demonstrative, and there was no

24   supplemental report to establish what its use might be

25   downstream, and following the guidance that we got from the

1    Court, we're assuming if it's not in the report or supplemental

2    report denoted as such, it is out of bounds.

3            THE COURT:  Well, the question I'm raising, this is

4    the first time this has come up in which something was raised

5    in the deposition and not in the report.  The deposition is not

6    a useless exercise, it's intended to permit cross-examination

7    and fleshing out of the report, and, again, there's some zone

8    of reasonableness, how big that zone is the question.  If it

9    was properly raised at the deposition, for example, the

12:03PM 10    measurements of the vehicle, you know, perhaps aren't even

11   controverted.  Do I need to deal with this issue now, I guess?

12   Is this going to come up today?

13           MR. CAMPBELL:  Well, your Honor, you're going to go to

14   about --

15           THE COURT:  About 1:15.

16           MR. CAMPBELL:  How long do you expect for your cross?

17           MR. GREEN:  20 more minutes.

18           MR. CAMPBELL:  It probably will come up, she's here to

19   testify.

12:04PM 20           THE COURT:  All right.

21           MR. CAMPBELL:  In terms of the stuff about their

22   weights and the like, there is information in the report, it's

23   not presented in that exact fashion, but I believe that there's

24   information --

25           MR. MOLLER:  Obviously we're more concerned with the

1    new stuff that goes to velocity, weights and trajectory of

2    occupants in vehicles.  They weigh what they weigh, and their

3    names are what they say they are, but there's a lot of stuff

4    here that is really new and should have been the subject of a

5    supplemental report, and I would also, pardon me for not

6    standing, I would also say when we approached and earlier in

7    our direct case and referred to the deposition testimony as

8    amplying something that was in the report, we respected the

9    ruling of the Court, which was it's not in the report, so we're

12:05PM 10    just following the same guidelines that we anticipated we would

11    be following when we heard the defendant's case, and so to that

12    extent, I'm prepared to inquire on whatever might be left in

13    Dr. Raphael's testimony because now it's also crystal clear

14    that most of what's in her report is cumulative of what --

15        THE COURT:  I'm not going to strike it on that basis.

16    This whole trial has been cumulative.  The inefficiency of this

17    trial to me is breathtaking, and, Mr. Moller, you're Exhibit A,

18    but, you know, your questioning has been quite repetitive, but

19    the narrow question, and I'm trying to be even-handed here and

12:05PM 20    apply the same principles to both sides is whether or not these

21    four additional things can come in.

22        I guess I'm inclined to keep them out except -- well,

23    let me take it a step at a time.  As to Exhibit 49, which has

24    technical information as to centrifugal force and so forth, I

25    didn't see it in the report, technical data.  I mean, it goes

1    beyond I think merely fleshing things out.

2          MR. CAMPBELL:  Your Honor, the numbers on what we were

3    provided are different than what I have, if you could hold it

4    up.

5          THE COURT:  I'm sorry, what I have is this document.

6          MR. MOLLER:  That's what you gave us, right?

7          MR. CAMPBELL:  Okay, understood.

8          THE COURT:  I just don't see those numbers in her

9    report.  If the calculation was performed, I don't know why it

12:06PM 10   wouldn't be in her report, but they're not there, so, I mean,

11   the point of this is disclosure so it can be tested in the

12   crucible of litigation.

13         MR. CAMPBELL:  I understand the issue about the

14   content of the report and latitude and what's in and not in,

15   but the calculations that she did were presented at her

16   deposition.  Her opinion is clearly that Mr. Zeolla at the

17   crash with the jersey barrier was moved violently to his right,

18   went out the window there, there's --

19         THE COURT:  And all of that can come in, it's the

12:07PM 20   specifics of the g forces which I didn't see in her report.

21         MR. CAMPBELL:  Okay.  They're not there.

22         THE COURT:  Then in terms of documents 32, 33 and 34,

23   I guess 32 is simply measurements and weights, I'll allow it as

24   a chalk if there's a foundation, I'll reserve judgment on 33

25   and 34, which is nominal position and a document called

1    immediately before weight impact, okay.  I think 49 is out.

2         MR. CAMPBELL:  What about this one, your Honor,

3    occupant kinematics?

4         THE COURT:  Again, I see that as a chalk.  It doesn't

5    have data and numbers, g forces and so forth on it, so I'll

6    permit that as a chalk.  Again, all of this assumes that a

7    foundation will be laid that will help the jury understand.

8         MR. MOLLER:  What's in and what's out?

9         THE COURT:  49 is out, 32 is -- everything is in

12:08PM 10    except 36 to 47, the free particle analysis is abandoned, 49 is

11    out, the centrifugal forces document.  Everything else is in

12    except 33 and 34 I'm reserving judgment on.

13         MR. CAMPBELL:  Your Honor, I'll try to be careful.

14         THE COURT:  Very quick break.

15         THE CLERK:  All rise.

16         (A recess was taken.)

17         THE CLERK:  All rise for the jury.

18         (JURORS ENTERED THE COURTROOM.)

19         THE CLERK:  Thank you.  Please be seated.

12:16PM 20         THE COURT:  Mr. Green.

21         MR. GREEN:  Thank you, your Honor.

22    Q.   Can you give me 877.7.29.  Dr. Carhart, this is a slide

23    that you prepared, correct?

24    A.   It appears to be, yeah.

25    Q.   And this green object on the left side is designed to show

1    where Mario Zeolla ended up according to you after being thrown

2    from the vehicle?

3    A.    Right, and this one is not time sequenced.

4    Q.    Right.  At your deposition, I believe you testified as to

5    why you put Mario Zeolla in that location.  Do you recall that

6    testimony?

7    A.    I don't remember specifically, but I think I was asked

8    about the positioning, and I tried to describe it the best I

9    could the work that was done at that point.

12:17PM 10    Q.    Well, let me read to you a question and answer.  I'm going

11    to read from page 34 to page 35 of your deposition.  You

12    reviewed your deposition in this case, correct?

13    A.    I read it this morning.

14    Q.    Okay.  Question on the bottom of page 34, "Have you

15    calculated the distance that Mario traveled from the moment of

16    ejection to where you have his body on Dave's computer at slide

17    29?"  Your answer:  "I did calculate it.  It's implicit in this

18    three-dimensional model, so, in other words, we put it there

19    based on the physical evidence in the roadway in the roll path

12:18PM 20    of the vehicle, and I could tell you what the distance is, I

21    suppose, but I didn't compute it in any way.  In other words,

22    we're assembling the physical evidence, and I'd say that I'm

23    putting him in that location for two reasons."

24         MR. CAMPBELL:  "A couple reasons."

25    Q.    "A couple reasons," correct.  First of all, we've got to

1    explain some deformation with the vehicle and that area on the

2    vehicle, the path is constrained by the reconstruction by the

3    physical evidence, by the movement of the vehicle, and so that

4    helped me place him in that location.  Also what helped me to

5    place him in that location is going back --" if you zoom in on

6    29, can you give me 50.29, please.  Okay.  That's the wrong

7    one.  A little bit back and look around the green dot.  "If you

8    don't zoom in too tightly, there's actually some splattered

9    area in the scene photograph, so I depicted it in the

12:19PM 10   three-dimensional model, so it's there for two reasons.  It's

11   there because there's physical evidence in the roadway, and

12   it's there because we've got to explain some physical evidence

13   on the vehicle that has to happen in the sort of confined

14   path."  Is that your testimony?

15   A.    It sounds right.

16   Q.    Do you stand by that testimony?

17   A.    Yeah.

18   Q.    So you put Mario Zeolla exactly where he had to be so that

19   when the left side of the vehicle rolled on him, his head was

12:20PM 20   perfectly positioned to make the dent that we see right above

21   his own left side window?

22   A.    Yeah, let's clarify.  I didn't depict his head, I'm

23   depicting a generic shape here.

24   Q.    But you agree that his head made that dent?

25   A.    I believe Dr. Raphael will opine that, and I defer to

1    that.

2    Q.    But you accept his head made that dent?

3    A.    The dent above the roof rail above the opening, yes.

4    Q.    So he had to be in the perfect location so when at the

5    time the left side of the vehicle rolled on his head, his head

6    made that dent?

7    A.    In order for him to interact with the vehicle and create

8    the damage in the physical evidence, it's constrained by the

9    roll path of the vehicle, so, yeah, yeah, there was a finite

12:20PM 10    space where he can be for that to occur.

11    Q.    You put him in that finite space in the perfect position

12    so that his head made the dent above his own window?

13    A.    Again, I didn't focus on the head and the dent but so that

14    his body position spanned the areas of damage on the vehicle

15    creating the glass breakage, the dent to the upper roof rail

16    and the dent to the roof, so I placed him to account for the

17    physical evidence, yes.

18    Q.    Then after the vehicle rolls over him, you have him being

19    moved, correct?

12:21PM 20    A.    I do.

21    Q.    To where he's found by the emergency response people?

22    A.    Well, to where there's some physical evidence in the

23    roadway that's consistent with what's described as his rest

24    position.

25    Q.    So the place where he's found, the physical evidence where

1    you just said, the place where the blood is that shows where

2    basically most of the blood coming off of him accumulated is

3    not where he could be -- withdrawn.  If he was in the place

4    where he is found after the accident, he's not in the right

5    location to make the dent above his own window, correct?

6    A.    His rest location and the location where I believe he was

7    overrun by the vehicle are not identical, they are separated in

8    space identically.

9    Q.    If he was where he was found after the accident when the

12:22PM 10    vehicle rolled, he could not have made that dent?

11   A.    He would have interacted with some other part of the

12   vehicle.

13   Q.    Right, some other part, maybe the second row or the first

14   row?

15   A.    Yeah, we could probably appreciate that by running the

16   video.  I haven't tried to do that.

17   Q.    But your reconstruction has him going out the right side,

18   hitting the barrier, bouncing off the barrier, landing in the

19   road, the car turns around, it rolls on him, and his head makes

12:22PM 20    a dent right above his window, the window he was not thrown

21   out, correct?

22   A.    That's right.

23   Q.    Then he gets moved?

24   A.    And then he acquires a velocity from the vehicle

25   overrunning him, yeah.

1   Q.   To a place where he would not have been rolled over

2   wherever you believe he was rolled over?

3   A.   He gets moved slightly from the position where he's

4   overrun.

5   Q.   Could we have Exhibit 50.18, please.  This concentrated

6   area of glass, according to you, that concentrated area of

7   glass that goes up to the right -- withdrawn.  According to

8   you, this concentrated area of glass is Mario Zeolla's glass?

9   A.   Driver's side glass.

12:24PM 10   Q.   The left side?

11   A.   Driver's side, left side, yeah.

12   Q.   Okay.  The side that Mario Zeolla was sitting?

13   A.   Yes.

14   Q.   And the blood here, the blood in this photograph -- well,

15   the red liquid in this photograph is Noah Sorensen's; is that

16   what you understood?

17   A.   I understand that Dr. Raphael opined on that issue.

18   Q.   Can we go to 50.23, please.  I'm sorry, 50.29.  Now, I

19   think on direct you testified about the front right glass.

12:24PM 20   Have I just circled the front right glass?

21   A.   Yeah, then maybe a little larger, but, yes.

22   Q.   Could you zoom in on it.  So this is glass that broke out,

23   this is glass that broke out near the end of the accident

24   sequence, correct?

25   A.   That's correct.

1    Q.   And it broke out when the mirror went into the glass,

2    according to your testimony, correct?

3    A.   That's my opinion, yes.

4    Q.   And this glass is from the right front.  Because of the

5    color we know that, correct?

6    A.   It does simplify it, that's right.

7    Q.   And the trail of glass goes basically from the right in

8    this direction, correct?

9    A.   Well, it's probably laid down the opposite direction.

12:25PM 10    Q.   Okay.

11    A.   But it's within the area you circled.

12    Q.   And did you notice this scratch that I'm going to now

13    circle?  Withdrawn.  Did you see a scratch in what I've just

14    circled?

15    A.   There appears to be an abrasion on the ground.

16    Q.   Okay.  Could we go to 50.23.  Actually let's go back.

17    Could we go back to 50.18.  I think you can see on the top of

18    this photo some of the glass evidence from the right front,

19    correct?

12:26PM 20    A.   I do see some green glass from the right front window

21    there.

22    Q.   Okay.  Thank you.  And this glass evidence that's adjacent

23    to the right rear, however, according to you, comes from the

24    left rear?

25    A.   That's correct.

1    Q.    Thank you.  We've seen this before, but this is your

2    opinion about where the glass went, correct?

3    A.    This is my opinion about a cone depicting its

4    directionality, and it's redirecting off the barrier.

5    Q.    Okay.  And one of the reasons that you believe Dr. Batzer,

6    according to you, he has glass closer to the yellow line than

7    you believe it was shown?

8    A.    Yeah, I don't know if I actually covered it in my direct,

9    but I do think that his scenario would result in glass being

12:27PM 10    out near the roadway as opposed to the barrier.  It wouldn't be

11    accumulated along the barrier if it had broken out at position

12    10, as he described.

13    Q.    If we could go to 50.23.  If you could zoom in that area

14    now, do you know what that white stuff is?

15    A.    It looks like something that's put down in the roadway.

16    Q.    Put down in the roadway.  To I guess get the oil up?

17    A.    Absorb fluids, I would assume.

18    Q.    And in that white area, you can see chunks of glass, can

19    you not?

12:28PM 20    A.    I can see distinctly glass off the back, and what's

21    imbedded in the white, I would have to look a little more

22    closely in there.

23    Q.    You wouldn't say that's glass that's imbedded there?

24    A.    I would have to look a little more closely.

25    Q.    That's an area that you don't have glass in your diagram?

1    A.   I'm not sure.  I'm not sure I used this photo or not in

2    depicting that pool.

3    Q.   I'm not talking about the photo.  You've done a number of

4    different graphics showing where you believe the glass field

5    was, and on direct you actually drew where the glass beam was.

6    If there's glass in that white area, that's not where you

7    believe glass was?

8    A.   It's not where I depicted glass being.

9    Q.   I want to talk about your vehicle inspection now.  I think

12:29PM 10   I'm going to need the Elmo for this one.

11         MR. GREEN:  Can I have the Elmo, please?

12         THE CLERK:  Sure.

13   Q.   You talked on direct about a vehicle inspection that you

14   performed?

15   A.   I did.

16   Q.   After your vehicle inspection, you typed up inspection

17   notes, correct?

18   A.   Yeah, and I may have typed while I was doing it.  I don't

19   recall on this occasion.  Sometimes I do this during and then

12:30PM 20   formalize it after.

21   Q.   What's the purpose of doing a vehicle inspection?

22   A.   To make observations with respect to the vehicle.

23   Q.   And in this report, you did make observations regarding

24   the left and right row third row positions, correct?

25   A.   I believe I did.

1    Q.   And I highlighted, have I highlighted those observations

2    correctly?

3    A.   These are with respect to trim findings.  Let me look

4    here.  Yes, those are some of my observations at the

5    inspection.

6    Q.   Those are all of your observations that you included in

7    your inspection report regarding the left row third position,

8    the right row third position, correct?

9    A.   All of my observations.

12:31PM 10    Q.   Including this report?

11    A.   There are some notes I took of my inspection, and there

12    are some additional observations pertaining to the windows.

13    Q.   Okay.

14    A.   They are separate from those that you highlighted.

15    Q.   And you say in this, I'm talking, I want to be clear, I'm

16    talking about the inside.  I think you have a report that talks

17    about occupant compartment and restraints.  Let me rephrase my

18    question.  These are all your notes regarding occupant

19    compartment and restraints as with regard to the left row 3

12:31PM 20    position and right row 3 position in your inspection notes?

21    A.   I think so.

22    Q.   And in those notes, you say, "At the right row 3 portal,

23    there was an abrasion on the inbound edge of the C pillar trim

24    at mid height."  Do you see that?

25    A.   I do see that note.

Q.   Can you give us 57.36.  Do I have the right part of the

car?

A.   That's the C pillar trim.

Q.   Okay.  So which part of the car would be showing the

abrasion on the inboard edge of the C pillar trim?

A.   I don't recall this specific finding.  I'd have to frankly

search the photos a little bit.  If I remember right, there's a

little mark in the trim at the edge there.  I don't

specifically recall what I was denoting there.

12:32PM Q.   But this is the C pillar trim?

A.   It is, it is.

Q.   Okay.  Now, you also say that there's a collection of

short, dark fibers on the headliner at upper rear aspect of

right row 3 window.  Do you see that?

A.   Yes, I do.

Q.   I think you testified about that on direct, correct?

A.   I did.

        MR. GREEN:  If we could go back to the Elmo, please.

Q.   And is this a photograph showing the collection of the

12:33PM fibers that you found?

A.   It's one of the photographs I took, I believe.

Q.   On direct, you didn't testify as to who you believe left

those fibers?

A.   I thought I did.

Q.   Who do you think left those fibers?

1    A.   I think it's probably Mr. Sorensen.

2    Q.   Not Mr. Zeolla?

3    A.   That's right.

4    Q.   And you didn't find any evidence what you might term

5    biological evidence of Mr. Zeolla on the right side of the

6    vehicle?

7    A.   This was the evidence that I could attribute occupant

8    interaction that I observed, and I don't specifically recall

9    what the mark was that you previously asked me about, so this

12:34PM 10   is one of the fundamental findings related to occupant

11   interaction that I observed.

12   Q.   And you attribute that occupant interaction to

13   Mr. Sorensen?

14   A.   Yeah, it's back towards the very rear edge up against the

15   pillar area, yeah.

16   Q.   Not Mr. Zeolla?

17   A.   That was my observation.  I think I was asked about it in

18   my deposition, and that was my observation.

19   Q.   And you saw no occupant interaction evidence regarding

12:34PM 20   Mr. Zeolla on the right side of the vehicle?

21   A.   I found this one deposit of hair that I would specifically

22   attribute to an occupant myself, and this one I think is more

23   likely Mr. Sorensen.  I don't know if there's another.

24   Q.   And then you also note regarding the right row 3 position,

25   "Areas of discoloration and deposit on the headliner."  Do you

1    see Exhibit 57.37?  Could you just tell the jury what you're

2    referring to in your inspection notes?

3    A.    Well, there's a lot of deposits on the headliner as you

4    could see on the headliner of the photo you pulled up.

5    Q.    Could you circle the area that you are talking about on

6    the right row 3 position areas of discoloration of deposit on

7    the headliner?

8    A.    Well, I didn't look through all my photographs, but in

9    this one, I mean, there's a very broad area for deposit

12:35PM 10   discoloration.

11   Q.    I note that on the left row 3 position, you don't note any

12   areas of discoloration or deposit on the headliner?

13   A.    It doesn't look like I made a specific distinct note, but

14   there's lots of deposits throughout.

15   Q.    I think this is one of your photos.  Is this one of your

16   photos, Dr. Carhart?

17           THE COURT:  I'm sorry, what's the number?

18           MR. GREEN:  It's 587, photograph 276.

19   A.    Can you slide it up a little bit so I can see the trace

12:36PM 20   number?

21   Q.    Sure.

22   A.    You're referring to the bottom photo, I assume?  Could you

23   slide it up.

24   Q.    I can only slide it up a little bit more.

25   A.    Okay, sorry, it does appear to have numbering that's

1   consistent with what I do when we archive our photos, so it

2   does look like one of my photos.

3   Q.   This shows left side portal, correct?

4   A.   There's deposit throughout on the headliner, yeah.

5   Q.   You didn't note that in your special notes?

6   A.   I didn't specifically make a separate note.

7   Q.   You did note in your inspection notes that the left side,

8   unlike the right side -- withdrawn.  You did note on the left

9   row 3 position that trim and fabric openings are not remarkable

12:37PM 10   to flow, correct?

11   A.   I do recall that.

12   Q.   And you don't make the same finding in your inspection

13   notes about the right side?  Do you want me to show you?

14   A.   You can.  Agreed.

15   Q.   You also note there's some discoloration of the right

16   exposed webbing.

17        MR. GREEN:  And can you give me, Andy, 57.73.  That's

18   the wrong one.  Let's go back to the Elmo.

19   Q.   Back to your picture at 587, photograph 146.  This is

12:38PM 20   Noah Sorensen's side, correct?

21   A.   It's the side that he's initially seated on, yes.

22   Q.   Those fibers, you put a little box in this photograph,

23   right, showing where the fibers were?

24   A.   I did.

25   Q.   And you also said that there's some discoloration on the

1    webbing?

2    A.   Yeah, I think you can actually faintly see it on the 146,

3    if you zoom in on the webbing between the D ring and the

4    retractor mouth where the webbing goes into the trim.

5    Q.   Okay.

6    A.   I think I can see I can see some discoloration in what

7    we've got shown here.

8    Q.   And these two items together tell you that Noah Sorensen

9    loaded the window near the rear side -- withdrawn.  These two

12:39PM 10  pieces of evidence tell you that Noah Sorensen's body went out

11   the window near the rear side of the window, correct?

12   A.   The discoloration on the webbing, I didn't attribute any

13   particular significance to that.  That's a stowed webbing that

14   was not in use at the time of the crash in a vehicle that's got

15   all kinds of fluid deposits all over it, so I didn't attribute

16   the discoloration of the webbing to Mr. Sorensen.

17   Q.   But you did contribute the fibers, and I believe you

18   believe that that shows that Mr. Sorensen was near the rear

19   regulator, correct?

12:39PM 20  A.   Yeah, I did attribute that to him, yeah, when asked in my

21   deposition, yeah.

22   Q.   And that his body was near the regulator?

23   A.   He'd be in the back part of the window opening.

24   Q.   Okay.  I don't need the Elmo anymore.  Let's talk about

25   testing.  You didn't prepare, you didn't do any specific

1    testing for this case, did you?

2    A.   I did not.

3    Q.   And Exponent did not do any testing for this case

4    specifically?

5    A.   We did not.

6    Q.   And we talked about the buck, the window.  Before

7    providing your opinion in this case, in your report, you hadn't

8    gone out and bought framed or fixed windows to help prepare

9    your report?

12:40PM 10   A.   Did I go purchase equipment?

11   Q.   Right.

12   A.   No, I did not purchase any replacement parts to prepare my

13   report.

14   Q.   You had never -- withdrawn.  You've never done any testing

15   to specifically test the retention strength of a fixed versus

16   flip-out window; is that correct?

17   A.   I haven't targeted testing specifically comparing the two.

18   Q.   Okay.  And Exponent, as far as you know, has never done

19   testing specific to target the strength characteristics of

12:41PM 20   fixed versus tempered glass, we're talking about fixed versus

21   flip-out glass?

22   A.   We have not specifically tested that configuration versus

23   the fixed.

24   Q.   And, in fact, Ford hasn't tested that configuration to

25   determine the difference between fixed strength/flip-out

1    strength, correct?

2    A.   I've not seen testing on that specific geometry.

3    Q.   And you read --

4    A.   By Ford, but I've seen it by Dr. Batzer.

5    Q.   You've read Mr. Ridenour's testimony?

6    A.   I did.

7    Q.   And you've relied on his testimony?

8    A.   It's been some time.  I believe I did at the time of my

9    report.

12:41PM 10   Q.   This is on your report, and you know Mr. Ridenour?

11   A.   I've met him, sure.

12   Q.   You've written papers with Mr. Ridenour?

13   A.   We did co-author a paper, yes.

14   Q.   And you're aware where Mr. Ridenour said he's not aware of

15   any such testing?

16   A.   I don't specifically recall that, but if he was, then I'd

17   be aware of it.

18   Q.   Is it your testimony in this case that on an inside to

19   outside loading in every case, in every circumstance, the

12:42PM 20   regulator is going to break before the tempered glass?

21   A.   Not in every circumstance.

22   Q.   You believe that the attachment hardware for this flip-out

23   window is less strong than the tempered glass it attaches to

24   the vehicle?

25   A.   I do believe that that's been demonstrated in some

1    testing, yeah.

2    Q.   So you disagree with Mr. Ridenour who testified that it

3    was in line, the strength was in line between the glass and the

4    hardware?

5    A.   I've seen some testing that demonstrates that the hardware

6    is not as strong as the glass when it's loaded in the central

7    window opening.

8    Q.   Okay.  So you relied on Mr. Ridenour's testimony?

9         MR. CAMPBELL:  Judge, I object.  It's cumulative and

12:43PM 10    it's being represented without the testimony.

11        THE COURT:  If you have his testimony, you ought to

12   confront him with the specific questions and answers.

13        MR. GREEN:  Give me one moment, your Honor.

14        THE COURT:  Put a question to the witness, come on.

15   Q.   Did you read the following question and answer in

16   Mr. Ridenour's deposition on page 28, actually 27 starting at

17   line 16?  Question:  "Does that window have any window

18   mitigation design to it?"  Answer:  "Sure."  Do you believe

19   that the flip-out window was designed to have ejection

12:45PM 20   mitigation?

21   A.   Yes.  Any and all vehicle perimeter structures can

22   mitigate ejection.  They can present a constraint surface,

23   sure.

24   Q.   The next question:  "Speaking generally, I'm sure we can

25   find exceptions to this, but, speaking generally, is a fixed

1    window likely to have better ejection mitigation features than

2    an open, flipped window?"  The answer is:  "Are you talking

3    about this in general, or are you talking about the window?"

4    Question:  "I'll tell you what, let's talk about this window

5    first, and then if there's need to talk more generally, we

6    can."  Answer:  "Okay.  It depends, I guess, on the short

7    answer, and I can elaborate a little bit.  As I said earlier --

8    as we said, as I said earlier, glass breaks in tension so when

9    you start to bend it, you can get to the bending point where

12:45PM 10    the stress on the outside of the glass is beyond its

11    capabilities.  That's when the glass breaks.  A latching

12    mechanism here is quite strong, and it is -- its strength is in

13    line or consistent with the strength of the tempered glass, so

14    not that, you know, I could envision some circumstances where

15    you might break the latch first, but, typically, you would

16    break the window, the glass first, so the fact that it is a

17    pivoting window doesn't make the glass any less strong.  As a

18    matter of fact, in certain circumstances, it can make it

19    stronger."  Do you disagree with Mr. Ridenour in the quote I

12:46PM 20    just read?

21    A.    That was quite a mouthful.  It wouldn't be -- it wouldn't

22    hurt so I could see it with the length of that.

23    Q.    Sure.

24              MR. GREEN:  Your Honor, may I approach?

25              THE COURT:  Yes.

1    A.    Well, you said quite a few different things in there in

2    terms of responding to the question.

3    Q.    Let me direct it.

4    A.    Yes.

5    Q.    Do you agree with Mr. Ridenour that typically when the

6    flip window breaks, the glass is going to break, although

7    sometimes the regulator might break?

8    A.    I think for loading in the central portion of the window,

9    for example, where the fracture origin is in this case on the

12:47PM 10    driver's side.

11    Q.    Inside?

12    A.    The inside out load that the regulator hardware would be

13    overloaded first.

14    Q.    If it was loaded in the center inside to out, it's your

15    opinion that the regulator would break before the glass would

16    break?

17    A.    Yes.

18    Q.    What if it's loaded right at the rear, would you agree

19    that that's going to increase the likelihood that the rear

12:48PM 20    regulator is going to break before the window?

21    A.    Yeah, if it's loaded further rearward, it increases the

22    stress on the toggle link; if it's loaded towards the front, it

23    decreases.

24    Q.    If it's loaded towards the front, it's going to increase

25    the load on the hinges?

1    A.   It would.

2    Q.   And if it's loaded in the middle, that's about as far as

3    away as you can get from the hinges and from the regulator,

4    correct?

5    A.   If it's loaded in the middle, and you're asking me, does

6    that put it most distant from both ends?

7    Q.   Yes.

8    A.   I will agree with you.

9    Q.   So do you agree that generally the glass is going to break

12:48PM 10   before the regulator?

11   A.   No, I would say that based on the testing I've seen for

12   central loading, as is indicated by the fracture pattern on the

13   driver's side glass, that the hardware would break first.

14   Q.   And you disagree with Mr. Ridenour, as you've said, you

15   believe that the attachment piece, the hinges and the regulator

16   are less strong than the tempered glass?

17   A.   For the specific loading condition on the driver's window

18   in this case, driver's side.

19   Q.   Generally?  Mr. Ridenour said that the attachment hardware

12:49PM 20   is in line strength with the tempered glass, correct, that's

21   what you have in front of you?

22   A.   It is.

23   Q.   And you disagree with that?

24   A.   No, I'm telling you that there's going to be a different

25   stress distribution upon where you load the glass, and so for

1    where it was loaded in this crash, where it broke, it would

2    result in hardware overload first.  If you load it further

3    forward, then you're getting the advantage of the constraints

4    provided by the forward pivots, you're reducing the stress,

5    tensile stress at the toggle link, so you more likely see the

6    glass break first.

7    Q.   Okay.  I'm only going to touch on blood.  You didn't do a

8    blood analysis, did you?

9    A.   Just analyzed where I saw red deposits in the roadway.

12:50PM 10    Q.   You're not a blood splatter expert?

11    A.   I didn't do any analysis of blood splatter in this case.

12    Q.   Are any of the defense experts blood splatter experts?

13         MR. CAMPBELL:  Excuse me, I object, Judge.

14         THE COURT:  Sustained.

15    Q.   For the blood evidence in this case, you rely entirely on

16    the police photos?

17    A.   Yeah, I rely on what's visible in the scene photographs

18    and what we're able to photogrammetry construct positions for.

19    Q.   In your report, you relate statements by Mr. Kiminiski.

12:51PM 20    Do you recall that?

21    A.   I think I did review his statement and mentioned it in my

22    report.

23    Q.   In your report, you wrote, "As it rolled, Mr. Kiminski saw

24    one passenger thrown from the vehicle and land behind the

25    vehicle "?

1    A.   I do see that sentence in rely report, I'm with you.

2         MR. GREEN:  I have no further questions at this time,

3    your Honor.

4         THE COURT:  Redirect.

5                    REDIRECT EXAMINATION

6    BY MR. CAMPBELL:

7    Q.   Dr. Carhart, I just want to follow up on a couple of areas

8    that were specifically raised during your cross limited to

9    those, okay.  You were asked about this slide presentation that

12:52PM 10  you gave to the plaintiff's lawyers at your deposition.  Do you

11   remember that?

12   A.   I do.

13   Q.   Why is it that in that you didn't put any glass over the

14   railing, over the jersey barrier?

15   A.   Why didn't I?

16   Q.   Yes.

17   A.   Because I was demonstrating how the glass fragments that

18   we can see got to where they are in the scene photographs.  I

19   was demonstrating where the physical evidence that we can see,

12:52PM 20  how it got there.

21   Q.   And you were shown this -- you were asked about whether

22   the glass left any marks on the jersey barrier?

23   A.   I was.

24   Q.   Would you -- in your opinion, why isn't there any marks on

25   the jersey barrier from the glass?

1    A.    Tempered glass is designed to break into small fragments.

2    It does so to the potential, for example, if an occupant hits

3    with their head or face, it breaks into fragments that have low

4    mass by design, and so those low mass particles flying into the

5    barrier are not going to damage concrete.

6             MR. CAMPBELL:  Your Honor, could I get the Elmo,

7    please?  Actually, can you call up 887.7.24.

8    Q.    Now, I believe this is one of the PowerPoint slides that

9    you were shown; is that right?

12:53PM 10    A.    Yes.

11    Q.    Explain what you're depicting here.

12    A.    I'm demonstrating a cone of the glass coming away from the

13    vehicle, and that is when tempered safety glass breaks, there's

14    residual stresses in it, and so it doesn't just break into tiny

15    fragments, it will separate, the fragments will separate a

16    little bit, and so I'm demonstrating a cone of tempered glass

17    coming away from the side of the vehicle because those small

18    fragments will kind of go into a cloud as opposed to

19    maintaining the shape of the glass.

12:54PM 20             They would especially do so here, and then on the rear

21    direct or on the rebound off the barrier, I'm showing a

22    secondary cone that would include you've got this dispersion

23    coming into the barrier, you're going to get more dispersion

24    coming out.  I'm just demonstrating generally how it would get

25    to the location where we would find it and why it would be

1    dispersed.

2    Q.   Now, when the glass, if you assume it came in and hit the

3    barrier, is it all going to be out in that cone?

4         MR. GREEN:  Objection, your Honor.

5    Q.   What, if anything, is going to happen to the glass after

6    it bangs into the barrier?

7    A.   Well, some of it is going to slow down more than others,

8    it's going to rebound, some of it, because it's disbursing this

9    way, it's disbursing this way as well, I acknowledge that, so

12:55PM 10   some may go over, some is going to bounce, some is going to go

11   downstream.

12        MR. CAMPBELL:  Could you call up 882.15, please.

13   Would you blow up right here.

14   Q.   What do you see at the base of that jersey barrier up

15   along here?

16   A.   Fragments of gray tempered safety glass.

17   Q.   Why is it there?

18   A.   Well, because the barrier is constraining it.  It's making

19   it accumulate more there because it's bouncing off the barrier.

12:55PM 20   Q.   Now, you were asked about your analysis of Dr. Batzer's

21   position 10 theory.  Do you remember that on cross?

22   A.   Yes.

23   Q.   Did you actually do an analysis of the position 10 theory?

24   Do you remember that on cross?

25   A.   I did.

1    Q.   And did you prepare an animation of what would happen in

2    the position 10 theory?

3    A.   Yeah, I prepared exhibits and an animation.

4    Q.   That's Exhibit 888 for identification?

5         MR. GREEN:  Your Honor, I object.  This should have

6    been covered on direct.

7         THE COURT:  It does seem to be outside the scope.

8         MR. CAMPBELL:  He was specifically asked about where

9    the glass would be out by the yellow line, your Honor.

12:56PM 10    THE COURT:  Let me see counsel at sidebar.

11         (THE FOLLOWING OCCURRED AT SIDEBAR:)

12         THE COURT:  All right.  There was testimony elicited

13   to the effect that if it was Batzer's opinion it was

14   collecting, there would be glass out at the roadway, so what

15   are we going to show here?

16         MR. CAMPBELL:  That is extreme of the position 10 of

17   the material that's in evidence here.  You can see, your Honor,

18   that the vehicle is oriented is about -- it's going to driver's

19   side down, we have it's about to roll over, and Batzer says

12:57PM 20   this is where the glass breaks out, and then Mr. Zeolla comes

21   out and gets his head behind the ground and the roof rail.

22         THE COURT:  Okay.

23         MR. CAMPBELL:  Disclosed, I believe there's somewhat

24   of a reference in his report.  I avoided it because of the

25   scope issue.  In his deposition, he clearly talked about, we

1    clearly gave him an analysis of this, if the glass broke out at

2    that point, Dr. Carhart will testify that the glass field would

3    be this way in line with the vehicle.  It's a critical point.

4    He was challenged on it during the cross, and I should be able

5    to ask him about it.

6              THE COURT:  Mr. Green.

7              MR. GREEN:  Your Honor, the only thing I did get to on

8    cross was to show where the glass was in relation to where

9    Dr. Carhart put the glass.  I said you basically have glass

12:58PM 10   going in this area, but in this picture, there's glass over by

11   the yellow line.

12             MR. CAMPBELL:  Very specifically asked about the

13   yellow line.

14             MR. GREEN:  I did mention his, but I didn't go into

15   it, your Honor.

16             THE COURT:  All right.  I'm going to allow what

17   Mr. Campbell is represented he's going to do.  You can

18   obviously recross him on it.

19             (SIDEBAR CONFERENCE WAS CONCLUDED)

12:58PM 20            THE COURT:  Mr. Campbell.

21   Q.   Dr. Carhart, let me show you this.  Dr. Carhart, can you

22   recognize that as a blow-up of the Croteau diagram that we've

23   seen?

24   A.   I do.

25   Q.   Depicting positions 6 through 11?

1    A.    I do.

2    Q.    And I'm specifically directing your attention to the

3    question on cross regarding Dr. Batzer's opinion that the glass

4    broke out at position 10?

5    A.    Right.

6          MR. CAMPBELL:  Your Honor, may he come down, please?

7          THE COURT:  Yes.

8    Q.    Explain to the jury what your analysis of Dr. Batzer's

9    testimony about breaking the glass out at position 10 and where

01:00PM 10    you would expect to find that glass if that occurred.

11    A.    Okay.  So it's my understanding from the testimony of

12    Dr. Batzer and Dr. Bidez that they're talking about the glass

13    breaking on the driver's side of the vehicle at or about

14    position 10 as a result of an inside/out mode, and I analyzed

15    this previously and described it.

16          The issue with that is the velocity of the vehicle at

17    this point in time.  The velocity is in a direction for that

18    portion of the vehicle that's back out towards the roadway.

19    Q.    And if you just look at that, that is pointing back out to

01:00PM 20    the roadway.  Where is the position of the rear of the vehicle

21    or in the front of the vehicle that allows you to come to that

22    conclusion?

23    A.    Well, looking at the orientation of the vehicle at

24    position 10, it hasn't yawed all the way around, but it's still

25    coming around.  It isn't quite perpendicular to the barrier,

1    and if the glass is broken out at this point in time as a

2    result of inside/out mode, it's going to have to follow the

3    velocity of what the vehicle is doing at that point in time,

4    which is a heading like this so this portion of the vehicle,

5    and so the glass can disperse using that same cone analogy

6    something like that, but it's not going to disburse over into

7    the area of the barrier, it's going to be out here towards the

8    roadway like so.

9    Q.    Okay.  And is that consistent with the physical evidence

01:01PM 10    documented in the scene photos by the police?

11    A.    It's not.  The accumulation of the diffused glass is over

12    in here.

13         MR. CAMPBELL:  Can we mark the buck as Exhibit M for

14    identification?

15         THE COURT:  The buck meaning the automobile quarter

16    panel, whatever that is?

17         MR. CAMPBELL:  Yes.  If we could get this marked at

18    the break as the diagram that Dr. Carhart just drew on the

19    position 10 showing the glass distribution as N for

01:02PM 20    identification.

21         THE COURT:  All right.

22         (Buck was marked Exhibit M for identification.)

23         (Diagram was marked Exhibit N for identification.)

24    Q.    Now, Dr. Carhart, I'd like to turn your attention to those

25    series of questions that you were asked about with the dent on

1    the roof and the body position, okay, specifically to that.

2    Now, your understanding is that Dr. Batzer and Dr. Bidez say

3    that Mr. Zeolla exited the vehicle at approximately position

4    10, his head got between the roof and the ground; is that

5    right?

6    A.   That's my understanding of the testimony, yes.

7    Q.   And specifically as to the questioning about how the roof

8    dent happens, how can you get the roof dent in the down

9    position if his head is between the ground and the roof rail?

01:03PM 10             MR. GREEN:   Objection, your Honor.

11             THE COURT:   I'll allow it.  Overruled.

12   A.   If I understand your question correctly, in terms of the

13   overall damage pattern on the roof, you can't just get it from

14   a head partial ejection, there is downward loading in the roof

15   rack area which wouldn't happen for a load where an occupant's

16   head would let's say interposed between the roof and the

17   ground, we need to have some additional contact up on the top

18   panel of the vehicle to account for what we can see in the

19   scene photographs and what we see at the time of the

01:03PM 20   inspection.

21   Q.   Given that this is a three-quarter roll, how many

22   opportunities does each portion of the vehicle have in

23   contacting the ground?

24   A.   Just one.

25   Q.   If the roof rail hits his head, what's available then to

1  cause the downward deformation of the roof if Dr. Batzer and

2  Dr. Bidez are correct?

3  A.   They don't account for it.  There isn't anything.

4  Q.   I won't bother to call up the photographs, but

5  specifically as to these, the deposits on the headliner or the

6  fabric inside the Expedition, do you recall that testimony?

7  A.   Yeah.

8  Q.   What was -- first of all, where did you find deposits on

9  the headliner, this thing?

01:04PM 10  A.   All over.  There were massive deposits on the headliner.

11  Q.   What were those deposits?

12  A.   Well, I didn't identify them specifically, but I know that

13  there was fastfood in the vehicle at the time of the crash,

14  there was actually some fastfood out in the roadway in the

15  scene photographs, so drinks would be consistent with what I

16  observed on the vehicle interior.

17  Q.   And did you see containers in the vehicle and even when

18  you inspected it?

19  A.   I don't specifically recall seeing them in the vehicle

01:05PM 20  when I inspected it.

21  Q.   What about the scene evidence?

22  A.   Scene evidence I do see.  I think there's a McDonald's cup

23  in one of the photographs, there's some other food items that

24  you can see in the roadway.

25  Q.   And you were asked about these, the fibers that -- why is

1   it that you concluded that they were Mr. Sorensen's hairs or

2   hairs from his body?

3   A.   Because I believe that having discussed the case with

4   Dr. Raphael that Mr. Sorensen was pocketed back there for a

5   portion of the crash sequence, and I think that physical

6   evidence is consistent with that scenario.

7   Q.   And just to return to where I started, the slides that you

8   prepared at your deposition and that demonstrate the accident

9   sequence, are they -- how, if at all, do they differ from the

01:06PM 10   animation that we showed?

11   A.   I refined them for the purposes of the animation, and in

12   those deposition stills, I would sometimes stop the vehicle so

13   I could emphasize what the glass or what Mr. Zeolla was doing,

14   so the animation puts it all into proper time context, but it

15   sort of de-emphasizes aspects of it.

16        MR. CAMPBELL:  Those are all my questions.  Thank you

17   very much.

18        THE COURT:  Recross.

19                    RECROSS-EXAMINATION

01:07PM 20   BY MR. GREEN:

21   Q.   The animation also adds something, which is glass flying

22   over the barrier, correct?

23   A.   It does show some glass particles that are above the

24   barrier, yes.

25   Q.   And that wasn't included in what you provided us at your

1   deposition?

2   A.   No, at my deposition I just showed directionality.

3   Q.   You were asked a question about the roof damage that you

4   talked about.  Could I have the Elmo, please.  I only have one

5   more, two more questions.  Now, I'm pointing to the impact from

6   the head, correct, then you believe there's roof damage in this

7   area?

8   A.   I do believe that there's roof damage in that area, yes.

9   Q.   Okay.  And as part of your report, you had the accident

01:07PM 10   reconstruction report from the State Police?

11   A.   I had the State Police crash documentation, yeah.

12   Q.   And you recall that in that report it refers to the damage

13   that you attribute to Mr. Zeolla's buckling?

14   A.   I don't specifically recall what it says in that report.

15   Q.   Okay.

16          MR. GREEN:  Thank you, no further questions.

17          MR. CAMPBELL:  Nothing further, thank you.

18                          - - - -

19

20

21

22

23

24

25

1                  C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS ) ss.

6    CITY OF BOSTON )

7

8           I do hereby certify that the foregoing transcript,

9    Pages 1 through 100 inclusive, was recorded by me

10   stenographically at the time and place aforesaid in Civil

11   Action No. 09-40106-FDS, Christine Zeolla, Individually and as

12   Administratrix of the Estate of Mario Zeolla vs. Ford Motor

13   Company and thereafter by me reduced to typewriting and is a

14   true and accurate record of the proceedings.

15           Dated this 29th day of April, 2014.

16

17                     s/s Valerie A. O'Hara

18           _____

19                 VALERIE A. O'HARA

20                 OFFICIAL COURT REPORTER

21

22

23

24

25